**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ONE WORLD FILTER CORPORATION,<br><br>                              Plaintiff<br><br>v.<br><br>KOSLOW TECHNOLOGIES<br>CORPORATION, EVAN E. KOSLOW, and<br>NEW MILLENNIUM CONCEPTS, LTD.<br><br>                              Defendants | Civil Action No.<br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

Plaintiff One World Filter Corporation ("Plaintiff" or "OWFC"), by and through its undersigned counsel, as grounds for its Complaint against Defendants Koslow Technologies Corporation ("KTC") and Evan E. Koslow ("Koslow" and collectively with KTC, the "KTC Defendants") for breach of contract, fraud, fraud in the inducement, and against New Millennium Concepts, LTD ("NMC") for tortious interference with a contract (NMC collectively with KTC Defendants, the "Defendants"), pleads and alleges as follows:

## **PRELIMINARY STATEMENT**

1.      This action is brought by OWFC under the common law of the State of New York against KTC Defendants, seeking permanent injunctive relief and damages relating to KTC Defendants' intentional breach of contract arising out of KTC Defendant's deliberate failure to meet certain contractual obligations to OWFC.

2.      By this action, OWFC seeks to enforce KTC Defendants to perform their obligations under the contract, and to enjoin them from contracting with third parties in violation

of OWFC's exclusive rights under the contract, including with NMC, and to enjoin NMC and other third parties from tortiously interfering with OWFC's contract with KTC Defendants. OWFC further seeks damages resulting from KTC Defendants' breach of contract, fraud, fraud in the inducement, and NMC's tortious interference with the contract in violation of the common law of the State of New York.

## THE PARTIES

3.      One World Filter Corporation ("Plaintiff" or "OWFC") is a company organized and existing under the laws of the British Virgin Islands, with a principal place of business at Unit B, 17th Floor, United Centre, 95 Queensway, Admiralty, Central, Hong Kong, China. OWFC has extensive contacts in the United States, including contracting to source goods and materials from the United States for its OWF Systems (as defined below) throughout the world. Before November 26, 2019, OWFC was formerly known as Silver Rock International Limited ("SRIL").

4.      On information and belief, Koslow Technologies Corporation ("KTC") is a corporation organized under the laws of the State of Connecticut, with a principal place of business at 137 Mattatuck Heights Road, Waterbury, Connecticut 06705, and a place of business at 6063 Willow Wood Lane, Dallas, Texas 75252.

5.      Mr. Evan E. Koslow ("Koslow") is an individual and, on information and belief, a citizen of the State of Texas with a residence at 6063 Willow Wood Lane, Dallas, Texas 75252. Upon information and belief, Mr. Koslow also has a residence and real property in Connecticut and Vermont. Mr. Koslow is the founder and president of KTC.

6.      On information and belief, New Millennium Concepts, LTD ("NMC") is a limited liability company organized under the laws of the State of Texas, with a principal place of business at 3301 Airport Fwy, Ste 103, Bedford, Texas 76021-6123. NMC is the manufacturer of Berkey®

gravity-fed water filter systems.

7.      OWFC, KTC, and Mr. Koslow, are parties to a License Agreement entered into by the parties on or about June 5, 2017 (the "License Agreement"). A true and correct copy of the License Agreement is attached hereto as **Exhibit A**.

<u>**JURISDICTION & VENUE**</u>

8.      This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). The amount in controversy, without interest and costs, exceeds the sum or value of $75,000.

9.      This Court has personal jurisdiction over the KTC Defendants because they have purposefully availed themselves of the laws of the State of New York and because KTC Defendants consented to the personal jurisdiction of tribunals in the State of New York pursuant to Section 5.19 of the License Agreement, in which—at KTC Defendants' insistence—the parties agreed that "[a]ll claims and disputes arising under or relating to this Agreement are to be settled by binding arbitration in the state of New York, U.S.A. or another location mutually agreeable to the Parties." As such, each of the parties to the License Agreement irrevocably consent to the jurisdiction of federal and state courts located in the State of New York in any such suit, action, or proceeding and to the laying of venue in such court.

10.      This Court has personal jurisdiction over NMC because NMC has availed itself of the laws of the State of New York by transacting business within the state and/or contracting out of the State of New York to supply goods in the State of New York. NMC is not subject to the arbitration and the appropriate tribunal for this dispute between OWFC and NMC is the Federal Courts, and KTC Defendants are a necessary party with respect to the claims against NMC. Accordingly, the Federal Courts in the state of New York are the appropriate forums to resolve this dispute.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) and because of Section 5.19 of the License Agreement.

## GOVERNING LAW

12.     Section 5.19 of the License Agreement provides, in pertinent part, that "The applicable law for this Agreement is the law of the state of New York, USA."

## FACTS

### *Background of OWFC*

13.     Founded in 2012, OWFC was involved in multiple businesses. In 2017, OWFC became exclusively dedicated to the global marketing of The One World Filter™ Systems ("OWF System"), which includes water dispensers designed and manufactured by OWFC to use certain water filters using technology developed by KTC (the "KTC Technology" as further defined below). The OWF System was and continues to be promoted by OWFC, based on representations by KTC Defendants regarding the KTC Technology, as being capable of providing high volumes of pristine and safe water with no taste or odor at an economical price point.

14.     The OWF System is crucial to OWFC's mission to solve the global drinking water crisis and eliminate water borne disease globally, which represents one of the largest sources of illness on the planet. The hundreds of billions of dollars being wasted on treating preventable water borne illnesses may then be utilized for other initiatives including addressing other medical concerns, education, and infrastructure development. Thus, OWFC's mission is to eliminate water-borne illnesses which will result in the increased performance of developing as well as developed economies.

15.     OWFC's philanthropic arm, non-party One World Filter Foundation Inc., has as its sole purpose to provide clean, safe drinking water to underprivileged families, individuals, and

communities around the world by supplying them with the One World Filter™ Humanitarian kits and replacement kits, believing that the OWF System is the solution to the global drinking water crisis.

16.    The OWF System presently consists of an OWF Gravity Flow 16 Liter Dispenser (the "OWF Dispenser") and a filter pack consisting of three filters ("OWF Filter Pack 1"): a sediment prefilter, an activated carbon prefilter ("OWF Prefilter 1"), and a nanotech filter that uses the KTC Technology (the "OWF Filter 1"). (The OWF Filter 1 is marketed by OWF to customers under the name NanoTech Filter 1.)

17.    The OWF System is a gravity-flow system whereby dirty water deposited into the upper tank of the OWF Dispenser passes through the three filters, and as a result provides clean water in the bottom tank of the OWF Dispenser. The OWF System was and continues to be promoted, based on representations from KTC Defendants regarding the KTC Technology, as being able to filter water without removing essential salts and minerals from the water, which are essential to human health, thereby producing safe, good tasting, and healthy drinking water.

18.    The OWF Filter Pack 1 is a three-stage filtration system that was and continues to be promoted, based on the same or similar representations from KTC Defendants, as having 24 performance claims and being capable of removing all microbiological threats (such as bacteria, viruses, parasites and protozoan oocysts) and a myriad of pesticides, herbicides, pharmaceuticals, industrial chemicals, asbestos, chlorine, chloramine, rust and sediments, and in addition is capable of removing nearly all microplastics.

19.    OWF Filter 1 was and continues to be promoted, based on representations from KTC Defendants, as being composed of proprietary nanofibers that have a very strong positive charge that capture all microbiological threats and proprietary natural adsorbents that release no

chemicals and capture a broad range of pesticides, herbicides, pharmaceuticals, and industrial chemicals, plus chlorine, rust, and micro plastics. OWF Filter 1 is the primary filter of OWF Filter Pack 1.

20.     OWFC expended millions of dollars developing the capability to bring the OWF System to market globally, through its exclusive Country Group Distributors ("CGD"). Under the License Agreement, groups of countries were designated as Country Groups for which OWFC would obtain exclusive rights to distribute the OWF System via its CGD for that Country Group.

21.     The global water filtration market is expected to grow significantly over the next five years. A market study projects value of this market through 2025 for wall-mounted, countertop, tabletop, and under-the-sink devices to be valued at about $50 to $80 billion annually globally. OWFC's products are expected to make significant inroads into the market in these product categories. OWFC's territories to which it has exclusive distribution rights under the License Agreement (as discussed further below) comprise about 87% of the global population. Thus, OWFC projects hundreds of millions of dollars in cumulative net profit over the next six (6) years.

### *KTC Defendants and Their Purported Water Filter Technology*

22.     Mr. Koslow and KTC are in the business of water filter technology. Mr. Koslow is the founder and president of KTC and is on information and belief the purported inventor of certain water filter technologies.

23.     On information and belief, KTC Defendants purportedly developed certain water filter technology that use a combination of nanofibers, powdered adsorbents, and chemical treatments that purportedly reduce bacterial and viral particles by at least 99.9999% and 99.99%, respectively (the "KTC Technology").

### *Events Leading to a License Agreement Between OWFC and KTC Defendants*

24.     In 2017, representatives from OWFC were connected to KTC Defendants to discuss a business opportunity involving the KTC Technology. In the discussions that followed, KTC Defendants made numerous claims that induced OWFC to enter into a business agreement with them.

25.     On or about April 2017, Mr. Carl Erickson, OWFC's then-president, and Ms. Judith Ryan, OWFC's director (where OWFC was operating under its predecessor name SRIL), were introduced to Mr. Koslow by Mr. Ken Roko, who worked with Mr. Koslow, for the purpose of creating a business to exploit the KTC Technology. The Parties signed a nondisclosure agreement in this respect on or about May 1, 2017.

26.     In the discussions that followed, Mr. Koslow made multiple material representations that influenced OWFC's decision to do business and to enter into a license agreement with KTC and Mr. Koslow personally. These include:

27.     Mr. Koslow claimed that he formed KX Industries, L.P., a Delaware Limited Partnership ("KXI"), which he claimed was a successful joint venture with Exxon Chemical Company ("Exxon") in which Koslow purportedly invented extruded carbon block technology for use in connection with water filtration.

28.     Mr. Koslow claimed further that KXI was one of the largest water filter companies in the world.

29.     Mr. Koslow claimed further that he developed the KTC Technology, which he claimed provides water filters with superior characteristics, including purportedly being capable of reducing bacterial and viral particles by at least 99.9999% and 99.99%, respectively.

30.     Mr. Koslow claimed further that the KTC Technology was based 100% on his

technology, that it did not use third party technology, and that he would not patent the KTC Technology and instead would maintain it as a trade secret so that others could never copy his technology.

31.     Mr. Koslow further claimed that his technology included a feature that stops water flow through the filter when the filter was exhausted.

32.     Mr. Koslow's claims that he owned 100% ownership of all intellectual property in the technology, which purportedly included this unique safety feature along with other features, were representations that induced OWFC to enter into an agreement with KTC Defendants. Furthermore, OWFC relied on those representations to convince its distributors to enter into distribution agreements with OWFC.

33.     Mr. Koslow claimed further that KTC was capable of developing the needed OWF Dispenser hardware (i.e., the dispenser hardware components used to hold the OWF Filter 1 product in a high-integrity seal, direct water through the OWF Filter 1 for purification, and to hold contaminated water and purified water for storage) and of providing the specifications for OWFC to manufacture the OWF Dispenser.

34.     Mr. Koslow claimed further that he had sold the purportedly successful KXI business to Berkshire Hathaway's subsidiary Marmon Water. Mr. Koslow disclosed at the time that the sale involved a lawsuit with Mr. Koslow's brother. Mr. Koslow provided a basic description of the lawsuit and represented that the suit was a result of a personal dispute between Mr. Koslow and his brother, that Mr. Koslow had won the lawsuit, and that his brother had died.

35.     Mr. Koslow claimed further that the OWF Filter 1 filters using the KTC Technology were already proven to remove bacteria and viruses from water to the "log 6" and "log 4" reduction levels.

36. OWFC exercised reasonable diligence in vetting the claims of KTC Defendants described in paragraphs 26-35 above and did not have reason to believe that the representations made by KTC Defendants were false or misleading.

37. On information and belief, Defendants made the above representations with the intent to deceive OWFC and to induce OWFC to rely on the representations believing them to be true.

38. Based upon and in reliance on KTC Defendants' representations above, OWFC entered into a written License Agreement with KTC and Mr. Koslow personally on or about June 5, 2017. A true and correct copy of the License Agreement is attached hereto as **Exhibit A**.

39. The License Agreement provided generally that KTC Defendants agreed to supply filters/filter tickets meeting certain performance specifications to OWFC by certain deadlines, in exchange for payments and licensing fees from OWFC for the exclusive right to distribute OWF Systems featuring the KTC Technology in certain markets throughout the world.

40. After the parties entered into the License Agreement, numerous setbacks and challenges caused the Parties to enter into eight (8) subsequent Addendums to the License Agreement over the course of the Parties' dealings: Addendum No. 1 dated July 27, 2018, Addendum No. 2 dated August 30, 2018, Addendum No. 3 dated November 13 2019, Addendum No. 4 dated May 10, 2019, Addendum No. 5 dated August 10, 2019, Addendum No. 6 dated October 2, 2019, Addendum No. 7 dated November 15, 2019, and Addendum No. 8 dated September 22, 2020. A true and correct copy of each of the Addendums is attached hereto as **Exhibit B**. The License Agreement and Addendums Nos. 1-8 thereto are collectively referred to herein as the Agreements.

*KTC's Conduct Materially Breached the License Agreement*

41.    Bottom line, KTC Defendants failed to provide a working filter product or a functional dispenser design for OWFC, pursuant to its obligations under the License Agreement.

42.    To move the business relationship forward, OWFC agreed to enter into numerous addendums to the License Agreement beginning in or about the middle of 2018, which extended delivery and payment deadlines and adjusted pricing, provided capital for the KTC Defendants to continue the development of the KTC Technology, relieved KTC Defendants of the responsibility to develop the OWF Dispenser at no cost to KTC Defendants in hopes that KTC Defendants would meet its deadlines and other obligations. *See* Addendums Nos. 1-8. In several of these addendums, the Parties added to the exclusive territories. Despite these and many other efforts, KTC Defendants still failed to meet numerous obligations under the License Agreement and Addendums Nos. 1-8. These include:

43.    KTC Defendants failed to provide a supply chain security of 30 million filter ticket units per year pursuant to and in violation of Section 5.5 of the License Agreement and Clause 7.1 of Addendum No. 5 (OWF Filter Packs 1 and 2).

44.    KTC Defendants failed to manufacture and allow collection of the first container of compliant filters/filter tickets within six months of receiving payment therefore from OWFC pursuant to and in violation of Section 5.15(b)(ii) of the License Agreement, which is specifically defined as a material breach event under the License Agreement. For example, payment for the first container of filters/filter tickets destined for the Philippines was made by OWFC in or about September 2019, but KTC Defendants have yet to deliver conforming filters/filter tickets.

45.    KTC Defendants failed to manufacture and make ready for collection the first container of compliant filters/filter tickets within 180 days from order and payment thereof, and the second and all subsequent containers of compliant filters/filter tickets within 90 days from

order and payment thereof, as required by and in violation of the deadlines set forth in Clause 2 of Addendum No. 1.

46.    KTC Defendants failed with respect to commissioning KTC OWF Filter Pack Production Line 1 and being ready to start production of the required number of units of OWF Filter Pack 1 and OWF Filter Pack 2 by on or about October 21, 2019, as required by and in violation of Clause 7.2 of Addendum No. 5 and Clause 5.1 of Addendum No. 6.

47.    KTC Defendants failed with respect to the completion and readiness for collection by OWFC of the required number of units of compliant OWF Filter Packs 1 by on or about December 31, 2019, for the first container order and by on or about January 10, 2020, for the second container order, as required by and in violation of Clause 7.4 of Addendum No. 5 and as amended in response to purchase orders thereto. KTC Defendants have yet to deliver conforming filters.

48.    KTC Defendants failed with respect to providing compliant OWF Filter Pack 1, which was required to be capable of achieving certain target performance claims, including achieving an initial flow rate of 8 liters/hour or 133 milliliters/minute, as required by and in violation of Clauses 1.1 and 1.5 of Addendum No. 5.

49.    KTC Defendants failed with respect to providing compliant OWF Filter Pack 2, which was required to be capable of achieving certain target performance claims, including achieving an initial flow rate of 8 liters/hour or 133 milliliters/minute, as required by and in violation of Clause 1.7 and 1.12 of Addendum No. 5. KTC Defendants have not yet provided samples of the OWF Filter 2 for testing by OWFC.

50.    KTC Defendants failed with respect to completing development of OWF Filter 2 to meet the required target performance claims by September 1, 2019, as required by and in

violation of Clause 4, as detailed in Appendix D, Statement of Work ("SOW") Task 1.1, of Addendum No. 5.

51.     KTC Defendants failed with respect to seeking and securing certification of OWF Filter Pack 1 by October 15, 2019, as required by and in violation of Clause 4, as detailed in Appendix D, SOW Task 1.2, of Addendum No. 5. KTC Defendants were required to seek and secure IAPMO certification seal stating that the product has been tested and is certified to NSF/ANSI standards. KTC Defendants have yet to deliver the required certification for OWF Filter Pack 1.

52.     KTC Defendants failed with respect to seeking and securing certification of OWF Filter Pack 2 by November 15, 2019, as required by and in violation of Clause 4, as detailed in Appendix D, SOW Task 1.3, of Addendum No. 5. KTC Defendants were required to seek and secure IAPMO certification seal stating that the product has been tested and is certified to NSF/ANSI standards. KTC Defendants have yet to deliver Certification for OWF Filter Pack 2.

53.     KTC Defendants failed with respect to the completion and readiness for collection of a first container order of compliant OWF Filter Packs 1 for Philippines on or about December 31, 2019, and of a second container order of compliant OWF Filter Packs 1 for India on or about January 10, 2020, as required by and in violation of Clause 5.2 of Addendum No. 6 and in accordance to purchase orders signed by OWFC and KTC (whose delivery dates above supersede those in the License Agreement and Addendums). Less than half of the filter packs provided by KTC in four shipments (3 x 40' containers of filter packs and 1 x 32,000 units of filter packs via airfreight shipment) complied with the specifications for, *inter alia*, initial water flow through the filter pack. While the KTC provided specification for initial flow rate was 8 l/hr (133 ml/min), OWFC tested over 500 filter packs and found that about 50% flowed below 100 ml/min, which

included about 23% of the tested filter packs that flowed below 80 ml/min.

54.     KTC Defendants failed with respect to resolving issues acknowledged by KTC Defendants with respect to the OWF Carbon Prefilter that has been shipped to Philippines and produced for, but not yet shipped to India, and has failed to implement the resolution of OWF Carbon Prefilter for future containers of OWF Filter Pack 1 (Model No. OWF-GF1) and OWF Filter Pack 2 (Model No. OWF-GF2), pursuant to and in violation of Clause 5 of Addendum No. 8. (OWF Filter Pack 1 and OWF Filter Pack 2 are interchangeably referred to by their model numbers in the Addendum and herein. *See* Clause 1.1-1.2 of Addendum No. 8.)

55.     KTC Defendants failed with respect to the completion of the development of OWF Pressure Filters, which meet the same performance claims as OWF-GF2, related hardware designs (housings and manifolds), and IAPMO certification of these filters and hardware in accordance with SOW Tasks 1-7, in violation of Clause 1.1, Appendix A – OWF Pressure System Products SOW of Addendum No. 6.

56.     Each of KTC Defendants' failures to perform their obligations under the Agreements listed in the above violations is a separate material breach of the Agreements.

### *KTC Defendants Colluded with Third Parties in Interference with OWFC's Exclusive Rights Under the Agreements*

57.     In addition to the multiple breaches of the Agreements from KTC Defendants' failure to develop and supply filters meeting the required performance specifications to OWFC by the required deadlines, KTC Defendants have also, on information and belief, engaged in conduct with Third Parties to intentionally interfere with OWFC's exclusive rights under the Agreements. This conduct demonstrates KTC Defendants' clear intent to violate the Agreements' terms with regards to respecting OWFC's exclusive rights under the Agreements.

58.     On information and belief, KTC Defendants offered to one or more third parties the

rights that have been granted exclusively to OWFC under the License Agreement, contrary to and in violation of Section 5.6 of the License Agreement, which states: "During the temporary or irrevocable exclusive period, KTC shall not directly or indirectly exercise the rights granted to [OWFC] in this Section 5.6 nor shall it grant such rights to any other party through a license or otherwise..." These exclusive rights to OWFC include the right to sell the Filter Product or a competing product within the Reserve Territory and/or the Exclusive Territory.

59.     On information and belief, Mr. Koslow negotiated in bad faith with multiple partners or prospective partners representing to them that the international market was open for them to exploit. On information and belief, Koslow made false representations to each of the partners or prospective partners that the international market or at least some portion of it was available to exploit because OWFC was in default on the License Agreement, when he was aware that this representation was not true and that he did not have the right to make such an offer.

60.     On information and belief, in a confidential KTC document entitled ███████████ ███████████████████████████████████, KTC Defendants stated their intentions with respect to the territorial rights of OWFC—based on KTC Defendants' false presumption that OWFC was going to default on the License Agreement—stating: █████████████████ ████████████████████████████████████████████████████████████ ███████████████ A true and correct copy of the ███████████ is attached hereto as **Exhibit C**. On information and belief, KTC distributed the ███████████ containing these representations based on false presumptions to investors, including Michael Boulos, well in advance of any date by which OWFC could have been accused of breach of the Agreements due to nonpayment of licensing fees (July 1, 2021). As explained below, because of Defendants' prior material breaches, OWFC is relieved and excused at least under New York law from performing its remaining

obligations under the License Agreement, including payment of licensing fees, until such time as KTC Defendants cure their material breaches.

61.     On information and belief, in a confidential KTC document entitled █████████ ████████████████████████████████████████████, KTC made false representations to prospective investors/buyers, including representations regarding OWFC's exclusivity. A true and correct copy of the █████████████████████████████ is attached hereto as **Exhibit D**.

62.     Slide 3 of the ██████████████ highlights KTC's partnership with Exxon partnership and his sales to Berkshire Hathaway company Marmon Water, a prominent water filter company, as evidence of KTC Defendants accomplishments and reliability, never mentioning the true nature of these matters.

63.     Slide 7 of the ██████████████ gives ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████ and what KTC Defendants were touting to potential investors while actively working to starve OWFC of product in order for its exclusive territories to revert back to KTC Defendants.

64.     Slide 14 of the ██████████████ shows that ████████████████████████ ████████████████████████████████████████ while at the same time trying to get OWFC to go to market with the defective filters that often offered only one-third of this performance. As discussed in paragraphs 48-49, KTC Defendants failed with respect to providing compliant OWF Filter Pack 1 and OWF Filter Pack 2 that were capable of achieving an initial flow rate of 133 milliliters/minute and 100 milliliters/min respectively, yet were marketing to other investors ████ ████████████████████████████████.

65.     Slide 20 of the ███████████ discusses ████████████████████████

█████████████████████, which would have competed with OWFC and thus would have

been a further breach of the Agreement by KTC Defendants.

66.     Slide 24 of the ██████████████ acknowledges that OWFC "has ***invested***

millions of dollars in the gravity-flow filter product line" (emphasis added) and also acknowledges

the overall market size for water purifiers as exceeding $8 billion. Despite these acknowledgments,

KTC Defendants purposely failed to deliver conforming products to OWFC, thus expecting

OWFC would be unable to pay millions of dollars in license fees for exclusivity by the due date

(July 1, 2021) and for that to be the basis for reversion of OWFC's exclusive rights to KTC

Defendants.

67.     On information and belief, KTC Defendants offered the exclusive rights granted to

OWFC under the Agreement to several third parties, including NMC, Michael Boulos, █████████

████████████████████████████████████████████████, and others.

### NMC Intentionally Colluded with and Induced
### KTC Defendants to Breach the Agreement with OWFC

68.     On information and belief, NMC had knowledge of the Agreement and the

exclusive rights granted to OWFC thereunder, yet NMC nonetheless intentionally colluded with

and induced KTC Defendants to breach the Agreement and OWFC has been damaged as a result

of the breach.

69.     On information and belief, and based on a confidential KTC document entitled

████████████████████████████████████████████ a true and correct copy of which

is attached hereto as **Exhibit E**, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ had extensive talks with Mr. Koslow about █████████



**Exhibit E** at 15-16.

*See* **Exhibit C** at 2

. Koslow also stated in this ⬛⬛⬛ that ⬛⬛⬛ ⬛⬛⬛ even though under the License Agreement it is clearly owned by OWFC. **Exhibit E** at 3.

70. Thus, on information and belief, NMC and Mr. Koslow and/or KTC were actively interfering with OWFC and KTC Defendant's obligations under the Agreement to purposely cause the expected default so that the international market could be funneled to the NMC-Koslow and/or KTC venture, or other similar arrangements.

***Michael Boulos Colluded with KTC Defendants to Breach the Agreement with OWFC***

71. On information and belief, Michael Boulos ("Boulos") had knowledge of the Agreement and the exclusive rights granted to OWFC thereunder, yet Boulos nonetheless colluded with KTC Defendants to breach the Agreement and OWFC has been damaged as a result of the breach.

72. Boulos was originally vying to become OWFC's exclusive country group distributor for distribution of goods to certain territories in Africa. Mr. Erickson introduced Boulos to Mr. Koslow in or about January 2020. Shortly after this introduction of Boulos to Mr. Koslow (within January 2020), Boulos confirmed he was no longer interested in becoming a distributor of

OWFC. On information and belief, Boulos continued dealings with Evan and then in or about January of 2021 Boulos announced that he joined KTC as vice president of business development.

73.     Between January and early October 2021, Boulos was listed on LinkedIn as Vice President of Business Development at KTC. The LinkedIn profile was recently updated to change his purported role to Business Development Consultant to KTC.

74.     On information and belief, Boulos was and is an investor or potential investor in KTC.

75.     During a visit by OWFC's president, Peter Heilveil, to KTC's offices on or about late July or August 2021, Heilveil, Mr. Koslow, and Boulos spoke on a joint conference call in which Boulos stated that it was his understanding that OWFC was in default on the License Agreement and that control of all global territories to which OWFC had exclusive distribution rights under the License Agreement had reverted back to KTC. In response, Heilveil stated that this was not true, that OWFC and KTC had addressed their relationship issues, and that OWFC was in retention of the territories. Boulos seemed surprised and unhappy to hear this, yet Mr. Koslow did not dispute on the call that OWFC was not in default, nor did Mr. Koslow contradict OWFC's explanation to Boulos that OWFC and KTC had addressed the relationship issues and that OWFC was retaining territories.

76.     Thus, on information and belief, Boulos was and is seeking to invest in territories to which OWFC has exclusive distribution rights under the License Agreement.

**██████████████████ *Colluded with***
***KTC Defendants to Breach the Agreement with OWFC***

77.     On information and belief, ████████████████████████ had knowledge of the Agreement and the exclusive rights granted to OWFC thereunder, yet ████████ nonetheless colluded with KTC Defendants to breach the Agreement and OWFC has been

damaged as a result of the breach.

78.     On information and belief, ▮▮▮▮ was interested in the KTC Technology and has also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. On information and belief, ▮▮▮▮ is considering an investment or even a merger with KTC for the filtration business based on KTC Defendants' KTC Technology.

79.     On information and belief, ▮▮▮▮ as the investor was expected to be the third element of the venture between the NMC and the Koslow and/or KTC venture and by allowing the venture to utilize the ▮▮▮ brand and network.

### ▮▮▮▮▮▮ Colluded with KTC Defendants to Breach the Agreement with OWFC

80.     On information and belief, ▮▮▮▮▮▮▮▮▮▮▮ had knowledge of the Agreement and the exclusive rights granted to OWFC thereunder, yet ▮▮▮ nonetheless colluded with KTC Defendants to breach the Agreement and OWFC has been damaged as a result of the breach.

81.     On information and belief, ▮▮▮ reportedly expressed strong interest to buy the OWFC Dispenser for distribution in North America under their brand and is well along with negotiation with KTC Defendants in this regard.

82.     On information and belief, KTC Defendants offered to one or more third parties the rights to use the KTC Technology on pressure water filters in territories reserved exclusively of OWFC.

### OWFC Provided KTC Defendants with Proper and Timely Notice of Breach

83.     Despite the multiple breaches and defaults on the Agreements as discussed above, KTC Defendants demanded that OWFC pay certain License Fees and gave notice of their intent

to give notice to terminate OWFC's exclusivity in the Reserve Territory if the license fees were not paid by the July 1, 2021, due date, even though KTC Defendants failed, *inter alia*, to provide a single compliant filter for it to sell. KTC Defendants did not actually give notice to OWFC.

84.     However, because of Defendants' prior material breaches, OWFC is relieved at least under New York law from performing its remaining obligations under the License Agreement. Accordingly, OWFC's obligation with respect to the License Fees are excused until such time as KTC Defendants cure their material breaches, including without limitation the material breaches noted above.

85.     To that end, on June 29, 2021, OWFC gave written notice to KTC Defendants of their breach pursuant to Section 5.15 of the License Agreement and demanded that KTC Defendants cure all material breaches within 30 days of it receiving notice thereof, i.e., by July 29, 2021. OWFC further demanded that KTC Defendants confirm that they would not sell or offer to sell any product that uses the Licensed Technology, within the Reserve Territory and/or the Exclusive Territory, to any third party, including any and all gravity and pressure water filters that compete with OWF-GF1 and OWF-GF2 (OWF Filter Pack 1 and OWF Filter Pack 2), as well as with any and all OWF Pressure Filters.

### OWFC Fulfilled Its Obligations Under the License Agreement

86.     To date—more than four months after receiving notice of breach—KTC Defendants have still not cured their material breaches and have not provided any assurances with regards to OWFC's rights of exclusivity under the License Agreement. Despite all of KTC Defendants' breaches, at all relevant times, OWFC fulfilled its obligations under the Agreements, including paying to KTC Defendants about ▮▮▮▮▮▮ in advance for the products to date and for the work requested in the various SOWs provided in the Addendums.

87.     Under the License Agreement, OWFC was entitled to exclusive rights to market and sell products containing the licensed filter products under certain license payment terms. Pursuant to the License Agreement, OWFC made payments to Defendants of approximately ▆▆▆▆▆ through in or about November 2018 to April 2020 for the OWF Filter Pack 1 delivered for the PH Country Group (consisting of the Philippines market territory). KTC Defendants delivered non-conforming filters on or about February, April, and May 2020, as discussed above. KTC Defendants acknowledged on or about July 1, 2020, that the filters were non-conforming with regard to cutting dimensions and acknowledged on or about August or September 2020 that the filters were non-conforming with regard to permeability (flow rate). KTC Defendants have not yet replaced the non-conforming filters or even confirmed they have developed a solution to the problem.

88.     If KTC Defendants have in fact developed a solution to the problem of non-conforming filters, they have not supplied it to OWFC. In fact, OWFC believes that KTC Defendants may have had a solution available since at least early 2021, if not in 2020, and KTC Defendants have been intentionally withholding the solution to OWFC's detriment, so that KTC Defendants may attempt to reclaim the territories to which OWFC has exclusive rights. A true and correct copy of a document entitled ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆ is attached hereto as **Exhibit F**. In this document, KTC Defendants were describing the Agreements, well in advance of any possible default, as ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and falsely asserting that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ **Exhibit F** at 9.

89.     Pursuant to the License Agreement, OWFC also made payments to KTC

Defendants of approximately ███ on or about February to May 2020 for goods for the IN Country Group (consisting of the market territories of India). KTC Defendants did not deliver any compliant filters for India by the January 10, 2020, deadline stated in the purchase order. Non-conforming filters destined for India remain at the KTC factory waiting for correction.

90.     To date, as KTC Defendants acknowledged, OWFC has ***invested*** in KTC Defendants for them to develop products that use the KTC Technology, including over ███ in various SOWs for the development of gravity and pressure filters.

91.     Pursuant to the License Agreement, OWFC made payments to Defendants of approximately ███ from on or about August 2019 to on or about January 2020 for research and development of gravity flow filters OWF GF-1 and OWF GF-2 and IAPMO certification of these filters by November 15, 2019 and approximately ███ from on or about October 2019 to on or about March 2020 for research and development in pressure water filter systems and IAPMO certification of the same by October 2, 2019 + 130 working days pursuant Addendum No. 6. Despite these payments, KTC Defendants have yet to produce conforming filters and IAPMO certifications.

92.     KTC valued the market for water purifiers on the order of $8 billion annually, a substantial portion thereof from OWFC territories. **Exhibit D** at 24. OWFC projects ███ ███ in cumulative net profit over six (6) years and earnings before interest, taxes, depreciation, and amortization (EBITDA) beginning in the fifth/sixth year running about ███ ███ annually.

### *Despite Proper Notice to KTC of its Breach, and Failure of KTC to Remedy, OWFC Has Continued to Attempt to Salvage the Business Relationship*

93.     Despite providing Defendants notice of their breach, OWFC has continued to attempt to salvage the business relationship. OWFC's president, Peter Heilveil, visited KTC's

offices to reformulate the License Agreement between on or about July 26-31 and on or about August 9, 2021, during which time, KTC Defendants and OWFC discussed a timeline for curing the breaches.

94.     KTC Defendants proposed that OWFC pay half of the ███ direct manufacturing cost for manufacturing the replacement carbon prefilters for the non-compliant prefilters, included in the Filter Pack 1 that had already been delivered to the Philippines. Although this is entirely KTC Defendants' responsibility, OWFC agreed to shoulder half of the cost—approximately ███—and to advance the other half to ease KTC Defendants' cashflow problems that OWFC was led to believe to be at least part of the cause of the delays, with the advance to be credited against future orders. OWFC advanced ███ in hopes of getting KTC Defendants to cure the breach with respect to the non-conforming filters.

95.     OWFC then prepared and forwarded to KTC Defendants a draft agreement to replace the License Agreement and addendums, and an agreement for funding the prefilter cure and to provide cashflow assistance to KTC, based on the terms that KTC Defendants tentatively agreed to during the onsite meetings.

96.     KTC Defendants responded essentially that they would rather walk away from the License Agreements instead, mistakenly believing that the result would be a termination of the exclusivity granted to OWFC.

97.     KTC returned the ███ advance.

98.     On or about October 1, 2021, OWFC reiterated that KTC Defendants were not able to simply walk away because KTC Defendants are in breach of the Agreement.

99.     OWFC made repeated attempts to follow up with KTC Defendants, who have not responded to any of the email and voicemail messages from OWFC in this regard.

100.     OWFC attempted to contact Onyx Specialty Paper, the third party manufacturer of the original, defective carbon prefilters, for the pre-filter media, but Onyx refused to speak to OWFC without KTC Defendants.

### OWFC Recently Discovers KTC Defendants' Past and Present Fraudulent Conduct

101.     OWFC has discovered recently that Mr. Koslow has made multiple knowingly false representations which OWFC believes were made to induce OWFC to enter into the License Agreement and each of the subsequent Addendums Nos. 1-8 in reliance thereon, and to induce OWFC to invest in and make capital contributions in KTC Defendants' favor.

102.     *In his first act of fraud,* Mr. Koslow made false representations and omissions as to the circumstances under which Mr. Koslow's joint venture, KX Industries, was sold to Berkshire Hathaway subsidiary Marmon Water. Mr. Koslow deceptively presented the purportedly successful venture in a positive light, while in reality it was anything but.

103.     Mr. Koslow falsely represented that he had won a lawsuit brought by Mr. Koslow's brother that led to the sale of KX Industries and discussed this case in a manner that minimized any negative implication from the lawsuit, including portraying himself as a victim of bad luck. Based on those representations in April 2017, OWFC did not further investigate the lawsuit prior to signing the License Agreement. Had Mr. Koslow provided a true disclosure of the lawsuit, OWFC would have investigated the lawsuit further and after reading the court order in the lawsuit OWFC would have never entered into the License Agreement with KTC or done any other business with Mr. Koslow.

104.     KX Industries was jointly owned by Mr. Koslow, who had a 90% share, Mr. Koslow's brother Jon Koslow, who owned about a 7% share, and Kevin McGovern, who owned about a 3% share.

105.    Jon Koslow and Kevin McGovern brought the lawsuit against Mr. Koslow for, *inter alia*, breach of fiduciary duties, in an action in Delaware Chancery Court captioned as *McGovern v. Gen. Holding, Inc.*, No. 1296-N on April 25, 2005. Mr. Koslow did not disclose to OWFC that the actual reason for the lawsuit was, *inter alia*, Mr. Koslow's breach of fiduciary duties based on self-dealings.

106.    Mr. Koslow did not disclose that—as the Court also found in the litigation— Mr. Koslow had assigned key intellectual property to his own company, KTC—the Defendant in this case—and not the KX Industries partnership, and that Mr. Koslow was self-dealing at the expense of the other partners. Mr. Koslow did not disclose that—and as the Court further elicited from him— he admitted that he falsified test results. In fact, the Court ordered that he be removed as general partner of KX Industries, that the key intellectual property be transferred from KTC to KX Industries, that KX Industries be sold at auction, and the receipts from the auction be distributed to the owners. Furthermore, Mr. Koslow did not disclose that Mr. Koslow was barred from competing for three years and not allowed to participate in the auction. *McGovern v. Gen. Holding, Inc.*, No. 1296-N, 2006 WL 4782341 (Del. Ch. June 2, 2006).

107.    Based on Mr. Koslow's representations in or about April 2017 that he "won" the case, OWFC did not further investigate the lawsuit prior to signing the License Agreement. Had Mr. Koslow provided accurate disclosure or even said nothing of the lawsuit in response to OWFC's inquiry, OWFC would have investigated the lawsuit and after reading the court's order in the lawsuit, OWFC would have never entered into the License Agreement with KTC or done any other business with Mr. Koslow.

108.    Had Mr. Koslow truthfully represented in April 2017 that he had lost the lawsuit against his brother, OWFC would have investigated the lawsuit at that time prior to entering into

the License Agreement and would not have entered into the License Agreement with Mr. Koslow and KTC, as OWFC would have learned then that the reason for the sale of the business and for Mr. Koslow's removal from management of KXI was due to conduct in bad faith, gross negligence, and purposely misleading his partners for the sole purpose of usurping for himself the economic rights and opportunities that belonged to the partnership.

109.    *In his second act of fraud,* Mr. Koslow solicited investors with documents containing false information regarding the Agreements. Specifically, investors were informed that

███████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████. *See, e.g.,*

**Exhibits E-F**.

110.    *In his third act of fraud,* Koslow intentionally misused ██████████ in payment by OWFC provided for the development of pressure water filters pursuant to SOW Tasks 1-7, Appendix A – OWF Pressure System Products SOW of Addendum No. 6. The funds were defined for specific activities. But Mr. Koslow admitted the funds were spent on additional production equipment and not on the specified tasks for which the funds were designated. Mr. Koslow has stated that the tasks remain undone due to lack of funds.

111.    *In his fourth act of fraud*, Mr. Koslow made false representations or omissions with regards to filter capability for microbiological contaminant removal. Specifically, OWFC was told that the filters pass NSF P231 requirements, which it has not.

112.    The test results to date had significantly different performance characteristics with regards to flow rate, which is a critical parameter for virus removal. The latest test dated January 7, 2020, produced a failed result for viral removal at 99.9% rather than the 99.99%, as falsely stated by KTC Defendants and as required by the Agreement. Mr. Koslow has failed to produce a

passing test under NSF P231 since that time, but has repeatedly claimed that he has passed the test before and with in-house testing.

113.    In late 2020/early 2021, Mr. Koslow tried to persuade OWFC against proceeding with full IAPMO certification, as agreed to pursuant to Clause 4, as detailed in Appendix D, SOW Task 1.2 and 1.3, of Addendum No. 5, saying he didn't think OWFC really need it and it was expensive and a lot of headaches to maintain. When OWFC demanded IAPMO certification as agreed upon—as it was a fundamental basis of OWFC investing in this project and entering into the License Agreements and subsequent Addendums containing various SOWs— Mr. Koslow reluctantly agreed to finish the testing. However, Mr. Koslow has failed to do so eight months after the demand for testing. Later in 2021, Mr. Koslow, communicating with Heilveil, again tried to dissuade OWFC from full IAPMO certification. OWFC refused. On information and belief, Koslow's delay in providing IAPMO certification is due to the fact that KTC's products will not pass IAPMO certification to P231, contrary to the representations made by KTC Defendants prior to the Agreement and as required by the License Agreement and Addendums pursuant to Clause 4, as detailed in Appendix D, SOW Task 1.2 and 1.3, of Addendum No. 5.

114.    *In his fifth act of fraud*, Mr. Koslow made false representations and omissions regarding KTC Defendants' capability to develop certain elements of the dispenser design. Mr. Koslow led OWFC to believe that he could develop them and that the design that he provided to OWFC was fully functional and just needed to be refined for production purposes. A key element of KTC Defendants' design was the ███████████ used to control water flow from top to bottom tank and stop flow when the bottom tank was full. KTC Defendants' concept ultimately failed to operate as intended and OWFC had to invent its own subsystem for the dispenser to control the water flow. In hindsight, KTC Defendants' design was ███████████████

██████████████████████████████████████████████, a failure by KTC Defendants' that was due to a simple but incorrect calculation on the ██████████████, something that should have been simple for someone with Mr. Koslow's alleged capabilities.

115.    *In his sixth act of fraud,* Mr. Koslow revealed sometime in or about October 2020 (after OWFC had already taken delivery of the non-compliant filters and contrary to the representations that he owned all of the IP in the technology relating to the Filter Packs) that the feature of the Nanotech Filter 1 (OWF Filter 1) using the KTC Technology, as noted above in paragraphs 30-32, that stops water flow through the filter when the filter was exhausted was in fact an element covered by a patent owned by a third party. This feature—and Koslow's claimed 100% ownership of the IP for the feature—was a material reason in OWFC's decision to enter into the Agreements and to invest the funds in KTC as discussed herein. Mr. Koslow also misled as to the nature of this technology. That is, Mr. Koslow represented initially that this feature included chemistry that would cause the filter to shut down after it was exhausted, thereby preventing users from using filters past their intended life. In truth, however, the concerned chemistry only reacts to one specific class of contaminants, Natural Organic Materials (NOM), and does not function as a general safety factor, but only in circumstances where NOM is the primary contaminant that one is concerned with, which is only important in a limited portion of OWFC's expected market. Mr. Koslow asked that OWFC not mention this feature in any marketing material.

### KTC Defendants' Misguided Ploy to Cure Their Breach by Selling Defective Filters to Another Company

116.    On or about October 22, 2021, several months after OWFC had given KTC Defendants written notice of their breach, KTC Defendants contacted OWFC after purportedly having discussions with ██████ in which ██████ agreed to purchase the non-compliant filters to sell ██████████████████████████.

117.     OWFC responded in an email on or about October 25, 2021, that regardless of whether NMC agrees that the non-compliant filters' flow rate was enough for its purpose, that is not what KTC Defendants offered to OWFC and not what OWFC agreed, which based on KTC Defendants' assurances, OWFC agreed to deliver to its distributors. OWFC reminded KTC Defendants that they acknowledged that the products they had produced for OWFC to date did not meet the required flow rates specifications under the License Agreement and that they had agreed to rectify the problem pursuant to Addendum No. 8. Yet KTC Defendants failed to take any steps to correct the issues stated in the June 29, 2021, notice of breach. OWFC informed KTC Defendants that even if they were able to sell the deficient filters to NMC, that does not relieve KTC Defendants of their responsibility with regards to the goods that OWFC purchased. Finally, OWFC informed KTC Defendants, in response to KTC Defendants notice on or about September 20, 2021, that they would return the $30,000 payment and shut down the new filter production for the cure because it was too expensive, that it does not consent to any shutdown or diversion of resources for the new/replacement prefilter production as KTC remains obligated to immediately replace the defective filters.

118.     On or about October 27, 2021, Mr. Koslow responded via email that: "The Berkey people [at NMC] will be buying all of your older prefilter inventory so this matter appears to be settled … It's time to move on. We need to close the Berkey sale…", clearly showing KTC Defendants' intention not to cure their default.

119.     On information and belief, KTC Defendants' offer from NMC is a ploy to try to obviate OWFC's claims that the filters are defective and in breach of the Agreements so that they can gain an upper hand in this dispute.

### *Damages to OWFC Resulting from KTC Defendants' Purposeful Conduct*

120.     As a result of Defendants' conduct, including failure to fulfill its obligations under the Agreements, violation of the terms of the Agreements, the fraudulent statements made, and collusion with third parties, OWFC has been damaged and is entitled to compensatory damages, including as a result of OWFC's obligations to its distributors that purchased products and have yet to receive conforming products, and specific performance.

**Count One**
**(Breach of Contract)**
**(Against KTC Defendants)**

121.     OWFC repeat and reallege paragraphs 1-120 of its Complaint as if fully set forth herein.

122.     The License Agreement and Addendums Nos. 1-8 were valid, enforceable, and binding agreements between OWFC and KTC Defendants.

123.     As alleged herein, OWFC at all times performed all of its obligations under the Agreements to the extent that was possible considering the limitations imposed by KTC Defendants' failures to provide compliant filters and a functional dispenser design that would allow sales to commence. To date, OWFC's CGDs have not been able to proceed with sales to the public due to the lack of compliant filters (the dispenser design flaws having already been corrected by OWFC) and OWFC has not been able to proceed with soliciting and signing up additional CGD's due to lack of compliant filter products and no firm timeline on when, if ever, compliant product would become available.

124.     As alleged herein, KTC Defendants materially and substantially breached the Agreements by failing to perform their obligations under the Agreements, including at least a breach of Sections 5.15(b)(ii), 5.5, and 5.6 of the License Agreement; Clause 2 of Addendum No. 1; Clauses 1.1, 1.5, 1.7, 1.12, 4 (as detailed in Appendix D, SOW Tasks 1.1, 1.2, 1.3), 7.1 7.2, and

7.4 of Addendum No. 5; Clauses 1.1 (as detailed in Appendix A – OWF Pressure System Products SOW Tasks 1-7), 5.1, and 5.2 of Addendum No. 6; and Clause 5 of Addendum No. 8.

125.    As a direct and proximate result of KTC Defendants' breach, OWFC has suffered damages.

126.    The damages flow directly from and are the natural and probable consequences of KTC Defendants' breach.

127.    As a direct and proximate result of KTC Defendants' breach, OWFC has also suffered consequential damages and is entitled to compensatory and expectation damages.

128.    The consequential damages include but are not limited to: OWFC's lost profits, OWFC's liability to CGDs because of it not being able to deliver compliant filters to GCDs in accordance with the distribution agreements with GCDs, including GCDs' lost profits and costs associated with storing non-compliant products, as well as expected profits for OWFC and GCDs for the term of the respective agreements.

129.    The consequential damages were foreseeable and within the contemplation of the parties before or at the time the Agreements were made.

## Count Two
### (Common Law Fraud)
### (Against KTC Defendants)

130.    OWFC repeat and reallege paragraphs 1-129 of its Complaint as if fully set forth herein.

131.    KTC Defendants intentionally misrepresented to OWFC, as set forth in paragraphs 102-115, KTC Defendants' history with KX Industries, that they invented filters having specific characteristics, that they had the capability of and would produce filter products having those characteristics, were the owners of all intellectual property related to the KTC Technology, had

the capability of and would design the OWFC dispenser, and that the filter products/dispenser would meet IAPMO certifications, and would honor exclusivities granted to OWFC in furtherance of the business purposes set forth and agreed to by the parties in the Agreements. These misrepresentations were intended to fraudulently induce and were the basis for OWFC's investment in and capital contributions in KTC Defendants' favor.

132.    On information and belief, such statements were false at the time they were made.

133.    On information and belief, KTC Defendants knew such statements were false at the time they were made.

134.    Such statements or concealments were made with the intent to defraud OWFC.

135.    OWFC reasonably relied on the statements, and such statement were material to OWFC's reliance.

136.    At all relevant times, OWFC was unaware of the material facts that were suppressed and concealed by KTC Defendants. Had OWFC been aware of KTC Defendants' actions, OWFC would not have entered into a business relationship with KTC Defendants and would have taken steps to protect against KTC Defendants' wrongful conduct.

137.    KTC Defendants' conduct, as described above, constitutes fraud, suppression, and/or concealment of material facts known to them, with the intent by KTC Defendants of inducing reliance thereupon by OWFC and thereby depriving OWFC of property or otherwise causing injury.

138.    As a direct and proximate result of KTC Defendants' conduct, OWFC has suffered damages.

**Count Three**
**(Fraud in the Inducement)**
**(Against KTC Defendants)**

139.    OWFC repeat and reallege paragraphs 1-138 of its Complaint as if fully set forth herein.

140.    KTC Defendants intentionally misrepresented to OWFC, as set forth in paragraphs 102-115, KTC Defendants' history with KX Industries, that they invented filters having specific characteristics, that they had the capability of and would produce filter products having those characteristics, were the owners of all intellectual property related to the KTC Technology, had the capability of and would design the OWFC dispenser, and that the filter products/dispenser would meet IAPMO certifications, and would honor exclusivities granted to OWFC in furtherance of the business purposes set forth and agreed to by the parties in the Agreements. These misrepresentations were intended to fraudulently induce and were the basis for OWFC's investment in and capital contributions in KTC Defendants' favor.

141.    On information and belief, such statements were false at the time they were made.

142.    On information and belief, KTC Defendants knew such statements were false at the time they were made.

143.    Such statements or concealments were made with the intent to induce reliance thereupon by OWFC.

144.    OWFC reasonably relied on the statements, and such statement were material to OWFC's reliance.

145.    At all relevant times, OWFC was unaware of the material facts that were suppressed and concealed by Defendants. Had OWFC been aware of Defendants' actions, OWFC would not have entered into the License Agreement or subsequent Addendums Nos. 1-8 to the License Agreement with Defendants and would have taken steps to protect against Defendants' wrongful conduct.

146.    KTC Defendants' conduct, as described above, constitutes fraud, suppression, and/or concealment of material facts known to them, with the intent by KTC Defendants of inducing reliance thereupon by OWFC and thereby depriving OWFC of property or otherwise causing injury.

147.    As a direct and proximate result of KTC Defendants' conduct, OWFC has suffered damages.

**Count Four**
**(Tortious Interference with Contractual Relations)**
**(Against all Defendants)**

148.    OWFC repeat and reallege paragraphs 1-147 of its Complaint as if fully set forth herein.

149.    The License Agreement and Addendums Nos. 1-8 were valid, enforceable, and binding agreements between OWFC and KTC Defendants.

150.    NMC had knowledge of and is and was at all relevant times aware of the valid, enforceable License Agreement and Addendums Nos. 1-8 between OWFC and KTC Defendants.

151.    NMC intended to induce KTC Defendants to breach the Agreements with OWFC through improper means and/or with improper motive, including colluding with KTC Defendants to deprive OWFC of filter products, in breach of the Agreements, in the mistaken effort to cause OWFC's default and to deprive OWFC of the exclusivity granted to OWFC under the Agreements.

152.    As alleged herein, KTC Defendants failed to perform their obligations under the Agreements as a result of NMC's intentional conduct, causing breach of the Agreements.

153.    As a direct and proximate result of NMC's conduct, OWFC has suffered damages.

**PRAYER FOR RELIEF**

WHEREFORE, OWFC prays for judgment against Defendants as follows:

A.      An order and Judgment against Defendants as to each cause of action;

B.      An order enjoining preliminary and permanently Defendants, including its officers, agents, affiliates, employees, and attorneys, and all those persons acting or attempting to act in concert or participate with them, from contracting with any third party in violation of OWFC's exclusive rights under the Agreements;

C.      For damages in the sum of at least $1 billion or an amount to be determined at trial, whichever is greater;

D.      For actual damages, compensatory damages, statutory damages, and punitive or treble damages;

E.      For lost profits;

F.      For restitution in the amount that Defendants have been unjustly enriched;

G.      For restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from OWFC as a result of their unlawful, unfair, and fraudulent business practices described herein;

H.      Pre-judgment and post-judgment interest on such monetary relief;

I.      Attorneys' fees and costs of bringing this suit;

J.      Specific performance of the Agreements by KTC Defendants, including but not limited to ordering Defendants to:

> a.  License KTC Defendant's trade secrets and other intellectual property to a third party to satisfy KTC Defendants' obligations under the Agreements;
>
> b.  Replace Mr. Koslow as CEO with another having the capability to lead KTC to satisfy the Agreement;
>
> c.  Dissolve KTC and assign all intellectual property rights in the KTC

technology to OWFC; and/or

    d.  Dissolve KTC and assign the Agreements to a third party capable of fulfilling KTC Defendants' obligations under the Agreements; and

K.    Grant any such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, OWFC requests a trial by jury of all issues so triable.

Respectfully submitted,

**LOMBARD & GELIEBTER LLP**

Dated: December 15, 2021
New York, New York

By: _____

Darren M. Geliebter
Antonio Papageorgiou
Eric J. Huang (*Pro Hac Vice*)
230 Park Avenue, 4th Floor West
New York, NY 10169
(212) 520-1172 (telephone)
(646) 349-5567 (facsimile)
dgeliebter@lombardip.com
ap@lombardip.com
ehuang@lombardip.com

*Attorneys for Plaintiff*
*One World Filter Corporation*