UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ONE WORLD FILTER CORPORATION,

                              Plaintiff,

                    -v.-

KOSLOW TECHNOLOGIES
CORPORATION; EVAN E. KOSLOW; and
NEW MILLENIUM CONCEPTS, LTD.,

                              Defendants.

---

21 Civ. 10769 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

A business arrangement to supply water filters yielded the instant action, as well as a correlative arbitration (the "Arbitration") between Plaintiff One World Filter Corporation ("OWFC") and Defendants Koslow Technologies Corporation and Evan E. Koslow (collectively, "KTC" or "Defendants").[1]  A panel of three arbitrators from the International Centre for Dispute Resolution (the "ICDR") issued a Partial Final Award on October 28, 2024 (the "Award"), denying Plaintiff's claims, granting one of Defendants' counterclaims, and awarding Defendants damages, fees, and costs.  Plaintiff now moves to vacate the Award.  Defendants oppose Plaintiff's motion to vacate the award and cross-move to confirm the Award.  For the reasons set forth below, the Court

---

[1]     A third defendant, New Millenium Concepts, Ltd., has not appeared in this case.  (Dkt. #6).

In the Arbitration proceedings, Plaintiff is referred to as "Claimant," and Defendants KTC and Dr. Koslow are referred to as "Respondents."  (*See, e.g.*, Dkt. #85-2).  However, for clarity, the Court continues to refer to the parties by their designations in this litigation.

denies Plaintiff's motion to vacate the Award and grants Defendants' cross-motion to confirm the Award.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    The Parties

Plaintiff OWFC, formerly known as Silver Rock International Limited, is a corporation that markets a trademarked water filtration system that includes water dispensers.  (Compl. ¶¶ 3, 13).  OWFC is organized under the laws of the British Virgin Islands (*id.* ¶ 3), and it has a principal place of business either in Hong Kong or in the Philippines (*compare id.* (Plaintiff stating that its principal place of business is in Hong Kong), *with* Pl. Br. 2 n.2 (Plaintiff stating that its principal place of business is in the Philippines)).

---

[2]    Courts treat motions to confirm or vacate arbitration awards as summary judgment motions.  *See D.H. Blair & Co., Inc.* v. *Gottdiener*, 462 F.3d 95, 109-10 (2d Cir. 2006).  Because the parties did not submit a Joint Local Rule 56.1 Statement, however, the Opinion draws some of its facts from the Complaint ("Compl." (Dkt. #1)), to the extent that Defendants do not contest those facts.  It also draws on the parties' declarations submitted in support of their respective cross-motions and the exhibits attached thereto.

Where the Court refers to exhibits provided by both Plaintiff and Defendants (*see, e.g.*, Dkt. #85-2 (Partial Final Award); Dkt. #88-2 (same)), it cites to Plaintiff's exhibit (Dkt. #85-2.  The exhibits to which the Court refers include the Partial Final Award (the "Award" (Dkt. #85-2)), the June 5, 2017 license agreement between the parties (the "Initial Agreement" (Dkt. #85-3)), and various of the parties' eight subsequent addenda to the Initial Agreement ("Add. 4" (Dkt. #85-7); "Add. 5" (Dkt. #85-8); "Add. 6" (Dkt. #85-9); "Add. 7" (Dkt. #85-10); "Add. 8" (Dkt. #85-11)).

For ease of reference, the Court refers to Plaintiff's memorandum of law in support of its motion to vacate the Award as "Pl. Br." (Dkt. #85); to Defendants' memorandum of law in opposition to Plaintiff's motion and in support of its cross-motion to confirm the Award as "Def. Br." (Dkt. #88); to Plaintiff's reply brief in support of its motion and in opposition to Defendants' cross-motion as "Pl. Reply" (Dkt. #94); to Defendants' reply brief in support of its cross-motion as "Def. Reply" (Dkt. #96); and to Plaintiff's sur-reply as "Pl. Sur-Reply" (Dkt. #97).

Defendant Koslow Technologies Corporation is a Connecticut corporation with a principal place of business in Connecticut. (Compl. ¶ 4). It is a developer of water filtration technology used in the water dispensers that go into OWFC's water filtration system. (*Id.* ¶¶ 13, 23). Defendant Dr. Koslow is the founder and president of Koslow Technologies Corporation and is a resident of Texas. (*Id.* ¶¶ 5, 22).

### 2. The Agreement

The parties entered into a license agreement on June 5, 2017 (the "Initial Agreement"), and then executed eight addenda to that agreement between July 27, 2018, and September 22, 2020 (together, the "Agreement"). (Compl. ¶¶ 38, 40). Under the Agreement, KTC would develop and manufacture water filters for OWFC to use in its water filtration system. (*Id.* ¶ 39; *see also* Award ¶ 129(a)). In return, OWFC would provide payment for the filters and licensing fees for the technology. (Compl. ¶ 39; *see also* Award ¶ 129(b)).

KTC, through the Agreement, granted OWFC "a temporary License to exclusively" manufacture, sell, and market products within certain regions. (Initial Agreement ¶ 5.1). Under the Agreement, "[s]aid License immediately becomes an 'Irrevocable Exclusive License'" when OWFC "makes such License Fee payments as defined" by the Agreement. (*Id.*). Payment of that license fee would thus "convert" the temporary License into a license "in perpetuity." (*Id.* ¶ 5.2). OWFC's license fee payments were due within a specified timeframe. (*See id.*).

In Addendum 8, OWFC agreed to issue purchase orders for filters to market in multiple regions. (Add. 8 ¶ 8.3). In that same addendum, the parties agreed to update the licensing fee structure. (*Id.* ¶¶ 7-8). Based on the new agreement, the total license fee across all markets would equal $17,346,392. (*Id.*, App. A).

The Initial Agreement explains what would happen if OWFC failed to pay the license fees required to make its temporary license permanent:

> A ... material breach of this Agreement ... has occurred in the event that the total License Fee ... has not been paid in full by [OWFC] to KTC ... . In the event of this specific material breach, the [market] in default of License Fee payment shall be deemed no longer licensed for use by [OWFC,] and KTC shall have the option to either allow [OWFC] to continue supplying that [market] or license a third party to assume such license rights.

(Initial Agreement ¶ 5.4). Addendum 8, which altered the licensing fee structure, further clarifies that "[f]ailure of OWFC to make the License Fee payments specified ... will result in the termination of OWFC exclusive rights" in the given regions. (Add. 8 ¶¶ 7.3-7.4 (concerning the Philippines and India); *see also id.* ¶¶ 8.3, 8.5 (noting that failure to pay fees related to other regions would "result in the termination of OWFC exclusive rights"); Award ¶¶ 244-246 (setting forth Tribunal findings regarding Addendum 8)).

As for the filters that KTC would provide to OWFC, the Initial Agreement states that they would "conform to minimum performance standards." (Initial Agreement ¶ 5.9). Appendix B to that agreement clarifies that the filters would have specific size requirements and be "rated for the reduction of viral particles (MS-2 bacteriophage) at 99.99%, bacterial particles ... by 99.9999%[,] and

oocysts … by 99.95%," at an "[i]nitial flow rate … [of] approximately 45 ml/minute at an applied gravity head of 15" W.C." (*Id.*, App. B at 24; *see also* Award ¶ 133). Beginning with Addendum 4 and continuing through Addendum 8, KTC agreed to produce a second-generation filter ("GF-2") and a pressure water filter ("PWF"). (*See* Add. 4 ¶¶ 7-8; Add. 5 ¶¶ 2, 4, 6; Add. 6 ¶¶ 2-3; Add. 7 ¶¶ 2.1, 2.4; Add. 8 ¶ 4).

Addendum 5, which was adopted on August 10, 2019, discusses certification, stating that for its filters, "KTC will seek to secure IAPMO/NSF/ANSI certification and seal for the … target performance claims listed in [the Appendices to Addendum 5]." (Add. 5 ¶ 1.5 (discussing the original filters); *see also id.* ¶ 1.12 (discussing GF-2 filters)).[3] It adds that "KTC will endeavor to have IAPMO specify the highest possible percentage of reduction for all claims." (Add. 5 ¶¶ 1.5, 1.12). Appendix A to Addendum 5 specifies the target performance claims for the first-generation filter. In the "% Reduction or Results" column of the "Microbiological Claims" section, the corresponding values are >99.9999% for "Bacteria," >99.99% for "Virus" and "MS2 virus 0.025 micron," and >99.95% for "Parasites" and "Protozoan Oocysts." (*Id.*, App. A). The table lists the corresponding "NSF Standard" for each as "Note 1 Possibly NSF P231 ASI Confirmed." Below, Note 1 specifies:

> There is no NSF specific standard for gravity flow mic[r]obiological filters. KTC is in discussions with IAPMO to apply NSF P231 standard … . NSF P231

---

[3] "IAPMO" refers to the International Association of Plumbing and Mechanical Officials; "NSF" refers to NSF International (formerly known as the National Sanitation Foundation); and "ANSI" refers to the American National Standards Institute. (*See* Add. 5 ¶¶ 1.15-1.17).

> standard is for mechanical filters and primarily used to meet US and other military mechanical filter applications. Analytical Services Inc (ASI) independent testing certifies the ... microbiological claims.

(*Id.*, App. A). Addendum 5 also provides an "Initial Flow Rate" of "8 liters/hour" (*id.*), an update on the initial rate of 45 ml/minute (*see* Initial Agreement, App. B at 24).

Finally, the Agreement indicates that it would "continue indefinitely or until [it] is terminated by the mutual consent of the Parties or as a result of an uncured Material Breach of the Agreement." (Initial Agreement ¶ 5.15). "If said Material Breach is not cured within 30 days," the Agreement states that "a Party [could] demand and initiate recourse against the other Party that committed the Material Breach." (*Id.*). The Agreement also contains an "Applicable Law and Binding Arbitration" clause that specifies:

> The applicable law for this Agreement is the law of the state of New York, USA. All claims and disputes arising under or relating to this Agreement are to be settled by binding arbitration ... . The arbitration shall be conducted ... pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Any decision or award as a result of any such arbitration proceeding shall be in writing and shall provide an explanation for all conclusions of law and fact[.]

(*Id.* ¶ 5.19).

### 3.    The Dispute

Broadly speaking, Plaintiff alleges that Defendants failed to deliver contractually compliant filters. (Award ¶¶ 25(a), 150; *see also* Compl. ¶ 41). In consequence, Plaintiff responded by neither placing the orders required by the Agreement nor making the licensing fee payments listed in Addendum 8.

(Award ¶ 248).  Before this Court, Plaintiff asserts claims for breach of contract, common law fraud, fraud in the inducement, and tortious interference with contractual relations.  (Compl. ¶¶ 121-153).  It incorporated those claims into the arbitration proceeding (Award ¶ 25), and added a claim that Defendants fraudulently induced it to enter into Addendum 8 (*id.* ¶ 25(b) n.2).

In the arbitration proceeding, Defendants counterclaimed, alleging that OWFC: (i) "[b]reached the License Agreement by refusing to pay over $4 million in license fees"; (ii) "[b]reached the covenants of good faith and fair dealing, as well as non-disclosure agreements that OWFC executed"; (iii) "[w]as unjustly enriched by failing to pay license fees for an exclusive license"; and (iv) "[t]ortiously interfered with [Defendants'] prospective business opportunities by asserting rights under the License Agreement that OWFC knew it did not have."  (Award ¶ 33).

At the crux of the parties' disputes are competing claims regarding the performance of the filters that KTC produced.  The parties agree that KTC failed to obtain "IAPMO certification of the four-log virus removal standard set forth in the License Agreement or Addendum [5]."  (Award ¶ 153).  The parties disagree, however, about whether such certification "was an absolute contractual obligation."  (*Id.* ¶¶ 154-156).  The parties also dispute whether KTC's filters were "capable of removing 99.99% of virus materials from water at flowrates of 45 ml/minute to 133 ml/minute," as required by Appendix B to the Initial Agreement and Appendix A to Addendum 5.  (*Id.* ¶¶ 167-168).

OWFC also claims that the filters KTC produced did not satisfy the "flow rate" set forth in Appendix B of the Initial Agreement and Addendum 5. (Dkt. #85-22 ¶¶ 248-251; Pl. Br. 27-28). Finally, OWFC argues that Defendants breached the Agreement by failing to develop GF-2 and PWF filters. (Award ¶ 185).

In response to KTC's putative breaches, OWFC declined to place additional orders from KTC and withheld licensing fees. (Award ¶ 248). As noted, OWFC argues that it was excused from taking those actions because KTC had materially breached the License Agreement and had fraudulently induced OWFC to enter into Addendum 8. (*Id.* ¶ 249).

## B.    Procedural Background

### 1.    The Lawsuit and the Arbitration

Plaintiff sued Defendants in this Court on December 16, 2021. (Dkt. #1). On February 25, 2022, Plaintiff filed a proposed order to show cause requesting a preliminary injunction and a temporary restraining order (Dkt. #13), as well as a memorandum of law in support thereof (Dkt. #14). On March 4, 2022, Defendants filed their memorandum of law in opposition to Plaintiff's proposed order to show cause for injunctive relief. (Dkt. #19). Plaintiff filed its reply on March 10, 2022. (Dkt. #23). The next day, the Court held a hearing at which it denied Plaintiff's motion for a temporary restraining order. (March 11, 2022 Minute Entry).

On March 25, 2022, Defendants moved to compel arbitration, which motion Plaintiff did not oppose. (Dkt. #26, 27). In response, on March 31,

2022, the Court stayed the action and ordered Plaintiff to initiate arbitration proceedings within 30 days. (Dkt. #30, 31). Plaintiff filed a Demand for Arbitration with the American Arbitration Association (the "AAA") on April 29, 2022, and the case was assigned No. 01-22-0001-7885. (Dkt. #34). The case was heard by a panel of three arbitrators (the "Tribunal") with the ICDR, the international division of the AAA. (Award ¶¶ 27, 40-43).

### 2.    The Partial Final Award

After a comprehensive process that included discovery, a multi-day hearing, and post-hearing submissions (*see* Dkt. #59; Award ¶¶ 47-115), the Tribunal issued a Partial Final Award (the "Award") on October 28, 2024 (Dkt. #85-2). As relevant here, the Award (i) "[d]enie[d] all of OWFC's express claims"; (ii) "[g]rant[ed] [Defendants'] breach of contract counterclaim for unpaid license fees"; (iii) "[a]ward[ed] [Defendants] damages of $17,346,392.00 in unpaid license fees for that counterclaim"; (iv) "[a]ward[ed] [Defendants] pre-judgment interest of $726,272.00 on that amount"; and (v) "[a]ward[ed] [Defendants] their costs and expenses, including reasonable attorneys' fees, in an amount to be determined in a subsequent costs award." (Award ¶ 3). The Award further "terminated" the Agreement. (*Id.* ¶ 293(e)). The Court details the relevant portions of the Award in the remainder of this subsection.

### a. The Tribunal Rejects OWFC's Express Breach of Contract Claims[4]

After recounting the facts and procedural history of the case (Award ¶¶ 5-115), the Tribunal explained why each of OWFC's claims failed (*id.* ¶¶ 116-121). It began with OWFC's express breach of contract claims. (*See id.* ¶¶ 123-188). On OWFC's claim that KTC failed to deliver contractually compliant filters, the Tribunal interpreted OWFC to allege two separate breaches: *first*, that KTC failed "to have IAPMO certify that KTC's filters could in fact remove 99.99% of viral material placed in the water used to test the filters under P231 protocols," as arguably required by Addendum 5; and *second*, that KTC's "filters could not in fact meet the performance parameters for virus removal set forth in Appendix B to the [Initial] Agreement, as well as Appendix A to Addendum [5]." (*Id.* ¶ 150).

The Tribunal rejected both claims. As to the first claim, the Tribunal concluded:

> [T]he language in Addendum [5] to which OWFC points to support its contention that Respondents were obligated to obtain IAPMO certification of all — and particularly viral — claims is too equivocal and contradictory to impose a definitive contractual obligation upon Respondents, and the extrinsic evidence upon which OWFC relies in support of its position is insufficient to find any such obligation in the manner in which OWFC has framed it.

---

[4] OWFC does not challenge certain findings by the Tribunal, including (i) its rejection of OWFC's claim that KTC breached the covenant of good faith and fair dealing (*see* Award ¶¶ 190-206); (ii) its rejection of OWFC's unjust enrichment claim (*see id.* ¶¶ 207-215); and (iii) its rejection of OWFC's fraudulent inducement claim (*see id.* ¶¶ 216-228). As such, the Court does not discuss those findings by the Tribunal in any detail.

(Award ¶ 152). More specifically, it found that Addendum 5 "does not employ any definitive language making it unequivocally clear that [Defendants] were contractually obligated to obtain IAPMO certification" (*id.* ¶ 158), and, further, that OWFC's "extrinsic evidence" was insufficient to prove same (*id.* ¶ 159). Instead, the Tribunal found that KTC "discharged any certification obligations" it had "by contracting with IAPMO and genuinely attempting in good faith to get IAPMO certification for virus removal, by working closely with the IAPMO staff to formulate testing conditions that would match a gravity filter's possible performance, and in fact testing the filters against modified P231 protocols many times." (*Id.* ¶ 161(b)).

As to the second claim, the Tribunal rejected it "for lack of evidence." (Award ¶ 164). It found that "OWFC failed to present evidence showing that the filters [Defendants] delivered did not in fact meet the performance metrics stated in the License Agreement and Addendum [5]." (*Id.* ¶ 165). In so doing, the Tribunal rejected OWFC's attempt to use the failed IAPMO tests to prove that the filters failed to meet the required performance standard in the Agreement. (*Id.* ¶¶ 174-179). On this point, the Tribunal identified "serious questions as to whether or not the IAPMO tests in fact show that the filters" met the required performance parameters. (*Id.* ¶¶ 176-178). Conversely, the Tribunal noted that Defendants had "presented evidence showing that the filters could achieve, or likely would be able to achieve, that performance, and did in fact achieve it under testing conditions that more closely matched contractually stipulated flowrates." (*Id.* ¶ 165).

11

The Tribunal then turned to OWFC's other express breach of contract claims, all of which it rejected.  (Award ¶¶ 183-189).  On OWFC's claim that Defendants breached the License Agreement by failing to deliver filter packs for India (*id.* ¶ 184), the Tribunal pointed to testimony from Dr. Koslow that "the India shipment was completed and was simply waiting in KTC's Connecticut factory for OWFC to pick up, but OWFC never arranged to do so" (*id.* ¶ 184(b)). Ultimately, the Tribunal described the "evidence on the point" as "conflicting," which, given the allocation of the burden of proof, led it to hold that OWFC had not proven its claim.  (*Id.* ¶ 184(c)).

On OWFC's claim that Defendants breached the Agreement by failing to develop the more complex GF-2 filters and PWF filters (Award ¶ 185), the Tribunal noted that "Dr. Koslow testified" that OWFC's representative had "cancelled the GF-2 and PWF filter programs … , and the Tribunal does not have any countervailing evidence to effectively contradict that claim" (*id.* ¶ 186). Relatedly, the Tribunal rejected OWFC's allegations that Defendants breached the Agreement by not obtaining IAPMO certifications for the GF-2 and PWF filters using the same analysis it had used in resolving Plaintiff's analogous claim as to the original filters.  (*Id.* ¶ 187).

Having rejected all of OWFC's affirmative claims, the Tribunal found that "OWFC is precluded from recovering … damages." (Award ¶¶ 232-233).  The Award also includes a catchall clause stating that "[a]ny other claims, counterclaims, or defenses on the merits that are not specifically referenced above are hereby denied on the merits." (*Id.* ¶ 294).

### b.  The Tribunal Grants KTC's Breach of Contract Counterclaim[5]

The Tribunal then considered KTC's counterclaims, beginning with its claim that OWFC materially breached the Agreement by failing to pay license fees.  (Award ¶¶ 240-259).  The Tribunal agreed with KTC that "OWFC's claims against [KTC] … have failed," and that "OWFC has not asserted any other defenses to [KTC's] corollary counterclaim for unpaid license fees."  (*Id.* ¶ 240). In other words, "because OWFC's only excuse for not paying those fees was OWFC's failed contention that [KTC's] alleged breaches excused OWFC's performance," the Tribunal held that KTC was "entitled to the unpaid license fees that OWFC contractually agreed to pay in Addendum [8] to the License Agreement, but failed to pay."  (*Id.* ¶¶ 240-241).

The Tribunal then assessed the amount of those fees.  It started by noting that OWFC had neither placed the orders nor paid the licensing fees required in Addendum 8.  (Award ¶ 248).  Before the Tribunal, KTC had claimed $17,346,392 in damages, corresponding to the full license fee amount in Addendum 8.  (*Id.* ¶ 253).  And the Tribunal noted that OWFC did not argue that it should be credited for any payments it had already made.  (*Id.* ¶ 253 n.107).  As additional support for its damages claim, KTC submitted an expert report, which also included a claim for $726,272 in interest.  (*Id.* ¶¶ 253-255). The Tribunal awarded $17,346,392 in damages.  (*Id.* ¶ 259).  And because

---

[5]     The Tribunal rejected KTC's quasi-contract and tort counterclaims (*see* Award ¶¶ 260-278), and KTC does not challenge those determinations here (*see* Def. Br. 15 (noting, but not challenging, that the Tribunal rejected "some of KTC's counterclaims")). As such, the Court does not discuss them in detail.

(i) OWFC did not give "any contrary suggestion of a different interest rate" and (ii) KTC failed to provide an updated interest figure in the post-hearing submissions, the Tribunal found itself "constrained to accept" the $726,272 interest award as well.  (*Id.* ¶¶ 255-258).

### 2.  Subsequent Procedural History

Plaintiff moved this Court to vacate the Award on January 27, 2025.  (Dkt. #68).  On January 28, 2025, Plaintiff filed a sealed memorandum of law in support of its motion.  (Dkt. #72).  It then filed the same document, unsealed, on February 12, 2025.  (Dkt. #85).  On March 12, 2025, Defendants filed a cross-motion to confirm the Award (Dkt. #89), and a memorandum of law in support thereof (Dkt. #88).  On April 25, 2025, Plaintiff filed its reply brief in support of its motion to vacate the Award and in opposition to Defendants' cross-motion to confirm the Award.  (Dkt. #94).  On May 6, 2025, Defendants filed their reply brief in further support of their cross-motion to confirm the Award.  (Dkt. #96).  Perceiving Defendants to have made "new arguments and factual claims" in their reply brief, Plaintiff filed an unopposed sur-reply on May 9, 2025.  (Dkt. #97).  Before the Court now are the competing motions to vacate and confirm the Award.  (*See* Dkt. #68, 89).

## DISCUSSION

### A.  Applicable Law

### 1.  Judicial Review of Arbitral Awards

District courts may vacate arbitration awards "only in very unusual circumstances."  *First Options of Chi., Inc.* v. *Kaplan,* 514 U.S. 938, 942 (1995).

The standard for reviewing arbitration awards is "extremely deferential." *Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC,* 497 F.3d 133, 139 (2d Cir. 2007). This preserves the purpose of arbitration, which is to "settl[e] disputes efficiently." *Rich* v. *Spartis,* 516 F.3d 75, 81 (2d Cir. 2008) (quoting *Willemijn Houdstermaatschappij, BV* v. *Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997)).

### 2.    Grounds for Vacatur

#### a.    Statutory Grounds for Vacatur

The Federal Arbitration Act (the "FAA") creates "mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *Hall St. Assocs., L.L.C.* v. *Mattel, Inc.,* 552 U.S. 576, 582 (2008) (citing 9 U.S.C. §§ 9-11). A court must grant a motion to confirm an arbitration award unless the award "is vacated, modified, or corrected" under § 10 or § 11 of the FAA. *Id.*[6] There are four statutory grounds for vacatur:

> (1)    where the award was procured by corruption, fraud, or undue means;
>
> (2)    where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear

---

[6]    Because this Award was entered in the United States, the provisions of Chapter One of the FAA, 9 U.S.C. §§ 1-16, apply to the extent that they do not conflict with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (also known as the "New York Convention") or its enabling legislation, both of which are codified in Chapter Two of the FAA, *id.* §§ 201-208. *See Phoenix Aktiengesellschaft* v. *Ecoplas, Inc.*, 391 F.3d 433, 435 (2d Cir. 2004); *Parsons & Whittemore Overseas Co., Inc.* v. *Societe Generale de L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir. 1974).

> evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  Only § 10(a)(4) is at issue in this case, and so the Court discusses it in more detail below.

### b.    Section 10(a)(4) of the FAA

Given its potential for mischief, the Supreme Court and the Second Circuit have given § 10(a)(4) "the narrowest of readings." *Jock* v. *Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011) (internal quotation marks omitted) (quoting *ReliaStar Life Ins. Co. of N.Y.* v. *EMC Nat'l Life Co.,* 564 F.3d 81, 85 (2d Cir. 2009)), *cert. denied*, 565 U.S. 1259 (2012).  In contractual disputes, "[b]ecause the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits."  *Oxford Health Plans LLC* v. *Sutter,* 569 U.S. 564, 569 (2013) (quoting *E. Associated Coal Corp.* v. *United Mine Workers of Am., Dist. 17,* 531 U.S. 57, 62 (2000)); *cf. Int'l Bhd. of Elec. Workers, Loc. 97* v. *Niagara Mohawk Power Corp.*, 143 F.3d 704, 714 (2d Cir. 1998) ("[A]n arbitrator's award is legitimate and enforceable as long as it 'draws its essence from the collective bargaining agreement.'" (quoting *United Steelworkers of Am.* v. *Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960))).

The only question "is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Oxford Health Plans LLC*, 569 U.S. at 569. "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice that his decision may be unenforceable." *Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (alterations in original) (internal quotation marks omitted) (quoting *Major League Baseball Players Ass'n* v. *Garvey*, 532 U.S. 504, 509 (2001)).

Section 10(a)(4) permits a more probing review, however, when a party claims that an arbitrator has not fulfilled her obligations as established by the parties' arbitration agreement. "If it is clear that the arbitrator has exceeded his authority" as outlined in the parties' agreement, "the award cannot stand." *Loc. 1199, Drug, Hosp. & Health Care Emps. Union* v. *Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir. 1992); *see also Tully Constr. Co./A.J. Pegno Constr. Co., J.V.* v. *Canam Steel Corp.*, No. 13 Civ. 3037 (PGG), 2015 WL 906128, at *18 (S.D.N.Y. Mar. 2, 2015) ("In issuing an award in a form that does not comply with the arbitration agreement that is the source of the arbitrator's power and authority, an arbitrator does in fact exceed the authority that was granted to him to resolve the parties' dispute."). This includes "when the arbitrator renders a form of award that does not satisfy the requirements the parties stipulated to." *Tully*, 2015 WL 906128, at *18.

### c.    Judicially Created Grounds for Vacatur

### i.    Manifest Disregard of the Law[7]

In addition to the four statutory grounds, courts have created additional bases for vacating an arbitration award.  *See DiRussa* v. *Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997).  In the Second Circuit, a court may overturn an award if an arbitrator "has acted in manifest disregard of the law." *Porzig*, 497 F.3d at 139.  When a contract is at issue, courts can modify or vacate an arbitration award when "the arbitrator's award is in manifest disregard of the terms of the parties' relevant agreement."  *Schwartz* v. *Merrill Lynch & Co., Inc.*, 665 F.3d 444, 452 (2d Cir. 2011) (internal quotation marks omitted and alteration adopted) (quoting *Yusuf Ahmed Alghanim & Sons, W.L.L.* v. *Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)).

---

[7]    Plaintiff points out that "New York has an analogous and applicable provision to FAA § 10(a)(4) under [New York Civil Practice Law and Rules ("CPLR")] § 7511(b)(iii)," which provision allows vacatur when an arbitration "award is irrational."  (Pl. Br. 8-9 (first citing *Rivera* v. *N.Y.C. Tr. Auth.*, 187 N.Y.S.3d 768, 768-69 (2023), and then citing *Kudler* v. *Truffelman*, 941 N.Y.S.2d 44, 45 (2012))).  In its submissions to this Court, Plaintiff combines the "irrationality" state law analysis and the "manifest disregard" federal law analysis.  (*See, e.g.*, *id.* at 25-26; Pl. Reply 6).  The Court believes it appropriate to analyze the parties' competing claims only under the FAA, and not the CPLR.  *See Andriesz* v. *BGC Fin., L.P.*, No. 24 Civ. 7004 (LJL), 2025 WL 1184097, at *4 (S.D.N.Y. Apr. 23, 2025) ("Petitioner's contract provides that it 'shall be governed by and construed in accordance with the laws of the State of New York.'  However, the courts in this District have uniformly held that '[i]n the absence of more critical language concerning enforcement, the provisions of the FAA [and not those of the CPLR] apply to motions to compel arbitration and to confirm and vacate an arbitral award.'" (internal quotation marks and citation omitted) (alteration in original) (collecting cases)), *appeal dismissed*, No. 25-1341 (2d Cir. Aug. 1, 2025); *cf. Flintlock Constr. Servs., LLC* v. *Arch Specialty Ins. Co.*, No. 23 Civ. 1701 (LGS), 2024 WL 863700, at *3 (S.D.N.Y. Feb. 29, 2024) ("There is little practical difference between the standards applied by the CPLR and the FAA to the question of whether an arbitral award should be vacated.  Under either standard, judicial review of arbitration awards is deferential, limited and narrowly circumscribed." (collecting cases)), *aff'd*, No. 24-791-cv, 2025 WL 573425 (2d Cir. Feb. 21, 2025) (summary order).

The Second Circuit has repeatedly emphasized that this ground for vacatur applies only in "those exceedingly rare instances where some egregious impropriety on the part of the arbitrator[ ] is apparent." *T.Co Metals, LLC* v. *Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (alteration in original) (internal quotation marks omitted) (quoting *Stolt-Nielsen SA* v. *AnimalFeeds Int'l Corp.*, 548 F.3d 85, 91-92 (2d Cir. 2008)); *accord Kellner* v. *Amazon*, No. 22-734, 2023 WL 2230288, at *2 (2d Cir. Feb. 27, 2023) (summary order). Specifically, "[t]o succeed in challenging an award under the manifest disregard standard, a party must make 'a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it.'" *Seneca Nation of Indians* v. *New York*, 988 F.3d 618, 626 (2d Cir. 2021) (quoting *Schwartz*, 665 F.3d at 452); *accord Westerbeke Corp.* v. *Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208-09 (2d Cir. 2002). In the context of a contractual dispute, vacatur "is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." *Westerbeke Corp.*, 304 F.3d at 222.

An "award should be enforced, despite a court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached." *T.Co Metals, LLC*, 592 F.3d at 339 (internal quotation marks omitted) (quoting *Stolt-Nielsen SA*, 548 F.3d at 92); *accord Kellner*, 2023 WL 2230288, at *2. If

the arbitrators make an "error that an average person qualified to serve as an arbitrator should have instantaneously perceived and corrected," the arbitrators lack a "barely colorable justification." *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 13-14; *accord Smarter Tools Inc.* v. *Chongqing SENCI Imp. & Exp. Trade Co., Ltd.*, 57 F.4th 372, 383 (2d Cir. 2023); *Weiss* v. *Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019).

### ii.    Contravention of Public Policy

Another judicially created basis for vacatur exists when an award "is contrary to public policy." *Caremark, L.L.C.* v. *N.Y. Cancer & Blood Specialists*, 740 F. Supp. 3d 340, 355 (S.D.N.Y. 2024); *see also United Paperworkers Int'l Union, ACL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 42 (1987) ("A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy."). The "deferential" approach to reviewing arbitrator's decisions "is not applied '[i]f the contract as interpreted by [the arbitrator] violates some explicit public policy'; in that circumstance the courts 'are obliged to refrain from enforcing it.'" *Schwartz*, 665 F.3d at 452 (alterations in original) (quoting *W.R. Grace & Co.* v. *Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum, & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983)).

But this more probing review "does not … sanction a broad judicial power to set aside arbitration awards as against public policy." *Schwartz*, 665

20

F.3d at 452 (internal quotation marks omitted) (quoting *Misco*, 484 U.S. at 43).

Instead, "[a] reviewing court's authority to vacate on public policy grounds is

restricted to 'situations where the contract as interpreted would violate some

explicit public policy that is well defined and dominant, and is to be

ascertained by reference to the laws and legal precedents and not from general

considerations of supposed public interests.'" *Caremark*, 740 F. Supp. 3d at

355 (quoting *Misco*, 484 U.S. at 43). In addition, "[t]he party seeking to prevent

enforcement of the award must 'clearly show[ ]' a violation of public policy."

*DiRussa*, 121 F.3d at 825 (second alteration in original) (quoting *Misco*, 484

U.S. at 43).

## B.    Analysis

Plaintiff raises a series of challenges, each of which it claims

independently warrants vacatur of the Award. (*See* Pl. Br. 2). Plaintiff argues

that three of the Tribunal's substantive determinations exceeded its power and

manifestly disregarded the law: (i) its $18 million damages award (*see id.* at

9-16); (ii) its interpretation of the virus removal performance standard (the

"Virus Removal Requirement") (*see id.* at 19-22); and (iii) its finding that the

parties had canceled KTC's obligation to produce GF-2 and PWF filters (*see id.*

at 22-25). Further, Plaintiff argues that the damages calculation is contrary to

public policy. (*See id.* at 16-18). In addition to its substantive challenges,

Plaintiff argues that, in multiple instances, the Tribunal exceeded its powers

and manifestly disregarded the law by violating its contractual obligation to

explain all conclusions of law and fact. (*See id.* at 12-15, 21-28).

21

Unsurprisingly, Defendants cross-move to confirm the Award. (Def. Br. 20-21).[8] They also ask the Court to award attorneys' fees incurred in connection with the proceedings before this Court. (*See id.* at 19-20). The Court considers each argument below, ultimately confirming the Award but denying Defendants' request for attorneys' fees.[9]

### 1. The Tribunal's Damages Award Did Not Exceed Its Authority or Manifestly Disregard the Law

Plaintiff first contests the damages figure of approximately $18 million that the Tribunal awarded to KTC. (Pl. Br. 9-18). To review, the Initial Agreement granted OWFC a temporary exclusive license that would become permanent when OWFC paid the license fee. (Initial Agreement ¶¶ 5.1-5.2). OWFC's failure to pay would constitute a "material breach of th[e] Agreement," and "the [market] in default" would "be deemed no longer licensed for use by [OWFC] and KTC [would] have the option to either allow [OWFC] to continue supplying that [market] or license a third party to assume such license rights." (*Id.* ¶ 5.4). Addendum 8 also notes that "[f]ailure of OWFC to make the License

---

[8]     Defendants' rebuke of Plaintiff's argument is more cursory than the Court would have preferred, focusing principally on the granularity of the Tribunal's award and the paucity of supporting evidence for certain of Plaintiff's claims. (*See, e.g.*, Def. Reply 1 (arguing that Defendants contested Plaintiff's arguments by the sheer act of asking for confirmation of the Award)).

[9]     Plaintiff appears to think that Defendants' failure to vigorously contest certain of Plaintiff's arguments means that Defendants have conceded that vacatur is warranted. (*See, e.g.*, Pl. Reply 1 & n.1; Pl. Sur-Reply 1-3). Not so: Defendants have sufficiently (if tersely) contested Plaintiff's arguments in their briefing. In any event, Plaintiff bears the burden of showing that vacatur is warranted. *See D.H. Blair & Co.*, 462 F.3d at 110 ("A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high.").

22

Fee payments specified" would "result in the termination of OWFC['s] exclusive rights" in the given markets.  (Add. 8 ¶¶ 7.3-7.4; *see also id.* ¶¶ 8.3, 8.5).

Plaintiff asserts that the Tribunal exceeded its powers by awarding damages in unpaid license fees, when "under the express, unambiguous terms of the Agreement, the Tribunal was not authorized to award KTC one cent in unpaid license fees."  (Pl. Br. 9).  That is, Plaintiff argues that once the Tribunal awarded damages based on unpaid license fees, it "rewr[ote]" rather than interpreted the Agreement.  (*Id.*).  Plaintiff makes two related arguments about the Agreement's terms to support its point: (i) that the Agreement provides OWTC with an "option," rather than a mandate, to pay the license fee (*id.* at 10); and (ii) that the Agreement establishes that "the only consequences" for failing to pay the license fee "would be loss of … exclusivity" (*id.*).  If true, these two points would arguably hamstring the Tribunal's ability to award KTC damages based on unpaid license fees.  But, as explained below, the Agreement is not as clear as Plaintiff contends.

### a.    Whether the License Fee Was Optional

To begin, nowhere in the Agreement is OWFC's payment for the permanent license listed as an "option."  (*Cf.* Initial Agreement ¶¶ 5.1-5.2, 5.4). Instead, the Agreement stipulates that the temporary license "becomes" permanent when OWFC pays the license fee, which would occur within a given timeframe.  (*Id.* ¶¶ 5.1-5.2).  These provisions may be interpreted to grant OWFC an option to withhold the license fee, but they also may be interpreted to establish a mandated payment process.

Lending credence to the view that the parties intentionally rejected making the permanent license optional is the drafters' clear use of the word "option" elsewhere in the Agreement.  In discussing the consequences of OWFC's failure to pay the license fee, the drafters gave KTC an "*option* to either allow [OWFC] to continue supplying that [market] or license a third party to assume such license rights."  (Initial Agreement ¶ 5.4 (emphasis added)).  In contrast, the text about OWFC's license fee obligation does not mention an "option" and therefore does not mandate that the Tribunal treat it as one.  *See Oxford Health Plans LLC*, 569 U.S. at 569.

### b.    Whether the Tribunal Could Award Unpaid License Fees as Damages

Plaintiff similarly fails to prove that the Tribunal lacked the authority to award unpaid license fees as damages.  Awarding damages is well within an arbitrator's power.  *See Westerbeke Corp.*, 304 F.3d at 220 (explaining that arbitrators have "broad power" to award damages); *Caremark*, 740 F. Supp. 3d at 353 ("Where an arbitration clause is broad, arbitrators have the discretion to order such remedies as they deem appropriate." (internal quotation marks omitted) (quoting *ReliaStar*, 564 F.3d at 86)); *Fellus* v. *Sterne, Agee & Leach, Inc.*, 783 F. Supp. 2d 612, 618-19 (S.D.N.Y. 2011) ("A party cannot successfully argue that the arbitrators exceeded their authority to award damages where the party did not dispute the arbitrators' authority to award damages generally, but only that they did not properly award damages under the specific facts of the case.").

Undaunted, Plaintiff asserts that "written explicitly and unambiguously" in the Agreement is that "the *only* consequences" of failing to pay the license fee "would be loss of … exclusivity." (Pl. Br. 10 (emphasis added)). No such unambiguous wording is present. To be sure, the Agreement lists loss of exclusivity as a remedy for the failure to pay the license fee. (Initial Agreement ¶ 5.4; Add. 8 ¶¶ 7.3-7.4, 8.3, 8.5). But the Agreement nowhere describes it as the "only" remedy. Plaintiff is correct that the Agreement makes no mention of OWFC's responsibility to pay unpaid license fees in the event of breach. (Pl. Br. 12). But neither does the Agreement foreclose such a reading. In fact, it says that the failure to pay a license fee qualifies as a "material breach of this Agreement," suggesting that traditional remedies for breach may be available. (Initial Agreement ¶ 5.4). And it gives the non-breaching party the power to "demand and initiate recourse against the [breaching] Party." (*Id.* ¶ 5.15). Furthermore, the Agreement clearly sets out the cost of the license. (*See* Add. 8, App. A).

Here, KTC sought recourse against OWTC for an alleged breach, and the Tribunal awarded KTC damages based on the provision of the Agreement establishing the license fee. (*See* Award ¶¶ 245-254). Because the Agreement did not expressly prohibit it from doing so, the Tribunal's damages award was defensible. *See Westerbeke Corp.*, 304 F.3d at 220; *Caremark*, 740 F. Supp. 3d at 353. And that is all that § 10(a)(4) requires. *See Oxford Health Plans LLC*, 569 U.S. at 569 (noting that the question "is whether the arbitrator (even arguably) interpreted the parties' contract").

The Court recognizes that Plaintiff may have a creditable interpretation of the Agreement. But Plaintiff's view is just that — an interpretation. The Tribunal did not exceed its authority or manifestly disregard the law by interpreting the Agreement differently. *See Schwartz*, 665 F.3d at 452; *Westerbeke Corp.*, 304 F.3d at 222.

### 2. The Tribunal's Damages Award Does Not Contravene Public Policy

Plaintiff next argues that the Tribunal's damages award violates public policy. (Pl. Br. 16-18). The standard for a court to vacate an arbitration award as contrary to public policy is high. It requires the "contract as interpreted" by the arbitrator to "violate 'some explicit public policy' that is 'well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Misco*, 484 U.S. at 43 (internal quotation marks omitted) (quoting *W.R. Grace & Co.*, 461 U.S. at 766). The violation of public policy "must be clearly shown." *Id.*

Here, Plaintiff must "clearly show[ ]" that a contract which, upon breach, permitted a court to both terminate the agreement and award unpaid license fees, would violate a "well defined and dominant" public policy such that it could not be enforced. *Misco*, 484 U.S. at 43. Plaintiff asserts that the Award contravenes two public policies: one "against unjust enrichment" and one against "the enforcement of penalties in contracts." (Pl. Br. 16-18). These arguments differ in persuasiveness, but ultimately both fail.

26

### a.    Unjust Enrichment

Plaintiff's unjust enrichment argument fails by its terms.  Under New York law, unjust enrichment is a cause of action available when there is no contract.  *See Amable* v. *New Sch.*, 551 F. Supp. 3d 299, 318 (S.D.N.Y. 2021) ("The claim [for unjust enrichment] is available 'only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.'" (quoting *Corsello* v. *Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012))).  Plaintiff has provided no case, and the Court is aware of none, in which unjust enrichment served as a public policy defense to enforcing an otherwise valid contract.  (*Cf.* Pl. Br. 16-17).[10]  Plaintiff's contention that the Award qualifies as "textbook unjust enrichment" is therefore misguided.  (*Id.* at 17).

### b.    Enforcement of Penalties

In contrast, Plaintiff's argument that the Agreement as interpreted by the Tribunal would violate New York's policy against the enforcement of penalties is worthy of deeper discussion.  As Plaintiff explains, the Award both grants Defendants damages in unpaid license fees and terminates the Agreement such that Defendants may re-license to other entities — a "windfall" if the

---

[10]    In fact, when the parties share a contractual relationship, as here, unjust enrichment is unavailable as a claim.  *See, e.g.*, *Goldberg* v. *Pace Univ.*, 535 F. Supp. 3d 180, 198 (S.D.N.Y. 2021) ("Under New York law, a plaintiff may not recover under quasi-contract claims such as unjust enrichment where an enforceable contract governs the same subject matter."); *Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.").

Defendants' ability to re-license has value. (Pl. Br. 16-17).[11] Plaintiff, on the other hand, must pay the cost of the exclusive license, while losing the right to use that license in the future because the Agreement is no longer in place. Plaintiff argues that this result "is a penalty against OWFC, which New York law has a well-established policy of refusing to enforce." (*Id.* at 17). This question is close, but the Court ultimately concludes that Plaintiff has not clearly shown that enforcing the damages award levies a "penalty" under New York law, and it therefore declines to vacate the Award as violating public policy.

New York has a "well-established policy of refusing to enforce penalty provisions in contracts." *PDV Sweeny, Inc.* v. *ConocoPhillips Co.*, No. 14 Civ. 5183 (AJN), 2015 WL 5144023, at *8 (S.D.N.Y. Sept. 1, 2015). If a contract awards damages that "bear[ ] a reasonable proportion to the probable loss," the award "will be sustained." *Truck Rent-A-Ctr., Inc.* v. *Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977). "If, however, the amount fixed is plainly or grossly

---

[11]   Part of Plaintiff's argument here is that granting Defendants a "windfall" alone violates public policy. (Pl. Br. 16). But windfalls only violate public policy when the recipients of the windfall have "themselves engaged in wrongful conduct." *McDaniel* v. *Bear Stearns & Co.*, 196 F. Supp. 2d 343, 364 (S.D.N.Y. 2002); *see also Barker* v. *Kallash*, 459 N.Y.S.2d 296, 296-99 (2d Dep't 1983) ("[T]he public policy of this State require[s] that [a party] not be allowed to profit from his wrongdoing[.]" (citing *Riggs* v. *Palmer*, 115 N.Y. 506, 511 (1889))). Here, the Tribunal held that Defendants had clean hands (*see* Award ¶ 293(a) (denying Plaintiff's claims)), so granting them a windfall does not, on its own, violate public policy.

   Defendants, for their part, argue that there is no "windfall" because "OWFC has had the full benefit of exclusivity." (Def. Br. 19; *see also* Def. Reply 6). This may be true now, but the Tribunal's termination of the contract ensures that KTC will retain the benefits of exclusivity going forward, which *could* qualify as a windfall.

disproportionate to the probable loss, the provision calls for a penalty and will not be enforced." *Id.*

Here, the Court cannot say that the Tribunal's damages award "is plainly or grossly disproportionate to [KTC's] probable loss." *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425. The Award simply requires OWTC to pay exactly what OWTC promised it would pay under the Agreement, a figure that dovetailed with the damages analysis provided by KTC's expert witness. (Award ¶ 254). In fact, when making its damages calculation, the Tribunal considered whether OWFC had made any license fee payments to justify lowering the amount. (*Id.* ¶ 253 n.107). It had not, so the Tribunal awarded the full license fee as damages. This consideration demonstrates the Tribunal's effort to compensate KTC for its losses rather than to punish OWFC. *Cf. Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 424 (noting that a penalty "is not intended to provide fair compensation but to secure performance by the compulsion of the very disproportion"); *McDaniel* v. *Bear Stearns & Co.*, 196 F. Supp. 2d 343, 364 (S.D.N.Y. 2002) ("The Award states that, in arriving at the $1 million figure, '[t]he panel took into account that Claimants' actions and inactions contributed to their losses.' Thus, the … damages award reflected the very public policy considerations [Respondents] claims were ignored." (internal citation omitted) (first alteration in original)).

The decision of the New York Court of Appeals in *Trustees of Columbia University in the City of New York* v. *D'Agostino Supermarkets, Inc.*, 36 N.Y.3d 69 (2020), is instructive on this point. That case concerned a liquidated damages provision in a surrender agreement that related to a lease agreement,

under which, "if defendant timely made all but the final monthly surrender payment of $15,977.43, defendant's breach would render it liable for $1,020,125.15," which was the full payment due for the remainder of the underlying lease. *Id.* at 72, 77. The Court of Appeals held that the provision qualified as a penalty because it was "obviously and grossly disproportionate." *Id.* at 80. In so holding, the Court of Appeals emphasized that (i) the damages award was "more than sevenfold the amount due if defendant had complied fully with the surrender agreement," *id.*, and (ii) the damages were the same notwithstanding any completed surrender payments, *id.* at 77.

The Tribunal's Award avoids both worries that animated the Court of Appeals in *D'Agostino Supermarkets*. *First*, the Award, under any interpretation, does not impose liability beyond what OWFC owed in the Agreement. (*See* Award ¶¶ 253-254). *Second*, the Tribunal explicitly tied its damages calculation to the license fees that OWFC had yet to pay, and it only awarded the full license fee as damages because OWFC had paid none of its obligation. (*See id.* ¶ 253 n.107). The damages award thus "bears a reasonable proportion to the probable loss." *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425. As a sister court in this District has stated, a damages award that "reflect[s] the amounts" that a party "would have paid … does not render the Award punitive or noncompensatory." *N.Y. & Presbyterian Hosp.* v. *N.Y. State Nurses Ass'n*, No. 24 Civ. 5648 (JLR), 2024 WL 5107586, at *5 (S.D.N.Y. Dec. 13, 2024).

OWFC's best argument is that the disproportionality comes from the combination of the damages award and the termination of OWFC's exclusive rights. (Pl. Br. 18). But the Court understands that Defendants have not, as of the date of this Opinion, been able to re-license the rights at issue. (*See* Def. Br. 19 ("This audacious argument tries to blind the Court to the fact that OWFC has maintained exclusive rights to KTC's technology … . Indeed, until the arbitral award is confirmed, OWFC will continue to tie-up KTC's technology.")). And determining the value of the exclusive rights going forward — *i.e.*, after KTC regains the ability to re-license the rights — is a factual determination that the arbitrators, not the Court, must make. *See Wallace* v. *Buttar*, 378 F.3d 182, 192 (2d Cir. 2004) ("[T]he court should not conduct an independent review of the factual record presented to the arbitral panel in order to achieve the 'correct result.'"). Because the value of the exclusive rights going forward is unclear, the Court is uncertain whether the damages award is disproportional at all.

The Court thus cannot say that Plaintiff has met its burden of "clearly show[ing]" that the Award is a penalty. *Misco*, 484 U.S. at 43.[12] The Tribunal may have calculated damages differently than the Court would have, but that alone does not turn the Award into a penalty. *Cf. Bates Advert. USA, Inc.* v.

---

[12]    Furthermore, the Court disagrees with Plaintiff's worry that upholding the Award "would coerce OWFC to perform by paying for exclusive rights, even if KTC could never meet its obligation to deliver compliant Filter Products." (Pl. Br. 18). If KTC could not deliver compliant products, it would be the breaching party, and OWFC would be excused from performance. All the Award purports to do is compensate KTC for the loss of license fees that OWTC, as the breaching party, was obligated to pay under the Agreement.

*498 Seventh, LLC*, 7 N.Y.3d 115, 120 (2006) (holding that damages are not "transformed into a penalty merely" by the fact that they "encourage parties to comply with their contractual obligations … , so long as they are not grossly out of scale with foreseeable losses").

### 3. The Tribunal's Interpretation of the Virus Removal Requirement Did Not Exceed Its Authority or Manifestly Disregard the Law

Plaintiff next argues that the Tribunal's interpretation of the Virus Removal Requirement exceeded its authority and manifestly disregarded the law. (Pl. Br. 19-22). When considering whether KTC's filters satisfied the Virus Removal Requirement, the Tribunal noted that "OWFC failed to present evidence showing that the filters [KTC] delivered did not in fact meet the performance metrics." (Award ¶ 165). In contrast, Defendants "presented evidence showing that the filters could achieve, or likely would be able to achieve, that performance, and did in fact achieve it under testing conditions that more closely matched contractually stipulated flowrates." (*Id.*). As a result, the Tribunal rejected OWFC's claim that the filters failed to meet the virus removal standard "for lack of evidence." (*Id.* ¶ 164).

Plaintiff asserts that this line of reasoning shows that the Tribunal "changed the unambiguous written requirement" that KTC's filters be "*rated to remove at least 99.99% of viruses*" to a lower requirement that the filters "*'could remove'* or *'likely would be able to'* remove at least 99.99% of viruses." (Pl. Br. 20). By applying the purportedly lower standard, Plaintiff contends, "the Tribunal failed to even arguably *interpret* [the Agreement] and instead

32

rewrote the express, unambiguous term to require a lesser obligation." (*Id.*; *see also* Pl. Sur-Reply 2).

This argument fails. The Tribunal, by using terms like "could achieve" and "likely would be able to achieve," was not changing the standard required by the Agreement. Instead, it was examining different pieces of evidence and determining if they "could" prove the standard. In fact, Plaintiff conveniently leaves out that after using the modal language of "could" and "would be able to," the Tribunal found that the filters "did in fact achieve" the standard. (Award ¶ 165).

It is the arbitrator's job to weigh evidence. *See Wallace*, 378 F.3d at 183 (explaining that district courts must not "weigh[ ] evidence … when faced with the question of whether a decision issued by an arbitral panel should be confirmed"); *Nicholls* v. *Brookdale Univ. Hosp. & Med. Ctr.*, 204 F. App'x 40, 43 (2d Cir. 2006) (summary order) ("[I]t is the arbitrator's role to make factual findings, weigh evidence, and assess the credibility of witnesses, and it is well-settled that '[a] federal court may not conduct a reassessment of the evidentiary record.'" (second alteration in original) (quoting *Wallace*, 378 F.3d at 193)). And the Court declines Plaintiff's invitation to question the Tribunal's assessment of the evidence here. The Tribunal did not exceed its authority or manifestly disregard the law when interpreting the Virus Removal Requirement. *See Wallace*, 378 F.3d at 191-92 ("[T]he Second Circuit does not recognize manifest disregard of the evidence as proper ground for vacating an

arbitrator's award." (internal quotation marks omitted) (quoting *Success Sys., Inc.* v. *Maddy Petroleum Equip., Inc.*, 316 F. Supp. 2d 93, 94 (D. Conn. 2004))).

### 4. The Tribunal's Interpretation of KTC's Obligations Regarding GF-2 and PWF Filters Did Not Exceed Its Authority or Manifestly Disregard the Law

For similar reasons, the Court refuses to vacate based on the Tribunal's finding that KTC was not obligated to manufacture GF-2 and PWF filters.[13] (*See* Pl. Br. 22-25). The Tribunal credited Dr. Koslow's testimony that the parties had "cancelled the GF-2 and PWF filter programs," and because it did "not have any countervailing evidence to effectively contradict that claim," it found that KTC had no obligation to produce GF-2 and PWF filters. (Award ¶ 186). Plaintiff argues that in so finding, the Tribunal "rewr[o]te a key term" of the Agreement "by removing KTC's one-way contractual obligation" to produce GF-2 and PWF filters "completely." (Pl. Br. 24).

The Tribunal's determination that KTC did not have to produce GF-2 and PWF filters, notwithstanding the terms of the written Agreement, was not the result of the Tribunal's own "rewrit[ing]." (*See* Pl. Br. 24). On the contrary, it resulted from the Tribunal's finding that the *parties* had rewritten the contract. As such, the Tribunal's determination that the parties canceled KTC's GF-2 and PWF filter obligations is a quintessential act of contractual interpretation that the Court may not second-guess. *See Oxford Health Plans LLC*, 569 U.S. at 569.

---

[13] Whether the Tribunal properly *explained* its conclusion pursuant to ¶ 5.19 of the Initial Agreement, however, is another question. *See infra* B.5.

Plaintiff essentially argues that the Tribunal's factual determination was incorrect — that the parties did not, in fact, cancel KTC's GF-2 and PWF filter obligations. (*See* Pl. Br. 23-24 (explaining that even KTC's own timeline of events establishes that the purported cancellation of KTC's GF-2 and PWF obligations occurred before the parties agreed to Addendum 8, which included the GF-2 and PWF obligations)). But as stated above, the Court refuses to second-guess the Tribunal's factual determinations when the Tribunal was "arguably" interpreting the Agreement. *See Oxford Health Plans LLC*, 569 U.S. at 569; *Wallace*, 378 F.3d at 191-92. The Tribunal thus did not exceed its authority or manifestly disregard the law by determining that KTC had no obligation to produce GF-2 and PWF filters.

### 5. The Tribunal Did Not Exceed Its Authority or Act Irrationally by Failing to Explain All Conclusions of Law and Fact

Plaintiff's final set of arguments is that the Tribunal, in numerous ways, exceeded its power by failing to "provide an explanation for all conclusions of law and fact," as the Agreement mandated. (*See* Pl. Br. 12-15, 21-28; Initial Agreement ¶ 5.19). When arbitration agreements require this, or something similar, *see New Elliott Corp.* v. *MAN Gutehoffnungshütte AG*, 969 F. Supp. 13, 14 (S.D.N.Y. 1997) (analyzing an arbitration agreement that required the arbitrators to "make written 'findings of fact and conclusions of law'"), arbitrators must provide more than a "reasoned award," *Leeward Constr. Co., Ltd.* v. *Am. Univ. of Antigua-Coll. of Med.*, 826 F.3d 634, 640 (2d Cir. 2016).

For reviewing courts, "the touchstone is simply whether enough facts are found and enough legal principles stated" to "ascertain the reasons for the

ultimate determination." *New Elliott Corp.*, 969 F. Supp. at 15. For example, in *New Elliott Corp.*, a sister court in this District vacated an arbitration award because "the arbitrators' 'findings of fact' and 'conclusions of law' … were largely conclusory and unparticularized." *Id.* at 15. In that case, "most of the claims … were decided without explicit reference either to facts or to law. As a result, there is no way a reasonable reviewing Court can with any confidence ascertain the reasons for the arbitrators' decisions." *Id.*

Here, Plaintiff argues that the Tribunal, in at least six instances, failed to satisfy its obligation to explain its conclusions of fact and law. (*See* Pl. Br. 12-15, 21-28). Plaintiff's arguments fail because they, in effect, challenge how the Tribunal interpreted the Agreement and weighed evidence, rather than the form of the award. The Court considers each in turn.

*First*, Plaintiff argues that the Tribunal failed to explain its legal basis for awarding unpaid license fees as damages. (Pl. Br. 12-15; Pl. Reply 11-12). But as Plaintiff seems to recognize, its concerns relate more to the Tribunal's interpretation of the Agreement than to any supposed lack of explanation. For example, Plaintiff laments that "[t]he Tribunal provided no explanation for how it reached the conclusion that it was permitted to override the express unambiguous terms of the Agreement and replace it with its own brand of justice." (Pl. Reply 11; *see also* Pl. Br. 14-15). But, as explained above, *see supra* B.1, there were no "express unambiguous terms" that the Tribunal was "overrid[ing]" (Pl. Reply 11), so it did not need to provide the explanation that Plaintiff seeks. Instead, the Award explains in detail why the Tribunal granted

KTC's breach of contract claim for unpaid license fees and how it calculated damages (*see* Award ¶¶ 240-259), which is all ¶ 5.19 of the Agreement requires.

*Second*, Plaintiff argues that the Tribunal failed to explain its factual finding that KTC's filters did not fail the Virus Removal Requirement. (Pl. Br. 21). That argument is similarly unavailing. The Tribunal explained its view, in detail, that OWTC's evidence of noncompliance was "highly problematic," while KTC had presented evidence that it did "in fact achieve[ ]" the Virus Removal Requirement. (Award ¶¶ 165, 172-180). The Tribunal then "balance[d]" the evidence to determine that OWFC had not proven that KTC's filters failed the Virus Removal Requirement. (*Id.* at ¶ 181). The Tribunal aptly explained its finding (*see id.* ¶¶ 164-182), such that the Court has no trouble "ascertain[ing] the reasons for the [Tribunal's] ultimate determination," *New Elliott Corp.*, 969 F. Supp. at 15.

*Third*, Plaintiff argues that the Tribunal failed to explain its factual finding that KTC's obligations to produce GF-2 and PWF filters had been canceled. (Pl. Br. 22-24). Again, Plaintiff's concerns are more that the Tribunal explained its conclusion *poorly* than that the Tribunal did not explain its conclusion at all. For example, Plaintiff singles out the Tribunal's statement that it lacked "any countervailing evidence to effectively contradict" Dr. Koslow's testimony that the parties orally canceled the GF-2 and PWF programs. (Award ¶ 186; *see also* Pl. Br. 22-23). Plaintiff asserts that this statement "failed to acknowledge numerous evidence probative to timing of the

statement." (Pl. Br. 23-24). That may be true. *See supra* B.4. But devaluing evidence in an explanation does not equate to providing no explanation at all. *See Wallace*, 378 F.3d at 193 ("A federal court may not conduct a reassessment of the evidentiary record[.]"). And the Tribunal's statement clearly explains how it reached its finding that the parties orally canceled the GF-2 and PWF programs. This type of explanation is sufficient under ¶ 5.19. *See New Elliott Corp.*, 969 F. Supp. at 15.

*Fourth*, Plaintiff argues that the Tribunal failed to explain its conclusions regarding what caused the IAPMO tests to fail. (Pl. Br. 25-26). Here, Plaintiff acknowledges that its challenge is to the Tribunal's use of evidence. Specifically, Plaintiff bases its claim on the fact that "[t]he Tribunal never explained how, or even *if*, it considered" OWFC's countervailing testimony as to the cause of the IAPMO test failures. (*Id.* at 26). But Plaintiff recognizes that "[t]he Tribunal did provide some explanation" on the point. (*Id.* at 25). Plaintiff's quarrel is that the Tribunal adopted KTC's explanation (*see id.*), not that the Tribunal failed to explain at all. As such, Plaintiff's argument, like its prior three, amounts to a "manifest disregard of the evidence" challenge, which is not recognized in this Circuit. *See Wallace*, 378 F.3d at 191-93.

*Fifth*, Plaintiff argues that the Tribunal failed to explain its conclusion about the insufficiency of OWFC's extrinsic evidence supporting its certification claim. (Pl. Br. 26-27). This argument fails for a similar reason. On its face, this challenge attacks the Tribunal's weighing of evidence. (*See id.* at 27 ("In failing to provide an explanation as to how it reached the conclusion that the

extrinsic evidence that OWFC relied on didn't support its position, the Tribunal exceeded its powers[.]")).  Plaintiff acknowledges that the Tribunal "did … explain" itself here; Plaintiff just believes the explanation ignores key evidence. (*Id.* (citing Award ¶¶ 152, 159)).  Plaintiff may be right that the Tribunal does not explain in detail its weighing of evidence.  But ¶ 5.19 requires only that the Tribunal "explain" its factual and legal conclusions (Initial Agreement ¶ 5.19); it does not require the Tribunal to present disquisitions on each piece of evidence, *see New Elliott Corp.*, 969 F. Supp. at 15 (explaining that an award should be upheld as long as "a reviewing tribunal can ascertain the reasons for the ultimate determination").

*Sixth*, Plaintiff argues that the Tribunal failed to address "OWFC['s] alleg[ations] that KTC materially breached the Agreement by failing to manufacture and sell … filters to OWFC that meet minimum flow/size requirements under" Appendix B of the Initial Agreement.  (Pl. Br. 27; *see also* Dkt. #85-22 ¶¶ 248-251).  This challenge to the form of the Award is Plaintiff's strongest, but it still does not require vacatur or remand.  Before the Tribunal, Plaintiff raised six "[g]rounds" for its breach of contract claim.  (Dkt. #85-22 ¶¶ 213-260).  One of those was an argument that OWFC provided "filters that did not meet the flow rate set forth in the agreement."  (*See id.* ¶¶ 249-251).[14] Plaintiff argues that the Award does not address this ground for breach "at all." (Pl. Br. 27-28).

---

[14]     Notably, this argument had nothing to do with the size requirements for the filters, despite Plaintiff's assertion in its brief.  (*See* Pl. Br. 27).

It is true that in the Award, the Tribunal did not explicitly address OWFC's flow rate argument. (*See* Award ¶¶ 123-124 (describing the "alleged breaches" and listing OWFC's arguments related to the Virus Removal Requirement and IAPMO certification, but not its arguments related to flow rate)). It might have been advisable for the Tribunal to have explicitly addressed Plaintiff's flow rate argument in a separate section. But the Award still satisfies the requirements of ¶ 5.19.

*First*, the Award includes a catchall clause stating that "[a]ny other claims, counterclaims, or defenses on the merits that are not specifically referenced above are hereby denied on the merits." (Award ¶ 294). This leads the Court to believe that the Tribunal considered Plaintiff's flow rate argument and rejected it.

*Second*, and more importantly, the Tribunal's explanation for its rejection of Plaintiff's flow rate argument can be found in the Award's description of the Agreement itself. Specifically, the Tribunal interpreted the Agreement to "obligate[ ] KTC to develop and produce water filters of a specified size that met certain contaminant reduction metrics at specified flowrates." (Award ¶ 135). This statement makes clear that the Tribunal rejected Plaintiff's view that the flow rate standard listed in the Agreement was, like the size description, a manufacturing requirement. Instead, the Tribunal interpreted the flow rate as a condition under which the filters' performance would be tested. (*See id.* ¶ 165 (calling the "contractually stipulated flowrates" part of the "testing conditions")).

40

In other words, under Plaintiff's interpretation of the Agreement, KTC was obligated to produce filters that both met the Virus Removal Requirement *and* accommodated specific flow rates. (Pl. Br. 19-22, 27-28). But under the Tribunal's interpretation of the Agreement, the specified flow rate was a condition under which the Virus Removal Requirement would be tested, not a separate manufacturing requirement itself. Indeed, the Award repeatedly refers to the flow rate as a testing condition for the filter's performance throughout its section discussing the Virus Removal Requirement. (*See* Award ¶¶ 165, 167, 170-173, 176-181).

The Agreement requires the Tribunal to provide only "enough facts … and enough legal principles" for the reviewing court to "ascertain the reasons for the ultimate determination." *New Elliott Corp.*, 969 F. Supp. at 15. The Tribunal did not explicitly dispose of one of OWFC's grounds for breach, but the Award's discussion of the Agreement itself makes clear that the Tribunal rejected OWFC's argument as a matter of contractual interpretation. Because the Tribunal's discussion was sufficient for this Court to "ascertain the reasons" the Tribunal rejected OWFC's final ground for breach, *see id.*, and because this Court cannot override the Tribunal's interpretation of the Agreement, *see Oxford Health Plans LLC*, 569 U.S. at 569, the Court cannot find that the Tribunal exceeded its powers or manifestly disregarded the law.

### 6. The Court Confirms the Arbitration Award But Declines to Award Attorneys' Fees

Each of Plaintiff's arguments for vacating the Award fails. *See supra* B.1-B.5. As such the Court confirms the Award. *Hall St. Assocs.*, 552 U.S. at

41

582 ("Under the terms of § 9, a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected." (quoting 9 U.S.C. § 9)).

As a final point, the Court denies Defendants' request that it award KTC attorneys' fees associated with the cross-motions to confirm and vacate the Award. (*See* Def. Br. 19-20).[15]  Defendants' request is based on their assertion that OWFC has "'refus[ed] to abide by' the Award 'without justification.'"  (*Id.* at 19 (alteration in original) (quoting *Int'l Chem. Workers Union (AFL-CIO), Loc. No. 227* v. *BASF Wyandotte Corp.*, 774 F.2d 43, 47 (2d Cir. 1985))).

But this is not true.  As Plaintiff explains, it "has not refused to abide by the Award; it has simply sought to invoke its statutory right to move to vacate it." (Pl. Reply 14).  "KTC has not demonstrated any bad faith conduct … to justify the grant of attorneys' fees." (*Id.* at 15).  *See also Abondolo* v. *Jerry WWHS Co.*, 829 F. Supp. 2d 120, 130 (E.D.N.Y. 2011) (noting that attorneys' fees may be appropriate "when opposing counsel acts in bad faith" (internal quotation marks omitted) (quoting *N.Y.C. Dist. Council of Carpenters Pension Fund* v. *E. Millenium Constr., Inc.*, No. 03 Civ. 5122 (DAB), 2003 WL 22773355, at *2 (S.D.N.Y. Nov. 21, 2003)));  *accord Loc. 553, Int'l Bhd. of Teamsters* v. *Fred Schildwachter & Sons, Inc.*, No. 24 Civ. 9421 (KPF), 2025 WL 2391048, at *4 (S.D.N.Y. Aug. 18, 2025) ("However, pursuant to 'its inherent powers to supervise and control its own proceedings, a district court has the authority to

---

15      In addition, Defendants ask the Court to award KTC attorneys' fees "incurred … in the arbitration." (Def. Br. 19).  But, as Plaintiff explains, the issue of attorneys' fees incurred in the arbitration "is still pending before the Tribunal." (Pl. Reply 15). Therefore, Defendants' request is not properly before this Court.

award attorney[s'] fees to the prevailing party when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" (internal quotation marks omitted) (quoting *Eisemann* v. *Greene*, 204 F.3d 393, 395 (2d Cir. 2000)).  As such, the Court denies Defendants' request for attorneys' fees.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion to confirm the Tribunal's October 28, 2024 Partial Final Award.  Conversely, the Court DENIES Plaintiff's motion to vacate the Award.  The Clerk of Court is directed to terminate the pending motions at docket entries 68 and 89.

The parties are directed to file a joint letter proposing next steps in this case on or before **October 8, 2025**.

SO ORDERED.

Dated:    September 24, 2025
          New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge