**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**International Arbitral Tribunal**

---

**ONE WORLD FILTER CORPORATION**

      **Claimant**

**- against –**

**KOSLOW TECHNOLOGIES CORPORATION**

**and**

**EVAN E. KOSLOW**

      **Respondents**

---

**ICDR Case No. 01-22-0001-7885**

---

**PARTIAL FINAL AWARD**

---

**OCTOBER 28, 2024**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   BACKGROUND ................................................................................. 1

    A.   Parties and Counsel ................................................................. 2

    B.   Procedural History and the Arbitration Agreement ........................ 3

        1.   OWFC Submits a Demand for Arbitration .............................. 3

        2.   The Parties Request that the Arbitration be Suspended .......... 4

        3.   Respondents Submit Their Answer and Counterclaim .......... 5

        4.   The Arbitration Agreement and the Governing Law Clause .. 5

        5.   The Arbitrators Are Appointed ............................................. 6

        6.   Motion to Strike .................................................................. 7

        7.   Preliminary Hearing ............................................................. 7

        8.   Draft Procedural Timetable and Procedural Order No. 1 ....... 8

        9.   Procedural Order No. 2 ........................................................ 11

        10.  Procedural Order No. 3 ........................................................ 11

        11.  Procedural Order No. 4 ........................................................ 12

        12.  Procedural Order No. 5 ........................................................ 14

        13.  Procedural Order No. 6 ........................................................ 15

        14.  Procedural Order No. 7 ........................................................ 16

        15.  Procedural Order No. 8 ........................................................ 17

    C.   The Merits Hearing ................................................................. 17

    D.   Post-Hearing Written Submissions ............................................ 17

III.  OWFC'S AFFIRMATIVE CLAIMS AGAINST RESPONDENTS ............ 19

    A.   OWFC's Express Breach of Contract Claims Fail ...................... 20

        1.   The Key Terms of the Original License Agreement ............... 21

        2.   The Key Terms of Addendum No. 5 to the License Agreement ... 24

        3.   OWFC's Certification Claim Fails Under the Express Terms of the Contract ..................................................................... 28

        4.   OWFC's Performance Claim Fails for Lack of Evidence ....... 33

        5.   OWFC's Remaining Breach of Contract Claims Similarly Fail ... 38

    B.   OWFC's Claim for Breach of the Covenant of Good Faith and Fair Dealing Fails on the Merits .............................................. 40

    C.   OWFC's Unjust Enrichment Claim Fails on the Merits ............... 43

      D.      **OWFC's Fraudulent Inducement Claim Fails on the Merits as a Matter of Fact and Law**...................................................................... 45

      E.      **OWFC Is Not Entitled to Sanctions** ................................................... 49

      F.      **OWFC Is Not Entitled to Any Damages**............................................... 49

IV.      **RESPONDENTS' COUNTERCLAIMS**.......................................................... 50

      A.      **Respondents Have Established the Right to Damages for Unpaid License Fees** ......................................................................................... 50

      B.      **Respondents' Claim for Tortious Interference with Prospective Economic Advantage Fails**................................................................... 55

      C.      **Respondents' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Equally Infirm**............................................ 57

      D.      **Respondents Are Entitled to a Declaration that the License Agreement Is Terminated** ...................................................................... 58

      E.      **Respondents Are Entitled to their Costs**............................................. 59

V.      **PARTIAL FINAL AWARD**............................................................................ 60

## I.   INTRODUCTION

1.   WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into between the above-named Parties dated June 5, 2017, having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as set forth below.

2.   This Partial Final Award is issued pursuant to Section R-46(b) of the American Arbitration Association's ("**AAA**") Commercial Arbitration Rules, as Amended and Effective October 1, 2013 ("**Commercial Rules**"), and resolves the merits of the claims, counterclaims, and defenses asserted between Claimant One World Filter Corporation ("**OWFC**") and Respondents Koslow Technologies Corporation ("**KTC**") and Evan E. Koslow ("**Dr. Koslow**") (collectively, "**Respondents**").

3.   For the reasons that Sections III and IV below explain, this Partial Final Award:

   a.   Denies all of OWFC's express claims;

   b.   Grants Respondents' breach of contract counterclaim for unpaid license fees;

   c.   Awards Respondents damages of $17,346,392.00 in unpaid license fees for that counterclaim;

   d.   Awards Respondents pre-judgment interest of $726,272.00 on that amount; and

   e.   Awards Respondents their costs and expenses, including reasonable attorneys' fees, in an amount to be determined in a subsequent costs award that will be issued after the Parties have provided costs submissions on a date to be decided in consultation with the Tribunal.

4.   The full disposition is set forth in Section V below.

## II.   BACKGROUND

5.   The following sections set forth the background to this Arbitration.

6.   Section A below describes the Parties and their Counsel.

7.   Section B sets forth the Parties' arbitration agreement, and the procedural history of the matter.

8.   Section C recites salient points from the Evidentiary Hearing on the Merits ("**Merits Hearing**"), and Section D addresses the Parties' Post-Hearing Written Submissions.

**A.    Parties and Counsel**

9.   OWFC is the Claimant in this Arbitration.

10.   OWFC is a water filtration manufacturing and marketing company organized under the laws of the British Virgin Islands that has its principal place of business in China.

11.   For the duration of this Arbitration, OWFC's contact details have been:

Unit B
17th Floor
United Centre
95 Queensway, Admiralty Central
Hong Kong
People's Republic of China

12.   Throughout this Arbitration, OWFC has been represented by:

Antonio Papageorgiou
Darren Geliebter
Lombard & Geliebter LLP
230 Park Avenue
4th Floor West
New York, New York 10169
United States of America
P:  +1 212.520.1172
E:  ap@Lombardip.com
   dgeliebter@lombardip.com

13.   All correspondence to OWFC in this Arbitration has been directed to OWFC's Counsel.

14.   KTC is the First Respondent in this Arbitration.

15.   KTC is a company that is incorporated under the laws of the U.S. State of Connecticut that develops and licenses water filtration technology.

16.   Throughout this Arbitration, KTC's contact details have remained:

137 Mattatuck Heights Road
Waterbury, Connecticut 06705
United States of America

17.   Dr. Koslow is the Second Respondent in this Arbitration.

18.     Dr. Koslow is the founder and president of KTC.

19.     Dr. Koslow's contact details throughout this Arbitration have been:

6063 Willow Wood Lane
Dallas, Texas 75252
United States of America

20.     Throughout this Arbitration, both KTC and Dr. Koslow have been represented by:

Wesley Whitmyer, Jr.
Whitmyer IP Group, LLC
600 Summer Street
Stamford, Connecticut 06901
United States of America
P:  +1 203.703.0800
E:  litigation@whipgroup.com[1]

21.     All communications to Respondents were directed to their shared counsel throughout this Arbitration.

**B.      Procedural History and the Arbitration Agreement**

22.     As the following paragraphs demonstrate, the procedural history of this Arbitration has been complex, and has been impacted by numerous events, including several requests by the Parties to alter the initial Procedural Timetable that was set forth in Procedural Order No. 1.

23.     The procedural history is therefore set forth in detail below.

**1.      OWFC Submits a Demand for Arbitration**

24.     OWFC commenced this Arbitration by filing a Demand for Arbitration and Statement of Claim dated April 29, 2022 ("**SOC**") demanding to arbitrate its dispute with Respondents.

---

[1]     Throughout the Arbitration, various persons have been added to or removed from Respondents' Counsel team, with Mr. Whitmyer consistently acting as lead counsel.  For simplicity, only Mr. Whitmyer is therefore listed as Respondents' Counsel.

25.     In its SOC, which expressly incorporated a complaint that OWFC had filed in Federal Court in New York before it commenced this Arbitration, OWFC alleged in relevant part that Respondents:

   a.   Breached the terms of a license agreement they entered into with OWFC on June 5, 2017, which was amended (by addenda) eight times between 2018 and 2020 ("**License Agreement**"), by failing to provide functional water filtration products as the License Agreement required; and

   b.   Intentionally interfered with OWFC's exclusive rights under the License Agreement by colluding with third parties to give those third parties rights that Respondents had licensed to OWFC.[2]

26.     In the SOC, OWFC sought declaratory relief, specific performance, injunctive relief, monetary damages in an undisclosed amount, as well as costs, attorneys' fees, and pre-award and post-award interest on the foregoing amounts.[3]

### 2.     The Parties Request that the Arbitration be Suspended

27.     On May 12, 2022, the International Centre for Dispute Resolution ("**ICDR**"), which is the international division of the AAA and the body administering this Arbitration, held an administrative conference with the Parties.

28.     Following that conference, the Parties jointly requested by letter dated June 2, 2022, that the Arbitration be suspended until June 17, 2022, for settlement discussions to proceed between the Parties.

29.     The ICDR granted that request, put the matter in abeyance until June 17, 2022, and then granted several additional joint requests from the Parties to continue the matter in abeyance.

---

[2]     As Section II.B.12 below describes further, on September 15, 2023, OWFC added a claim that Respondents fraudulently induced OWFC to enter into the final addendum to the License Agreement.

[3]     While the SOC did not state the amount that OWFC was seeking, the federal court complaint that was incorporated by reference sought damages of no less than $1,000,000,000.00, and OWFC's Counsel represented at a Preliminary Hearing that damages could range into the tens of millions of dollars.  At the Merits Hearing, OWFC's Counsel suggested that OWFC's damages could well exceed $1,000,0000,000.00, and could be closer to $5,000,000,000.00.  Consequently, the damages that OWFC has been seeking have been a moving target.

30. On October 7, 2022, OWFC notified the ICDR that settlement discussions were not successful and that the matter should again proceed.

31. Accordingly, the matter was taken out of abeyance after that date.

### 3. Respondents Submit Their Answer and Counterclaim

32. On October 21, 2022, Respondents submitted an Answer and Counterclaim ("**Counterclaim**") to the SOC.[4]

33. In their Counterclaim, Respondents alleged that OWFC has:

a. Breached the License Agreement by refusing to pay over $4 million in license fees that OWFC allegedly owes;[5]

b. Breached the covenants of good faith and fair dealing, as well as non-disclosure agreements that OWFC executed;

c. Was unjustly enriched by failing to pay license fees for an exclusive license; and

d. Tortiously interfered with Respondents' prospective business opportunities by asserting rights under the License Agreement that OWFC knew it did not have.

34. Respondents sought a declaration that the License Agreement is terminated, monetary damages, costs, attorneys' fees, and pre-award interest on those amounts.

### 4. The Arbitration Agreement and the Governing Law Clause

35. Section 5.19 of the License Agreement contains the arbitration agreement pursuant to which the Tribunal (as defined in Paragraph 40 below) has authority to hear and adjudicate the disputes in this Arbitration.

36. In relevant part, that arbitration agreement states that:

> All claims and disputes arising under or relating to this Agreement are to be settled by binding arbitration in the state of New York, U.S.A., or another location mutually agreeable to the Parties. The arbitration shall be conducted on a confidential basis pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Any decision or award as

---

[4] That pleading was styled only as a Counterclaim, but was treated by the Tribunal as an answer as well.

[5] While OWFC initially characterized those amounts as royalties, it later called them licensing fees. In the interest of consistency and economy, this Partial Final Award refers to those amounts as licensing fees.

a result of any such arbitration proceeding shall be in writing and shall provide an explanation for all conclusions of law and fact and shall include the assessment of costs, expenses, and reasonable attorneys' fees. Any such arbitration shall be conducted by an arbitrator experienced in arbitrating agreements between foreign corporations and shall include a written record of the arbitration hearing. The Parties reserve the right to object to any individual who shall be employed by or affiliated with a competing organization or entity. An award of arbitration may be confirmed in any court of competent jurisdiction.[6]

37. None of the Parties contested the validity of that arbitration agreement during the course of the Arbitration, and none have disputed that the arbitration agreement gives the Tribunal full authority to resolve all aspects of this dispute that were presented to the Tribunal.

38. Section 5.19 of the License Agreement also contains a governing law clause, which states that the "law applicable for this [License] Agreement is the law of the state of New York, USA."[7]

39. No Party disputes that New York law is the substantive governing law of this dispute.

### 5.    The Arbitrators Are Appointed

40. On October 26, 2022, the ICDR confirmed that it had appointed Michele S. Riley, Stephen P. Gilbert, and James P. Duffy IV as the Arbitrators in this matter ("**Tribunal**").

41. The Tribunal Members' contact details have remained:

| | | |
|---|---|---|
| Michele S. Riley<br>12 East 86th Street<br>New York, New York 10028<br>P: +1 212.288.2931<br>E. mriley@rileyadrservices.com | James P. Duffy IV<br>Reed Smith LLP<br>599 Lexington Avenue<br>New York, New York 10022<br>United States of America<br>P: +1 212.549.0460<br>E: jpduffy@reedsmith.com | Stephen P. Gilbert<br>The Law Offices of<br>Stephen P. Gilbert<br>151 Hickory Grove Drive East<br>Larchmont, New York 10538<br>United States of America<br>P: +1 917.273.4910<br>E: spgadr@msn.com |

42. On November 8, 2022, the Arbitrators notified the ICDR that they had agreed to have James P. Duffy IV act as the Tribunal chair.

---

[6]    JB RESP. Ex. 3, § 5.19 RESP000013.

[7]    *Id.*

- 6 -

43. None of the Parties objected to the Arbitrators' appointment, and the time for doing so under the Commercial Rules has expired.

### 6. Motion to Strike

44. On November 17, 2022, Respondents submitted an application styled as Motion to Strike Introduction to Response to Counterclaim to the Tribunal.

45. By email that same day, the Tribunal directed:

    a. OWFC not to respond to the application; and

    b. Both Parties not to submit any motions without first consulting with the Tribunal.

46. After deliberating on the application, the Tribunal denied it.

### 7. Preliminary Hearing

47. On November 23, 2022, in accordance with Section R-21 of the Commercial Rules, the Tribunal held a Preliminary Hearing with the Parties at 10:00 EST to discuss various matters necessary for the prompt and efficient resolution of this Arbitration.

48. The Preliminary Hearing was attended by Peter Heilveil from OWFC, as well as OWFC's Counsel – Messrs. Papageorgiou and Chiu – and by Messrs. Keeler, Alexander, and Stankus (all of Mr. Whitmyer's firm) as Counsel for Respondents.

49. During the Preliminary Hearing, following a brief recitation of the Parties' respective cases, several matters were confirmed, and/or resolved.

50. Specifically, the Parties confirmed that:

    a. The legal seat of the Arbitration is New York, New York;

    b. The Commercial Rules govern this Arbitration;

    c. English is the language of the Arbitration;

    d. They did not wish to proceed with mediation under Section R-9 of the Commercial Rules;

    e. They did not intend to lodge any jurisdictional objections;

f.  There were no dispositive issues apparent at that time that warranted the consideration of a dispositive motion pursuant to Section R-33 of the Commercial Rules;

g.  They did not intend to amend their claims;

h.  Direct witness testimony would be presented by written witness statements, with the Parties presenting their cases in the manner set forth in the Procedural Timetable that is reproduced from Procedural Order No. 1 below; and

i.  The Merits Hearing would occur in-person in New York, New York from November 13, 2023 to November 17, 2023.

51.  Several additional issues were also discussed during the Preliminary Hearing, the resolution of which was deferred until a later date.

### 8.  Draft Procedural Timetable and Procedural Order No. 1

52.  On November 26, 2022, the Tribunal sent a draft procedural timetable to the Parties and directed them to confer and revert by December 2, 2022 with proposed dates for the milestone events set forth in that draft procedural timetable.

53.  On December 2, 2022, the Parties submitted competing versions of the draft procedural timetable that were largely in agreement, but which contained certain procedural differences.

54.  On December 9, 2022, the Tribunal issued Procedural Order No. 1, which set forth the practices and procedural timetable pursuant to which the Arbitration was to be conducted.

55.  The Procedural Timetable as set forth in Procedural Order No. 1 is reproduced below.

| PROCEDURAL TIMETABLE | |
|---|---|
| DATE | EVENT |
| April 29, 2022 | Claimant Submitted Its Demand for Arbitration and Statement of Claim |
| October 21, 2022 | Respondents Submitted Their Answer & Counterclaim |
| October 26, 2022 | Tribunal Appointed |

| PROCEDURAL TIMETABLE | |
|---|---|
| **DATE** | **EVENT** |
| November 17, 2022 | Motion to Strike Submitted |
| November 23, 2022 | Preliminary Hearing Held |
| January 27, 2023 | Simultaneous Exchange of Full Written Prehearing Statement of Case, Including Documents Upon which Each Party Intends to Rely, Written Witness Statements in Support, Expert Reports in Support (if any) and Legal Authorities upon which it Intends to Rely |
| March 17, 2023 | Simultaneous Exchange of Full Written Prehearing Statement of Case in Response to opposing Party's case, Including Documents Upon which They Intend to Rely, Written Witness Statements in Support, Expert Reports in Support (if any) and Legal Authorities upon which it Intends to Rely |
| April 7, 2023 | Exchange of Document Production Requests |
| April 28, 2023 | Exchange of Written Objections & Production of Documents to Which No Objections Are Made |
| May 12, 2023 | Applications to Compel the Production of Documents to Which Objections Have Been Made that the Parties Cannot Resolve |
| June 2, 2023 | Anticipated Ruling on Applications to Compel |
| June 16, 2023 | Production of Documents in Response to Overruled Objections |
| June 23, 2023 | Deadline for Submitting Arbitral Summonses Absent Good Cause Shown |
| July 28, 2023 | Claimant Submits Full Written Prehearing Statement of Case, to Address Matters Arising from Document Exchange, Including Documents Upon which it Intends to Rely, Written Witness Statements in Support, Expert Reports in Support (if any) and Legal Authorities upon which it Intends to Rely |
| September 1, 2023 | Respondents Submit Full Written Prehearing Statement of Case in Response to Claimant's case and in Support of Its Counterclaims to Address Matters Arising from Document Exchange, Including Documents Upon which They Intend to Rely, Written Witness Statements in Support, Expert Reports in Support (if any) and Legal Authorities upon which They Intend to Rely |

| PROCEDURAL TIMETABLE | |
| --- | --- |
| **DATE** | **EVENT** |
| September 29, 2023 | Claimant Submits Full Written Prehearing Statement of Case in Reply and in Response to Respondent's Counterclaims, Including Documents Upon which it Intends to Rely in Reply and Response, Written Witness Statements in Support in Reply and Response, and Legal Authorities upon which it Intends to Rely in Reply and Response[8] |
| October 27, 2023 | Respondent Submits Full Written Prehearing Statement of Case in Reply to Its Counterclaims, Including Documents Upon which it Intends to Rely in Reply, Written Witness Statements in Support in Reply, and Legal Authorities upon which it Intends to Rely in Reply |
| November 1, 2023 | Pre-Hearing Conference Call at 10:00 Eastern |
| November 13, 2023 – November 17, 2023 | In-Person Hearing on the Merits in New York |
| December 5, 2023 | Simultaneous Exchange of Post-Hearing Written Submissions |
| December 12, 2023 | Costs Submissions |

56.     Paragraph 48 of Procedural Order No. 1 expressly stated that the dates and deadlines set forth in the Procedural Timetable above – and particularly those for the Merits Hearing – could only be changed with consent of the Tribunal for good cause shown.

57.     Procedural Order No. 1 also set forth instructions for:

   a.     The immediate production of documents upon which a Party knew it intended to rely;

   b.     Document demands, document production, and labelling;

   c.     The production of legal authorities;

   d.     Submission formatting;

---

[8]     All replies are limited to matters raised in the other Party's preceding submission and shall not be employed to raise new issues that could have been addressed in prior submissions (i.e., matters shall not be tactically withheld for reply).

e.      Deadlines;

f.      Applications and motions; and

g.      Confidentiality and cybersecurity.

58.    Procedural Order No. 1 therefore offered a comprehensive framework for the entire Arbitration.

### 9.      Procedural Order No. 2

59.    On April 19, 2023, the Tribunal issued Procedural Order No. 2.

60.    In relevant part, Procedural Order No. 2 denied OWFC's requests to:

a.      Issue arbitral summonses to three entities on grounds that OWFC's request was premature, as Respondents' deadline for producing documents had not yet passed;

b.      Depose Respondents, as Procedural Order No. 1 called for direct witness testimony to be provided by written witness statement; and

c.      Submit a dispositive motion, because the Parties fundamentally disagreed as to a basic premise upon which the request was founded, as well as factual issues underpinning it.

61.    The Tribunal left open the possibility for OWFC to renew its requests at a later time if the infirmities identified by the Tribunal could be resolved.

### 10.      Procedural Order No. 3

62.    On July 31, 2023, the Tribunal issued Procedural Order No. 3.

63.    Procedural Order No. 3 resolved each Party's Application to Compel the Production of Documents by granting and denying each application in part.

64.    As the rulings on the Parties' applications were issued later than the Procedural Timetable in Procedural Order No. 1 anticipated, the Tribunal also offered the Parties the opportunity to comment on any timing issues they believed Procedural Order No. 3 presented.

65.    None of the Parties offered any such comments, and the Procedural Timetable was left as it then stood.

- 11 -

### 11. Procedural Order No. 4

66. On August 18, 2023, the Tribunal issued Procedural Order No. 4

67. Procedural Order No. 4 addressed two applications presented in a joint letter from the Parties dated August 8, 2023, in which the Parties advised the Tribunal of their efforts to resolve their discovery disputes in accordance with the directives of Procedural Order No. 3.

68. In that letter, which is quoted in Procedural Order No. 4, Respondents' Counsel notified the Tribunal that:

   a. "'Dr. Koslow will be undergoing cancer treatment starting on August 17, 2023 for approximately 4-6 weeks followed by an isolation period of 90 days;'"

   b. The "Parties 'presently believe this will not impact the timing of the parties' remaining submissions,' including Respondents' submission due on September 5, 2023;" and

   c. "Requested that the Hearing on the Merits scheduled to occur in-person in New York from November 13, 2023 to November 17, 2023," be postponed to unspecified dates in January of 2024.

69. In light of the information the letter was bringing to the Tribunal's attention, OWFC "requested that Dr. Koslow be 'made available for a deposition prior to the start of his treatment on August 17, 2023,' or in the alternative, that 'Dr. Koslow appear before the Tribunal for examination prior to August 17, 2023.'"

70. In short, OWFC asked that Dr. Koslow be made available for examination on nine days notice, immediately before he was to commence extended cancer treatment.

71. After conferring about the Parties' joint letter, on August 10, 2023, the Tribunal directed the Parties to attend a Zoom conference on either Friday, August 11, 2023, or Monday, August 14, 2023, to discuss the two Applications.

72. The Tribunal additionally directed that the Parties be prepared at the conference to address the following questions:

   a. "When did Dr. Koslow schedule the referenced cancer treatment?;"

b.   "When did Dr. Koslow notify Respondents' Counsel that the treatment was scheduled?;"

c.   "When did Respondents' Counsel notify Claimant's Counsel about that treatment?;"

d.   "What impact, if any, does Dr. Koslow's treatment have on Respondents' ability to provide its full written submission due September 1, 2023 (keeping in mind (a) Respondents' representation in the letter that treatment should not impact its ability to provide its submissions, and (b) that Dr. Koslow has already submitted a witness statement dated March 17, 2023)?;" and

e.   "What is Respondents' Counsel's current understanding of Dr. Koslow's expected ability to be cross-examined virtually during his 90-day isolation period?"

73.   The Tribunal further communicated that while it was "expressly maintaining the current Hearing dates of November 13, 2023 through November 17, 2023 that are set forth in the Procedural Timetable found at Paragraph 47 of Procedural Order No. 1," and that while it was "not indicating a desire to release those dates, out of an abundance of caution, the Tribunal also wishes to reserve January 29, 2024 through February 2, 2024 now as alternative hearing dates," and asked the Parties to be able to "confirm . . . [their] availability during that week, or to offer alternate dates if . . . not."

74.   Respondents' Counsel answered the majority of the Tribunal's questions in writing to the Tribunal's satisfaction, and on August 14, 2023, the Tribunal held a Zoom conference with the Parties that lasted over one hour.

75.   During that Zoom conference, the Tribunal directed Respondents' Counsel to provide additional information about how Dr. Koslow's treatment would impact his ability to participate in the Merits Hearing, and instructed Respondents' Counsel to obtain a letter from Dr. Koslow's treating physicians that addressed the Tribunal's questions, and to revert no later than August 18, 2023.

76.   On August 15, 2023, Respondents' Counsel submitted a letter from Dr. Koslow's treating physician providing further clarity regarding the Tribunal's questions.

77.    After reviewing that letter, on August 16, 2023, the Tribunal "invite[d] the Parties to confer and to provide any comments they wished to offer that arise from this letter no later than 17:00 EST on August 17th."

78.    On August 17, 2023, the Parties jointly submitted a letter to the Tribunal which stated in relevant part that:

a.    They wished to keep the hearing dates set forth in the Procedural Timetable set forth in Procedural Order No. 1;

b.    Dr. Koslow would likely participate in the Merits Hearing remotely, and that his ability to do so would not be known until his treatment was completed; and

c.    Respondents would provide regular status updates on the issues to the Tribunal.

79.    After receiving that information, the Tribunal deliberated and decided that there was a material risk that Dr. Koslow – who is both a named Respondent and Counterclaimant – would not be able to meaningfully participate in the Hearing on the Merits if it was held on the original dates, and that if the Tribunal was correct, the Parties might well seek to adjourn that Hearing closer to the time in any event.

80.    Accordingly, to minimize the risk of that occurring, the Tribunal deemed it appropriate to postpone the Hearing on the Merits to January 29, 2024 through February 2, 2024 – which were dates the Tribunal had previously asked the Parties to reserve – "to increase the likelihood that Dr. Koslow will be able to meaningfully participate."

81.    Nevertheless, the Tribunal reminded the Parties of instructions found in Paragraphs 77 and 78 of Procedural Order No. 1 regarding witness testimony, and also reminded them that each Party continued to bear the burden of proving its claims and defenses in accordance with Section R-32(a) of the Commercial Rules.

### 12.    Procedural Order No. 5

82.    On September 8, 2023, the Tribunal issued Procedural Order No. 5.

83.    In relevant part, Procedural Order No. 5:

a.    Granted OWFC's application to compel Respondents to comply with a previously issued document demand;

b. Granted OWFC's request to issue two arbitral summonses in the format recommended by the Tribunal; and

c. Denied Respondents' request to strike documents, authorities and arguments that Respondents claimed OWFC was raising for the first time as new claims, but directed OWFC to follow the requirements of Section R-6(b) of the Commercial Rules within seven days if OWFC wished to pursue those claims.

84. Additionally, the Tribunal directed the Parties to reserve February 5-6, 2024 as additional hearing days in the event any new claims necessitated additional hearing time.

85. In accordance with Procedural Order No. 5's directives, on September 15, 2023, OFWC submitted a "Notice of New Claims," pursuant to Section R-6(b) of the Commercial Rules, alleging that Respondents had concealed various test results from OWFC to fraudulently induce OWFC to enter into Addendum No. 8 to the License Agreement.

86. For that alleged conduct, OWFC sought to void Addendum No. 8, and also sought rescission, punitive damages, and costs, including attorneys' fees.

### 13.    Procedural Order No. 6

87. On October 2, 2023, the Tribunal issued Procedural Order No. 6.

88. Procedural Order No. 6 memorialized a request from the Parties to revise the dates for:

a. OWFC to submit its Full Written Prehearing Statement of Case in Reply and in Response to Respondents' Counterclaims;

b. Respondents to submit their Full Written Prehearing Statement of Case in Reply.

89. Procedural Order No. 6 ruled that:

a. OWF's Full Written Prehearing Statement of Case in Reply and in Response to Respondents' Counterclaims, which was originally due by September 29, 2023, could now be submitted no later than October 10, 2023; and

b. Respondents could submit their Full Written Prehearing Statement of Case in Reply, which was originally due by October 27, 2023, no later than November 10, 2023.

### 14.   Procedural Order No. 7

90.   On November 9, 2023, the Tribunal issued Procedural Order No. 7.

91.   Procedural Order No. 7 not only memorialized further revisions to the Procedural Timetable that OWFC had requested – namely, a three-day extension – which Respondents had opposed, but also:

a.   Set a Prehearing Conference with the Parties for January 18, 2023 at 13:00 EST;

b.   Enclosed a prehearing checklist of items for the Parties to address; and

c.   Set forth general directions for the Parties to follow for the remainder of the Arbitration.

92.   In the course of addressing the three-day extension request that Respondents had opposed, the Tribunal reminded the Parties that it had previously instructed them that:

> In furtherance to the Tribunal's prior email, both Parties are reminded that they incur costs every time they approach the Tribunal with an issue that must be resolved, and that the Tribunal will allocate costs at the conclusion of the matter (at a minimum), including "reasonable attorneys' fees," pursuant to Section 5.19 of the Licens[e] Agreement dated June 5, 2017.  A number of factors will guide that allocation, including how efficiently and economically each Party approached the matter.
>
> Accordingly, Counsel for both Parties are reminded to cooperate as much as possible to ensure that this Arbitration proceeds efficiently and economically.

93.   Procedural Order No. 7 reiterated that "[w]ith the revised dates for the Hearing on the Merits approaching in early 2024, and further Tribunal deposits having been requested, the Parties are reminded that: a. Involving the Tribunal in routine matters is not a cost-free exercise; and b. Costs will be assessed at the conclusion of the Arbitration."

94.   Paragraph 28 of Procedural Order No. 7 "therefore again encouraged" the Parties "to be as collaborative as possible, particularly when procedural matters are at issue," and "reminded [the Parties] again to attempt to resolve routine matters first before approaching the Tribunal."

**15.    Procedural Order No. 8**

95.    On January 26, 2024, the Tribunal issued Procedural Order No. 8, which memorialized various matters that were decided during and after the Prehearing Conference the Tribunal held with the Parties on January 18, 2024, from 13:00 EST to approximately 15:30 EST.

96.    Matters that Procedural Order No. 8 resolved included the Merits Hearing location, the daily hearing logistics, constitution of the joint hearing bundle, the manner in which hearing time would be allocated between the Parties, the manner in which documents and other evidence would be presented, the scope of cross-examination and redirect, witness sequestration, and similar matters.

**C.    The Merits Hearing**

97.    From January 29, 2024, through February 2, 2024, the Parties and the Tribunal conducted the Merits Hearing at the AAA's hearing facility at 150 E. 42nd Street in New York, New York.

98.    Hearing days typically began around 9:30 EST, and were scheduled to run to approximately 18:30 EST each day.

99.    During the Merits Hearing, each Party was afforded an opportunity to make opening presentations, to cross-examine the other Party's witnesses and experts, to present evidence (both existing and new) and argument, and to address the Tribunal.

100.    Accordingly, all Parties were afforded a full and fair opportunity to be heard, and to present their claims, defenses, evidence, and arguments.

101.    Specific aspects of the Merits Hearing are discussed in Section III below, as relevant.

**D.    Post-Hearing Written Submissions**

102.    Towards the conclusion of the Merits Hearing, the Tribunal asked the Parties if they wished to offer Post-Hearing Written Submissions, and stated that if they wished to do so, the Tribunal would offer guidance to them on issues the Tribunal wanted those submissions to address.

103.    On the last day of the Merits Hearing, the Parties stated that they did in fact wish to offer Post-Hearing Written Submissions.

104. The Tribunal directed them to create a joint timeline of material events for the matter, and to confer as to dates for the simultaneous exchange of Post-Hearing Written Submissions.

105. The Tribunal also stated that once it had the full Merits Hearing transcript and the other information it had requested, it would communicate its questions to the Parties so that they could address those questions in their submissions.

106. On March 27, 2024, Respondents' Counsel wrote to the Tribunal and stated that the joint timeline was completed and would be imminently provided, as well as stating that Respondents had completed their Post-Hearing Written Submission and were prepared to submit it.

107. In response, the Tribunal conferred and noted that the Parties had not yet provided:

   a.    The joint timeline the Tribunal had requested; or

   b.    Agreed dates for the simultaneous exchange of Post-Hearing Written Submissions.

108. On May 1, 2024, the Tribunal wrote to the Parties to inform them that it had not yet received the joint timeline or submission schedule, and that it would provide its list of questions to the Parties by May 8, 2024.

109. On May 8, 2024:

   a.    Claimant's Counsel sent the Tribunal a copy of the joint timeline; and

   b.    The Tribunal sent its list of questions to the Parties.

110. After acknowledging receipt of those questions, Respondents' Counsel stated that the Parties would revert with a date for the simultaneous exchange of Post-Hearing Written Submissions.

111. On May 9, 2024, Respondents' Counsel emailed the Tribunal and requested that Post-Hearing Written Submissions be exchanged on May 17, 2024.

112. Later that day, Claimant's Counsel requested until approximately July 2, 2024 to do so.

113. On May 29, 2024, the Tribunal issued Procedural Order No. 9, which in relevant part gave the Parties until June 21, 2024 to submit Post-Hearing Written Submissions.

114.    On June 21, 2024, both Parties submitted Post-Hearing Written Submissions.

    a.    Claimant submitted a 134-page submission with legal authorities and references to the record, together with a 24-page submission responding to the Tribunal's questions.

    b.    Respondents offered a 52-page submission with legal authorities and references to the record, together with a 12-page submission responding to the Tribunal's questions.[9]

115.    Accordingly, following the Merits Hearing, both Parties were again afforded a full and fair opportunity to be heard and to present their claims, defenses, evidence, and arguments.

### III.    OWFC'S AFFIRMATIVE CLAIMS AGAINST RESPONDENTS

116.    The following sections discuss OWFC's affirmative claims against Respondents and explain why all of those affirmative claims must be denied.

117.    Section A below addresses why all of OWFC's express breach of contract claims fail.

118.    Section B explains why OWFC's claim for a breach of the covenant of good faith and fair dealing fails.

119.    Section C discusses why OWFC is not entitled to recover for unjust enrichment.

120.    Section D explains why OWFC failed to show that Respondents fraudulently induced it to enter into Addendum No. 8.

121.    Section E provides the Tribunal's explanation for why it declines OWFC's invitation to sanction Respondents, and Section F explains why OWFC is not entitled to any damages.

122.    As the full factual background to this matter is long, complex, and partially disputed, only those facts necessary to resolve the Parties' competing claims are recited as needed.[10]

---

[9]    On June 24, 2024, OWFC's Counsel notified the Tribunal that its submission contained errors that needed to be corrected, and that same day, the Tribunal directed OWFC to provide a corrected submission, which OWFC's Counsel did.  All references in this Partial Final Award to OWFC's Post-Hearing Written Submission are to the corrected submission.

[10]    While the Parties did submit a joint timeline to the Tribunal, it contained discrepancies and disagreements that rendered it unhelpful to the overall resolution of this dispute.  Consequently, while the Tribunal did review that timeline, it does not rely upon it.

### A.    OWFC's Express Breach of Contract Claims Fail

123.    While OWFC claims a number of alleged breaches, it principally alleges that Respondents materially breached the License Agreement by failing to deliver filters for a gravity dispenser system that were capable of meeting Respondents' microbiological filtration claims, because Respondents supposedly:

   a.    Did not produce filters that were capable of removing 99.99% of virus materials found in testing water at specified flowrates of 133ml/min for a full filter life of 700 liters (or a rated life of 580 liters); and

   b.    Failed to obtain an IAPMO certification stating that the filters could achieve those performance metrics.[11]

124.    Additionally, OWFC has alleged that Respondents breached the License Agreement by:

   a.    Failing to "fulfill the order of 0.5M filter packs for India ('IN') within 6 months of receiving payment (in or about September 2019);"

   b.    Failing to "develop GF-2 filter packs;"

   c.    Failing to "develop pressure water filters ('PWF');" and

   d.    Failing to "secure IAPMO certifications for GF-1, GF-2, and PWF filters."[12]

125.    To determine whether OWFC's breach of contract claims can succeed, it is first necessary to discern the contractual obligations and duties that each of the Parties assumed, which is a matter of some disagreement between them.

126.    Accordingly, the Tribunal begins its analysis with the express terms of the governing contract, which is the License Agreement.

---

[11]    OWFC's Post-Hearing Written Submission, ¶ 9.

[12]    *Id.*, ¶ 9(c)-(f).

- 20 -

### 1.    The Key Terms of the Original License Agreement

127.   The governing contract between the Parties is the License Agreement, which was entered into by both Respondents and OWFC's corporate predecessor, Silver Rock International Limited.[13]

128.   Dr. Koslow signed the License Agreement as KTC's corporate representative, as well as in his individual capacity, and an individual named Judith E. Ryan signed for OWFC, who is identified as a Director.[14]

129.   The License Agreement set forth the original terms pursuant to which:

a.    KTC would "manufacture a unique gravity-flow microbiological interception filter based upon a combination of nanofibers, powdered adsorbents and chemical treatments" at a manufacturing facility that KTC would build; and

b.    OWFC would become KTC's exclusive Filter Product distributor in various territories (as that term is defined in the License Agreement), in exchange for paying "SOW" (Statement of Work) and license fees to KTC, purchasing "Filter Tickets" from KTC, and "fund[ing] and establish[ing] its marketing and distribution network in the Reserve and Exclusive Territories."[15]

130.   As the recitals to the License Agreement make clear, the Parties' primary objective under the License Agreement was to have KTC manufacture proprietary gravity-flow water

---

[13]    JB Resp. Ex. 3 (RESP000001).  For ease of reference, Silver Rock International Limited, which was a BVI-registered company located in Hong Kong, will be referred to simply as OWFC, as it changed its name to OWFC some time before September 22, 2020 (the date of Addendum No. 8 to the License Agreement, and prior to the commencement of this Arbitration). *See* Resp. JB Ex. 25, § 1.13 (RESP000082) (relating that Silver Rock International Limited changed its registered name to One World Filter Corporation).

[14]    Judith E. Ryan did not submit any evidence in this Arbitration, despite having signed the original License Agreement for OWFC, as well as most of the License Agreement addenda.

[15]    JB Resp. Ex. 3 (RESP000001) (stating the License Agreement Recitals).

- 21 -

filters that OWFC would buy and distribute in exclusive territories through a marketing and distribution network that OWFC would establish.

131.    The License Agreement contains several provisions that are relevant to the resolution of this dispute.

    a.    Under Section 2, both sets of Parties had development obligations.[16]

    b.    Under Section 5.1, KTC granted OWFC a temporary exclusive license to take the following actions within defined geographic markets:

        i.    "sell and market Filter Products," which are defined as appropriately sized "flat-sheet gravity-flow microbiological interception filter medium;" and

        ii.    "manufacture, sell and market System Products," where Systems Products are defined as "hardware components used to hold Filter Product in a high-integrity seal, direct water through the Filter Product for purification, and hold contaminated water and purified water for storage."[17]

    c.    Under Section 5.2, the temporary license granted in Section 5.1 would become a permanent license to "exclusively market and sell Ticket Products and System Products . . . in perpetuity," if OWFC paid a License Fee, which was calculated pursuant to a population-based formula set forth in that section.[18]  To obtain the perpetual license, OWFC had to pay the full license fee within a set timeframe, or had to elect to make deferred payments under conditions that are not relevant here.[19]

    d.    Section 5.4 states that OWFC would materially breach if it failed to pay license fees within specified timeframes, and along with Section 5.6, states that in the event of a material breach, OWFC would lose its exclusive license in the relevant territory for which license fees were not paid.[20]

---

[16]    JB Resp. Ex. 3 (RESP000004) (setting forth the Parties' respective development obligations).

[17]    *Id*., (RESP000003; RESP000005).

[18]    *Id*. (RESP000005).  Notably, the term "Ticket Products," while capitalized, is not defined anywhere in the License Agreement, and it appears that the Parties likely meant to write Filter Products instead.

[19]    *Id*. (RESP000005).

[20]    *Id*. (RESP000007).

- 22 -

e.   Under Section 5.9, KTC had to provide System Products – which were both filters and the dispensers into which the filters were placed – that "conform to minimum performance standards" that KTC and OWFC "jointly" established.[21]

f.   OWFC was obligated to both purchase filters directly from KTC, and to pay KTC directly, and all deliveries were to be made by KTC "FOB KTC Factory," in Connecticut, with OWFC arranging shipping.[22]

g.   Section 6.5 made clear that OWFC "intends to develop a specific business model for the sale and distribution" of the filters and dispensers, and obligated KTC to "support the general development of this business model."[23]

h.   Lastly, in relevant part, Section 7 expressly prohibited KTC from "directly or indirectly initiat[ing], solicit[ing] or facilitat[ing] any inquiries, discussions or proposals regarding, continu[ing] or enter[ing] into any other negotiations looking toward, or enter[ing] into, or consummat[ing] any agreement or understanding with any person other than . . . [OWFC] or its affiliates regarding the subject matter hereof . . . ."[24]

i.   As Section II.B.4 notes above, the License Agreement also states that it is governed by New York law, and that "[a]ll claims and disputes arising under or relating to" it shall be "settled by binding arbitration" under the Commercial Rules, with New York designated as the seat.[25]

132.  The "**Preliminary Description**" Section of Appendix B to the License Agreement sets forth the initial specifications and performance requirements for the filters.[26]

133.  Specifically, that section states in relevant part that the "Filter Ticket KTC will manufacture and sell to . . . [OWFC] is 12 cm x 12 cm x 1.5 mm thick and is a stiff and

---

[21]  JB Resp. Ex. 3 (RESP000008).  The License Agreement was later amended by an addedum that assigned the obligation to create a dispenser system to OWFC.

[22]  *Id*. § 5.9(f)-(g) (RESP000008).

[23]  *Id*. (RESP000016).

[24]  *Id*. (RESP000017).

[25]  *Id*. (RESP000013).

[26]  *Id*. (RESP000024) (emphasis in original).

durable composite rated for the reduction of viral particles (MS-2 bacteriophage) at 99.99%, bacterial particles (*Brevundemonas diminuta*) by 99.9999% and oocysts (*Cryptosporidium parvum*) by 99.95%," at an "[i]nitial flow rate . . . [of] approximately 45 ml/minute at an applied gravity head of 15" W.C."[27]

134.    Notably, the original License Agreement made no mention of any certification obligations, despite setting forth performance requirements that are similar to those found in a testing protocol referred to as NSF P231, which is described further below.

135.    In essence, the License Agreement obligated KTC to develop and produce water filters of a specified size that met certain contaminant reduction metrics at specified flowrates (initially established at 45 ml/minute), as well as dispensers to house those filters, and obligated OWFC to pay license fees for purchasing those water filtration systems from KTC so that OWFC could become and remain the exclusive distributor of those products in defined territories around the globe.

136.    As the following section describes, the Parties executed several addenda to the License Agreement, one of which assumed particular importance for OWFC's express breach of contract claims.

### 2.    The Key Terms of Addendum No. 5 to the License Agreement

137.    The Parties executed eight addenda to the License Agreement between June of 2018 and September of 2020.

138.    One addendum – Addendum No. 5 – is particularly relevant to this dispute, because it forms the primary basis for OWFC's claim that Respondents breached the License Agreement by failing to deliver filters that were certified to meet microbiological filtration claims set forth in appendices to Addendum No. 5.

139.    Addendum No. 5 was dated August 10, 2019 (over two years after the License Agreement was executed), and was signed by Dr. Koslow for Respondents, and by Judith E. Ryan for OWFC.[28]

---

[27]    JB Resp. Ex. 3 (RESP000024).

[28]    JB Resp. Ex. 13 (RESP000058).  Judith E. Ryan also executed the prior License Agreement addenda.

140. Addendum No. 5 contains several material provisions.

141. First, it updated the License Agreement definitions to include a definition for OWF Filter Pack 1, which it defined as a three-part filter pack that was KTC's primary product at that time.[29] Filter Pack 1 is the same filter that OWFC refers to as GF-1 in its written submissions.

142. Second, Addendum No. 5 added a definition for OWF Filter Pack 1 Certified Claims.[30]

143. Specifically, Section 1.5 of Addendum No. 5 stated that:

a. "KTC will seek to secure IAPMO/NSF/ANSI certification and seal for the OWF Filter Pack 1 target performance claims listed in *Appendix A OWF Filter Pack 1 Certified Claims* of this Addendum No. 5;" and

b. "KTC will endeavor to have IAPMO specify the highest possible percentage reduction for all claims."[31]

144. The meaning of those two statements, and any contractual obligations they might impose, are hotly contested issues between the Parties.

145. Appendix A to Addendum No. 5, which is reproduced below, sets forth "OWF Filter Pack 1 Certified Claim Targets."[32]

---

[29]    JB Resp. Ex. 13, § 1.4 (RESP000058).

[30]    *Id*., § 1.5 (RESP000058).

[31]    *Id*.

[32]    Dr. Koslow testified that he drafted the relevant portions of Appendix A to Addendum No. 5. Tr. of 01/31/24, at 818:01-14; JB Resp. Ex. 13 (RESP000064) (setting forth Appendix A); *see* Tr. of 01/31/24, at 756:19-757:06 (Dr. Koslow testifying that Tony Erickson drafted License Agreement and that neither party used lawyers in drafting the License Agreement or any addenda to the License Agreement).

**Appendix A OWF Filter Pack 1 Certified Claim Targets**

| OWF WATER DISPENSER 1 | | Specifications |
|---|---|---|
| Dimensions in cm Diameter x Height | | 26 x 50 cm |
| Dirty Water Storage (liters) | | 10 |
| Clean Water Storage (liters) | | 6 |
| Total Water Storage (liters) | | 16 |

| DESCRIPTION OF CLAIMS | NSF Standard | Specifications |
|---|---|---|
| Initial Flow Rate | NSF per below listed Standards | 8 liters/hour |
| Actual Life liters/filter set | NSF per below listed Standards | 700 liters |
| NSF Certified Life liters/filter set (Actual/1.2) | NSF per below listed Standards | 583 liters |

| MICROBIOLOGICAL CLAIMS | NSF Standard | % Reduction or Results |
|---|---|---|
| Bacteria | Note 1 Possibly NSF P231  ASI Confirmed | >99.9999% |
| Virus | Note 1 Possibly NSF P231  ASI Confirmed | >99.99% |
| Parasites | Note 1 Possibly NSF P231  ASI Confirmed | >99.95% |
| Protozoan Oocysts | Note 1 Possibly NSF P231  ASI Confirmed | >99.95% |
| MS2 virus 0.025 micron | Note 1 Possibly NSF P231  ASI Confirmed | >99.99% |

Note 1: There is no NSF specific standard for gravity flow micobiological filters.  KTC is in discussions with IAPMO to apply NSF P231 standard to test OWF Filter Pack 1.  NSF P231 standard is for mechanical filters and primarily used to meet US and other military mechanical filter applications.  Analytical Services Inc (ASI) independent testing certifies the OWF Filter Pack 1 microbiological claims.

| METALS & CHEMICAL CLAIMS | NSF Standard | % Reduction or Results |
|---|---|---|
| Lead | | |
| Mercury | | |
| Cadmium | | |
| Antimony | | |
| Aatenolol | NSF 401 | passed |
| Bisphenol | NSF 401 | passed |
| Carbamazepine | NSF 401 | passed |
| DEET (diethyltoluamide) | NSF 401 | passed |
| Estrone | NSF 401 | passed |
| Ibuprofen | NSF 401 | passed |
| Linuron | NSF 401 | passed |
| Meprobamate | NSF 401 | passed |
| Metolachlor | NSF 401 | passed |
| Naproxen | NSF 401 | passed |
| Nonylphenol | NSF 401 | passed |
| Phenytoin | NSF 401 | passed |
| TCEP (tris(2-chloroethyl)phosphate) | NSF 401 | passed |
| TCPP (tris(1-chloro-2-propyl)phosphate) | NSF 401 | passed |
| Trimethoprim | NSF 401 | passed |
| Chlorine | NSF 42 | passed |
| Asbestos | NSF 53 | passed |

| OTHER CLAIMS | NSF Standard | % Reduction or Results |
|---|---|---|
| Microplastics | NSF 42 Class 1 Filter | > 85% 0.5 micron |
| Sediments | NSF 42 Class 1 Filter | > 85% 0.5 micron |
| Rust | NSF 42 Class 1 Filter | > 85% 0.5 micron |
| Dirt | NSF 42 Class 1 Filter | > 85% 0.5 micron |

Page 7 of 12

146. As the case developed, the "Microbiological Claims" Section of Appendix A was the one to which the Parties devoted the majority of their attention in this case, and while the "Microbiological Claims" Section addresses claims targets for the "Bacteria, Virus, Parasites, Protozoan Oocysts, and MS2 virus 0.025 micron" categories, the "Virus" category found within that section is one that OWFC claims is most significant.[33]

147. Notably, with regards to the Bacteria, Virus, Parasites, Protozoan Oocysts, and MS2 virus 0.025 micron category under the Microbiological Claims section of Appendix A, Dr. Koslow wrote the following on each line in the NSF Standard column: "***Note 1 Possibly NSF P231 ASI Confirmed***."[34]

148. Note 1 to that section states that:

a. "There is no NSF specific standard for gravity flow microbiological filters,"

---

[33]    JB Resp. Ex. 13 (RESP000064) (setting forth Appendix A).

[34]    *Id*. (emphasis added).

- 26 -

b.      "KTC is in discussions with IAPMO to apply NSF P231 standard to test OWF Filter Pack 1,"

c.      "NSF P231 standard is for mechanical filters and primarily used to meet US and other military mechanical filter applications," and

d.      Analytical Services Inc [*sic*] (ASI) independent testing certifies OWF Filter Pack 1 microbiological claims."[35]

149.    The value in the "% Reduction or Results" column for the "Virus" category in Appendix A to Addendum No. 5 stated that viral reduction would be ">99.99%" – a four-log viral reduction – just as it was stated in Appendix B to the License Agreement.[36]

150.    Accordingly, as OWFC's case developed, it became clear to the Tribunal that OWFC was alleging two separate breaches in relation to its virus removal breach of contract claim.

a.      First, based on the language of Addendum No. 5 to the License Agreement, OWFC was alleging that Respondents were obligated to have IAPMO certify that KTC's filters could in fact remove 99.99% of viral material placed in the water used to test the filters under P231 protocols.  The Tribunal refers to this as OWFC's certification claim.

b.      Second, OWFC was alleging that Respondents' failure to pass the certification tests and obtain that certification proved that the filters could not in fact meet the performance parameters for virus removal set forth in Appendix B to the License Agreement, as well Appendix A to Addendum No. 5.  The Tribunal refers to this as OWFC's performance claim.

151.    The Tribunal addresses OWFC's certification claim first, as the resolution of that claim is partially dispositive of OWFC's performance claim, which the Tribunal addresses second.

---

[35]     JB Resp. Ex. 13 (RESP000064).

[36]     *Compare id.* (RESP000064) (setting forth Appendix A to Addendum No. 5) *with* JB Resp. Ex. 3 (RESP000024) (setting forth Appendix B to the License Agreement).  Strictly speaking, the viral reduction specified in Appendix B of the License Agreement is 99.99%, and the viral reduction specified in Appendix A of Addendum No. 5 is *greater than* 99.99%, but the difference is not material to the Tribunal's decision.

### 3. OWFC's Certification Claim Fails Under the Express Terms of the Contract

152. OWFC's certification claim fails because the language in Addendum No. 5 to which OWFC points to support its contention that Respondents were obligated to obtain IAPMO certification of all – and particularly viral – claims is too equivocal and contradictory to impose a definitive contractual obligation upon Respondents, and the extrinsic evidence upon which OWFC relies in support of its position is insufficient to find any such obligation in the manner in which OWFC has framed it.

153. At the outset, it is critical to note that both sides accept that Respondents never in fact achieved IAPMO certification of the four-log virus removal standard set forth in the License Agreement or Addendum No. 5.

154. Accordingly, there is no question that if IAPMO certification of P231 compliance was an absolute contractual obligation, then Respondents would have breached it.

155. Respondents contend, however, that the contract imposed no such obligation upon them, and that failing to obtain IAPMO certification of their virus removal claims was contractually permissible, because the language found in Addendum No. 5 regarding IAPMO certification of virus removal claims was merely aspirational, did not impose any firm obligations upon Respondents at all, and "at most," was "'best efforts' language rather than language of obligation."[37]

156. OWFC takes the opposite view, and argues that "Respondents' unsupported, conclusory assertions to the contrary, the language in Addendum [No.] 5 is *not* aspirational," and that "to adopt this reading of Addendum [No.] 5 leads to the unreasonable conclusion that the parties went from having explicit performance standards with respect to microbiological contaminant removal in the original [License] Agreement, to having *no baseline performance standards at all* with respect to microbiological contaminant removal in Addendum 5!"[38]

---

[37]    Respondents' Post-Hearing Brief, ¶ 135.

[38]    OWFC's Post-Hearing Written Submission, ¶ 13.

157. The Tribunal disagrees with OWFC's assertions for several reasons, including the express language found in Addendum No. 5 itself.

158. First, Addendum No. 5 does not employ any definitive language making it unequivocally clear that Respondents were contractually obligated to obtain IAPMO certification of their contaminant removal claims.

    a. Sections 1.5 and 1.12 of Addendum No. 5 state that "KTC will ***seek*** to secure IAPMO/NSF/ANSI certification and seal," for the "***target performance*** claims listed in *Appendix A*."[39] Use of the word "seek" in this context is significant, because its implies that Respondents will attempt to obtain that certification, but it does not obligate them to do so. Indeed, had the Parties merely left the words "seek to" out of those sections, and said only "will secure," the obligation would have been clearer and more definite. They did not do so, however, and the Tribunal is obligated as a matter of New York law to accord each word meaning.[40]

    b. Section 1.14 refers only to "**IAPMO/NSF/ANSI Certification Targets**."[41] Use of the phrase "certification targets" in this context again implies an aspirational objective, but not a definitive obligation, particularly when the Tribunal considers that the language was written by individuals with technical and business expertise who would be expected to understand what targets (as opposed to something more definitive, like 'requirements,' 'standards,' 'benchmarks,' 'criteria,' or any number of other possible choices) meant.[42] Moreover, a target is merely something one aims for – not something a party promises to achieve.

    c. The Virus line in the NSF Standard column of Appendix A to Addendum No. 5 expressly states in relevant part "Note 1 ***Possibly NSF P231***," indicating that there was not even agreement at the time that Addendum No. 5 was executed on the

---

[39] JB Resp. Ex. 13, §§ 1.5 (RESP000058), 1.12 (RESP000059) (emphasis added).

[40] *See Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. Ct. App. 1998) (relating that all "words . . . must be given meaning").

[41] JB Resp. Ex. 13, § 1.14 (RESP000059) (emphasis in original).

[42] While OWFC argues that targets provide a floor below which performance could not fall, that interpretation does not comport with the plain meaning of that term, when phrases like "minimum targets," or "base targets" could easily have been used if that was the Parties' intention.

protocol that would be used to obtain certification, and to assume that IAPMO certification was a definite obligation when the measuring protocol was not even agreed upon would be unreasonable.[43]

d.  Note 1 itself in Appendix A to Addendum No. 5 states that "[t]here is no NSF specific standard for gravity flow microbiological filters," "KTC is in discussions with IAPMO to apply NSF P231 standard to test OWF Filter Pack 1," and that "NSF P231 standard is for mechanical filters and primarily used to meet US and other military mechanical filter applications," which further calls into question whether IAPMO certification was even possible for gravity flow filters of this type.[44]

e.  While the language employed in Tasks 1.1-1.3 of Appendix D to Addendum No. 5 is clearer than the language used in Appendix A – stating that "KTC *__will contract__* IAPMO to test and certify OWF Filter Pack 1 to NSF/ANSI standards specified in *Appendix A OWF Filter Pack 1 Certified Claims* to this Addendum No. 5," that "[a]ll OWF Filter Pack 1 individual packaging *__will have__* the IAPMO certification seal stating that the product has been tested and is certified to NSF/ANSI standards," that Respondents would take certain actions "[a]fter securing IAPMO/NSF/ANSI Certification of all OWF Filter Pack 1 claims," and that "KTC estimates to secure IAPMO/NSF/ANSI Certification of all OWF Filter Pack 2 claims by October 15, 2019" – that language must be read against the language found in Appendix A, which shows two things.[45]  First, it shows that the Parties in fact knew how use clear language implying definitive obligations when they wanted to, which merely reinforces how equivocal that language in Appendix A in fact is. Second, it shows that Respondents had to contract with IAPMO (which is an obligation they fulfilled) and obtain an IAPMO seal certifying that the filters met

---

[43]  JB Resp. Ex. 13, Appendix A (RESP000064) (emphasis added).

[44]  *Id*. (emphasis added).  Appendix C to Addendum No. 5 contained the same qualified language in relation to the GF-2 Filter Pack. *See id.* (RESP000065).  Moreover, as Dr. Koslow explained, IAPMO certification for P231 could never be obtained because the filter at issue was not a water purifier. *See*, *e.g.*, Tr. of 01/31/24, at 965:13-966:07 (Dr. Koslow relating that the filters at issue could never pass P231 as written because the filters were not water purifiers).

[45]  JB Resp. Ex. 13, Appendix D (RESP000067) (emphasis added).

standards in Appendix A ***that still had to be finalized***, but it did not say that IAPMO certification would be obtained in the manner in which OWFC has construed it.

    f.    Consequently, the express language in Addendum No. 5 does not support OWFC's position that IAPMO certification of compliance with P231 protocols was an absolute obligation, because the language used in Addendum No. 5 is not sufficiently clear or precise to impose that obligation.

159.    Second, the extrinsic evidence that the Parties have presented does not support OWFC's position either.

    a.    OWFC did not present a single witness who was personally involved in negotiating the License Agreement or its addenda to support OWFC's certification claim interpretation, and while Carl "Tony" Erickson – who was OWFC's President, and who negotiated these agreements with Dr. Koslow – passed away before the Arbitration was commenced, Claimant did not present any emails or other writings from Tony Erickson or anyone else that independently corroborated OWFC's position. Moreover, even though Tony Erickson was not available to offer extrinsic evidence, OWFC did not offer the Tribunal any reasons why Judith E. Ryan – who signed virtually all of these agreements for OWFC – could not have done so.

    b.    Conversely, Dr. Koslow – who did directly participate in negotiations, and who wrote the relevant language found in Appendix A – made it clear in his testimony that obtaining IAPMO certification with P231 protocols would necessarily require altering and tailoring those protocols to match a gravity filter's removal mechanisms, which inherently made IAPMO certification uncertain (if not impossible without tailoring) and at best, would limit it to a "'manufacturer's claim specifying performance in TYPE 1 water only."[46]

---

[46]    *See* JB Ex. 30, E. Koslow Witness Stmnt. of 12/05/23, ¶ 7 (RESP007953) (describing how Respondents "clearly communicated in both Addendum 5 itself and during the negotiation of Addendum 5, that the P231 claim was speculative and would likely be confined to a 'manufacturer's claim'"); Tr. of 02/01/24, at 1101:21-1102:15 (Dr. Koslow explaining the requirement for a manufacturer's claim in relation to P231 testing).

c.  Furthermore, Dr. Koslow testified during the Merits Hearing that by the time the Parties entered into Addendum No. 6 on October 2, 2019,[47] which in relevant part addressed the timing of filter shipments to the Philippines and outstanding payments that OWFC was going to make for those shipments,[48] the Parties had largely recognized that any IAPMO certification was not going to be required before OWFC paid outstanding balances for the receipt of two shipping containers of GF-1 filter packs for the Philippines.[49]

d.  In short, even if the Tribunal were to discount Dr. Koslow's testimony (which the Tribunal does not do), there would be nothing dispositive from OWFC to support its interpretation of the language regarding IAPMO certification found in Appendix A to Addendum No. 5 upon which OWFC relies to assert its certification claim.

160.  Third, OWFC's contention that reading Addendum No. 5 in the manner that Respondents have suggested would impose "***no baseline performance standards at all*** with respect to microbiological contaminant removal in Addendum [No.] 5" is simply not correct, because all that reading does is discount the possibility that Respondents were contractually obligated to obtain IAPMO certification – it does not remove all performance standards or vitiate the obligation to provide filters that could in fact perform as Respondents promised, and as the following section discusses, the available evidence suggests that Respondents in fact satisfied that obligation.

161.  In short, the Tribunal:

a.  Does not accept OWFC's contention that IAPMO certification was a fixed contractual obligation that Respondents did breach or could have breached; and

---

[47]  *See* JB Resp. Ex. 15 (RESP000070).

[48]  *See* JB Resp. Ex. 15, § 5.3.2 (RESP000072) (setting forth the balance owed and payment timing for the second container of GF-1 filter packs to be shipped to the Philippines, despite IAPMO certification not having been received).

[49]  *See* Tr. of 02/01/24, at 1136:01-1138:17 (Dr. Koslow stating that during the negotiation of Addendum No. 6 – which Judith Ryan signed – Tony Erickson "sort of" cancelled certification, and agreed that "certification was no longer required for the payment to be made").

b.    Further concludes that Respondents in fact discharged any certification obligations that they did have by contracting with IAPMO and genuinely attempting in good faith to get IAPMO certification for virus removal, by working closely with the IAPMO staff to formulate testing conditions that would match a gravity filter's possible performance, and in fact testing the filters against modified P231 protocols many times.

162.    OWFC's express breach of contract claim based on Respondents' failure to obtain IAPMO certification – i.e., OWFC's certification claim – therefore fails on the merits, and is hereby denied.

163.    As the following section explains, because OWFC relies heavily on the failed IAPMO tests as the basis for asserting that Respondents failed to deliver filters that could in fact perform as promised in Appendix B to the License Agreement and Appendix A to Addendum No. 5, OWFC's performance claim also fails for lack of proof.

### 4.    OWFC's Performance Claim Fails for Lack of Evidence

164.    OWFC's claim that Respondents did not deliver filters that met the performance standards set forth in Appendix B to the License Agreement and Appendix A to Addendum No. 5 because they did not pass IAPMO certification tests fails for lack of evidence.

165.    Specifically, OWFC failed to present evidence showing that the filters Respondents delivered did not in fact meet the performance metrics stated in the License Agreement and Addendum No. 5, while Respondents conversely presented evidence showing that the filters could achieve, or likely would be able to achieve, that performance, and did in fact achieve it under testing conditions that more closely matched contractually stipulated flowrates – specifically four-log virus removal at flowrates of 45 ml/minute (License Agreement) and 133 ml/minute (Addendum No. 5).

166.    Consequently, on balance, the evidence presented shows that Respondents did not breach their performance obligations.

167.    All Parties agree that Appendix B to the License Agreement, as well as Appendix A to Addendum No. 5, obligated Respondents to deliver filters that were in fact capable of

- 33 -

removing 99.99% of virus materials from water at flowrates of 45 ml/minute to 133 ml/minute.

168.    The Parties disagree, however, as to whether Respondents did in fact do so, with OWFC claiming that the best proof that Respondents failed to satisfy their obligation is that they failed several tests conducted by IAPMO and never obtained IAPMO certification of that performance.

169.    OWFC states that "[o]ne of the most important, if not *the most* important, performance standards that Respondents are obligated to meet under the express terms of the [License] Agreement and Addendums is with respect to microbiological interception that meets the NSF P231 protocol performance *claims* as tested with TYPE 1 water (irrespective of formal NSF *certification*, which was nonetheless promised and subsequently memorialized as a requirement for Respondents to meet in Addendum [No.] 5)," and that "in January 2020, Respondents discovered through outside testing by the IAPMO certification agency that the first mass-produced water filters had in fact not achieved Koslow's earlier claims with regards to virus removal."[50]

170.    In other words, OWFC contends that Respondents did not deliver filters that could remove at least 99.99% of virus at specified flowrates, because IAPMO never certified that the filters could do so in accordance with NSF P231.

171.    For their part, Respondents not only contend that "the eight laboratory tests of KTC filters (JBC 1, 2, 5, 150) affirm that the KTC filters accomplish >99.99% (4-log) virus removal at flowrates up to 12L/hr (200ml/minute)" based on Dr. Koslow's view of the relationship between filter contact time and virus removal, but that "OWFC has not produced any evidence to controvert" Dr. Koslow's view.[51]

172.    From the Tribunal's perspective, whether or not Dr. Koslow is correct is ultimately irrelevant, because it was OWFC's obligation under Section R-32(a) of the Commercial

---

[50]    OWFC's Post-Hearing Written Submissions , ¶¶ 214, 222.

[51]    Respondents' Post-Hearing Brief, ¶ 106.

Rules to support its claim, and OWFC did not discharge that burden by relying on IAPMO tests that were highly problematic, particularly when Respondents presented:

a. Tests results from Analytical Services, Inc. ("**ASI**") which showed that the filters could achieve four-log virus removal at flowrates that more closely approximated the ones set forth in the License Agreement and Addendum No. 5 (as Paragraph 177 below discusses further); as well as

b. Uncontested expert testimony which stated in relevant part that both the ASI and IAPMO tests showed the filters could perform as promised at appropriate flowrates, and which attributed any failures in the IAPMO tests to excessive flowrates, the type of testing water used, and the testing apparatus (as Paragraph 177 below discusses further).

173. First, and perhaps must critically, despite having received and accepted in the Philippines a delivery of 500,000 filter packs from Respondents that OWFC could presumably have independently tested, OWFC never actually tested those filters itself, and never presented a single failed test that it conducted itself on any of the delivered filters showing that the filters did not meet the contractually stated viral removal metrics at appropriate flowrates.

174. Instead, OWFC has relied entirely upon the failed IAPMO tests that Respondents commissioned, which OWFC contends show the filters cannot remove 99.99% of viruses from test water.

175. OWFC's position is problematic for a number of reasons.

176. First, there are serious questions as to whether or not the IAPMO tests in fact show that the filters were incapable of removing 99.99% of viral material from test water at 133 ml/minute flowrates, as Paragraph 178 discusses further below.[52] Moreover, even if the IAPMO tests definitively showed that the filters could not remove 99.99% of viruses at 133 ml/minute flowrates, there would still be questions as to whether or not the filters

---

[52] *See* JB Resp. Ex. 18 (RESP007919) (showing flowrates of 250 ml/min); *See* JB Ex. 30, E. Koslow Witness Stmnt. of 12/05/23, ¶ 14 (RESP007955) (explaining that "IAPMO only reports flow rate in a single test and in that test report, **all of the filters (four samples** were flowing at >300 ml/minute, which greatly exceeds the original target specifications") (emphasis in original).

IAPMO tested were the same as the ones that OWFC accepted in the Philippines and resold without objection.

177. Second, there are ASI test results in evidence which show that Respondents' filters in fact achieved four-log virus reduction at flowrates that more closely approximated those set forth in Appendix B to the License Agreement and Appendix A to Addendum No. 5.[53]

    a. KTC's expert, whom OWFC did not challenge with an opposing expert, opined that the ASI tests results "are valid and accurately represent that KTC's filters achieved at least a 4-log reduction in virus."[54]

    b. Dr. Koslow, who – despite his personal interest – had greater water filtration experience than any other fact witness presented in this matter, also believed the ASI test results showed that KTC's filters could achieve four-log virus reduction.[55]

    c. Accordingly, there is evidence that the filter packs (and more specifically, the Filter Tickets) – which were all that Respondents were ultimately obligated to deliver – did achieve four-log virus reduction at lower flowrates than those which IAPMO used.[56]

178. Third, while IAPMO tests did all universally result in a stated failure to achieve 99.99% virus removal under the testing conditions that IAPMO employed, not only could that failure be attributable to the manner in which IAPMO conducted those tests, but the results might actually confirm that 99.99% virus reduction could be achieved under different

---

[53] *See* JB Resp. Ex. 1 (RESP007817) (stating that "test results obtained during a series of seven tests of filters provided by KT Corporation demonstrates . . . [that] [a]ll filters passed the EPA target criteria of more than 99.99% interception for MS-2 bacteriophage particles, with most filters greatly exceeding the target by providing 99.999% to 99.9999% reduction"); JB Resp. Exs. 49-51 (showing ASI test results); JB Resp. Ex. 30, E. Koslow Witness Stmnt. of 12/05/23, ¶ 11 (RESP007954) (relating that the ASI tests showed that the filters alone could achieve four-log virus removal); JB Resp. Ex. 35, Expert Report of Andrew Lombardo, ¶ 11 (RESP007976) (stating that the ASI tests showed that "KTC's filters achieved at least 4-log reduction of virus").

[54] JB Resp. Ex. 35, Expert Report of Andrew Lombardo, ¶ 13 (RESP007976).

[55] JB Resp. Ex. 30, E. Koslow Witness Stmnt. of 12/05/23, ¶ 11 (RESP007954) (relating that the ASI tests showed that the filters alone could achieve four-log virus removal); *see* JB Resp. Ex. 29, Decl. of Evan E. Koslow in Response, of 03/17/23, ¶ 7 (RESP007946) (stating that the ASI tests showed that KTC filters could meet or exceed four-log virus reduction).

[56] *See* Section III.A.5 below for the resolution of OWFC's claim that Respondents breached by failing to deliver GF-2 and PWF filters.

testing conditions at lower flowrates (and possibly using different test water), like those that ASI used.

a.    All of the IAPMO results presented show that IAPMO tested the filters at initial flowrates of at least 250 ml/minute,[57] and as high as 360 ml/minute,[58] which are substantially higher than the 45 ml/minute flow rate set forth in Appendix B to the License agreement,[59] and also substantially higher than the 133 ml/minute flow rate set forth in Appendix A to Addendum No. 5.[60]

b.    That fact is significant, because Respondents presented uncontroverted evidence that established a clear relationship between filter contact time and virus removal,[61] so much so in fact, that Respondents' uncontested and credible expert was fully comfortable attributing any failure to achieve four-log virus reduction in the IAPMO tests to the high flowrates that IAPMO used, which "limits contact time between the water and filter."[62]

c.    Indeed, Respondents' expert suggested that if IAPMO had used lower flowrates in its tests that were closer to those used in the ASI tests – or at least those stated in

---

[57]    *See* JB Resp. Ex. 18 (RESP007919); *but see id.* (RESP007929 – RESP007931) (stating an initial flow rate of 230 ml/minute before increasing to 250 ml/minute, and then 260 ml/minute).

[58]    *See id.* (RESP007925); *id.* (RESP007934) (showing flowrates of 340 ml/minute).

[59]    *See* JB Resp. Ex. 3 (RESP000024).

[60]    *See* JB Resp. Ex. 13 (RESP000064) (stating initial flowrates of 8 liters/hour, which equates to 133 ml/minute).

[61]    *See* JB Resp. Ex. 35, Expert Report of Andrew Lombardo, ¶ 26 (RESP007979) (explaining the relationship between filter contact time and virus removal rates); JB Resp. Ex. 114 (RESP008233) (showing that as flowrates increase, virus log removal rates conversely decrease); *see also* JB333 (showing same relationship); Tr. of 01/30/24, at 673:17-674:05 (P. Heilveil accepting this relationship).

[62]    JB Resp. Ex. 35, Expert Report of Andrew Lombardo, ¶¶ 17-18, 25-28 (RESP007977, RESP007979 – RESP007980) (relating that gravity flow filters of the nature at issue here rely on contact time to remove viruses, and stating that the high flowrates observed in the IAPMO tests reduced contact time and were a factor in the tests failing to achieve four-log virus reduction, and that if such high flowrates had not been used, the filters would not have failed virus removal "completely" instead of coming very close to achieving four-log reduction). Respondents' expert also attributed the difference in results between the ASI tests and the IAPMO tests to differences in the test water used, s*ee id.*, ¶ 19-20 (RESP007977), as well as possible issues with the filter housing. *See id.*, ¶ 28 (RESP007980).

Addendum No. 5 – then IAPMO would have seen a four-log virus reduction, just as ASI did,[63] which is completely consistent with Dr. Koslow's view.[64]

179. In short, while the IAPMO tests do state on their face that IAPMO did not see the filters it tested achieve a four-log virus reduction under IAPMO's testing conditions, that is insufficient to prove that the filters could not in fact achieve four-log virus reduction at lower flowrates that more closely approximated the contractually stated ones of 45 ml/minute to 133 ml/minute.

180. Conversely, the ASI tests show that the filters could achieve four-log virus removal at lower flowrates.

181. Accordingly, on balance, the evidence before the Tribunal does not establish that Respondents failed to deliver filters that could achieve four-log virus reduction at 133 ml/minute flowrates, which precludes a finding that Respondents breached their performance obligations.

182. Consequently, OWFC's performance breach of contract claim must similarly be denied on the merits.

### 5. OWFC's Remaining Breach of Contract Claims Similarly Fail

183. OWFC's failure to establish its certification and performance breach of contract claims largely disposes of its remaining express breach of contract claims.

---

[63] JB Resp. Ex. 35, Expert Report of Andrew Lombardo, ¶¶ 25-28 (RESP007979 – RESP007980) (explaining that filters do not fail viral tests in the manner IAPMO observed if they are defective, and that if IAPMO had used lower flowrates, four-log virus reduction would have been achieved).

[64] *See* Tr. of 02/01/24, at 1082:21-1086:06 (Dr. Koslow explaining Fick's Law and the relationship between contact time and virus removal); *see also id.*, at 1191:08-25 (Dr. Koslow stating that "[y]ou can see from the IAPMO testing, our bigger problem was there was too much flow"); *id.*, at 1192:01-1193:05 (relating same); *id.*, at 1090:20-1091:19 (explaining that the ASI test results showed that four-log virus reduction was possible at 133 ml flowrates); Tr. of 01/30/24, at 438:25-439:03 (P. Heilveil accepting the relationship between contact time and contaminant interception).

184. OWFC alleges that Respondents breached the License Agreement by failing to deliver 0.5M Filter Packs for India, stating only in its Post-Hearing Written Submission that "[t]here is no dispute IN [was] never fulfilled."[65]

    a. Addendum No. 8 to the License Agreement does make clear that Respondents had manufactured an order of filters for India that were "located at KTC Factory" in Connecticut, but that those filters had "issues which KTC has agreed to rectify."[66]

    b. While OWFC contends that order was never fulfilled, Dr. Koslow testified that in fact, the India shipment was completed and was simply waiting in KTC's Connecticut factory for OWFC to pick up, but that OWFC never arranged to do so.[67]

    c. Given the conflicting evidence on the point, the Tribunal is constrained to conclude that insufficient evidence exists for OWFC to prove its claim, and to therefore deny the claim on the merits.

185. OWFC further alleges that Respondents breached by failing to develop GF-2 filters, which were a more complex version of the GF-1 filters, as well as PWF filters, which were pressure filters that the Parties intended to sell in developed markets.

186. Dr. Koslow testified, however, that Tony Erickson cancelled the GF-2 and PWF filter programs to focus on the GF-1 program, and the Tribunal does not have any countervailing evidence to effectively contradict that claim.[68]

---

[65] OWFC's Post-Hearing Written Submission, ¶ 252 (citing P. Heilveil's testimony and Addendum No. 8).

[66] JB Resp. Ex. 25, Addendum No. 8, § 5 (RESP000084).

[67] *See* E. Koslow Witness Stmnt. of 01/27/23, ¶ 57 ((stating that an "India order of cut and packaged filters: approximately 500,000 (quantity)" are presently in KTC's Connecticut factory and attaching picture of the same); JB Resp. Ex. 3, § 5.9(f)-(g) (RESP000009) (relating that filters were deliverd FOB in KTC's Waterbury factory); *see also* Tr. of 02/01/24, at 1187:09-1193:05 (Dr. Koslow suggesting that the filters for India were produced and delivered FOB Waterbury, but also suggesting issues may have remained with them).

[68] *See* Tr. of 02/01/24, at 1137:09-1144:04 (Dr. Koslow testifying that Tony Erickson directed him to put all funds towards the GF-1 program); *id.*, at 1184:19-1186:09 (Dr. Koslow discussing the same).

187. Finally, OWFC alleges that Respondents breached by not obtaining IAPMO certifications for the GF-2 and PWF filters, in addition to the GF-1 filter discussed in Section III.A.3 above.

    a.    OWFC's IAPMO certification claims for the GF-2 and PWF filter fail for the same reasons discussed in Section III.A.3 above as to why Respondents had no obligation to obtain IAPMO certification for the GF-1 filter.

    b.    Consequently, those claims necessarily fail on the merits as well.

188. In short, all of OWFC's express breach of contract claims fail and are denied on the merits.

189. As the following section explains, OWFC's claim for an alleged breach of the implied covenant of good faith and fair dealing similarly fails.

**B.    OWFC's Claim for Breach of the Covenant of Good Faith and Fair Dealing Fails on the Merits**

190. OWFC's claim for breach of the covenant of good faith and fair dealing fails both as a matter of law, and for lack of evidence.

191. Consequently, that claim is also denied on the merits.

192. In its Post-Hearing Written Submission, OWFC alleges that "Respondents constantly lied, taking advantage of its [*sic*] superior knowledge," and purposely "withheld . . . failed [IAPMO] tests to claim a breach by OWFC in order to regain the territories and benefit from its [*sic*] manufacturing capability paid for by OWFC," which "clearly establishes a breach by Respondents of their duty of good faith and fair dealings [*sic*]."[69]

193. For their part, Respondents:

    a.    Dispute that they breached at all, because they had no obligation to obtain IAPMO certification, and delivered filters that could perform as promised;

    b.    Demonstrate that they in fact informed OWFC of all IAPMO tests they conducted;

    c.    Contend that OWFC cannot assert an equitable claim for breach of the covenant of good faith and fair dealing:

---

[69]    OWFC's Post-Hearing Written Submission, ¶ 263.

       i.      in relation to matters that are expressly covered by the terms of the agreement; and

      ii.     when OWFC itself has unclean hands.[70]

194. New York law implies the covenant of good faith and fair dealing into every contract, which prevents parties from taking any actions that would "'destroy[] or injur[e] the right of the other party to receive the fruits of the contract.'"[71]

195. New York law, however, generally prohibits claims for such breaches that are addressed by express contract provisions.[72]

196. Moreover, New York law does not allow the covenant of good faith and fair dealing to impose obligations into a contract that are inconsistent with its express terms.[73]

197. Accordingly, parties generally cannot claim breach of the implied covenant where a written contract expressly addresses the alleged breach at issue.[74]

198. While the contours of OWFC's claim for breach of the implied covenant of good faith and fair dealing are not well-defined, it seems that OWFC's position is that Respondents had an obligation to obtain IAPMO certification, and breached the covenant by failing to disclose failed IAPMO tests as part of a scheme to cause OWFC to breach, so that OWFC would lose its exclusivity rights.

199. Putting aside any logical deficiencies in OWFC's argument, it is clear that the License Agreement and Addendum No. 5 do address IAPMO certification, even if the agreement does not definitively impose any such obligation upon Respondents.

200. Moreover, the agreement does not impose any obligation to disclose the results of any IAPMO testing done, so to the extent OWFC is alleging that a failure to do so breaches the

---

[70]    Resp.'s Post-Hearing Brief, ¶¶ 164-69.

[71]    *See 511 West 232nd Owners Corp. v. Jennifer Reality Co.*, 98 N.Y.2d 144, 153 (N.Y. Ct. App. 2002) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2s 289, 291 (N.Y. Ct. App. 1995)).

[72]    *See Triton Partners LLC v. Prudential Secs. Inc.*, 301 A.D.2d 411 (N.Y. App. Div. 2003).

[73]    *See 511 West 232nd Owners Corp.*, 98 N.Y.2d at 153.

[74]    *See Clark-Fitzpatrick Inc. v. Long Island Rail Road Co.*, 521 N.Y.2d 653 (N.Y. Ct. App. 1987) (relating that parties cannot pursue quasi-contractual relief when there is a valid contract that covers the issue).

covenant of good faith and fair dealing, that claim is precluded as a matter of law on grounds that it would read into the contract an obligation that is not there, thereby altering the express terms of the contract.

201.  Consequently, OWFC's claim for breach of the covenant of good faith and fair dealing fails on the merits as a matter of New York law.

202.  To the extent that claim is predicated on the notion that Respondents concealed failed IAPMO tests from OWFC, it also fails on the merits for lack of proof.

203.  A significant portion of OWFC's Post-Hearing Written Submission is devoted to cataloguing the various ways in which OWFC accuses Dr. Koslow of lying to OWFC and to this Tribunal, and one of OWFC's primary contentions is that Dr. Koslow misled OWFC by failing to disclose several IAPMO tests which showed that KTC's filters did not achieve four-log virus removal under the testing conditions that IAPMO employed.

204.  As Respondents correctly point out, however, there are significant factual deficiencies in OWFC's contention.

   a.  First, OWFC presumes that if Peter Heilveil was unaware of any failed tests, then OWFC had to have been equally ignorant, even though Tony Erickson was the President of OWFC, was dealing directly with Dr. Koslow, and was informed about those tests either orally or in writing.[75]

   b.  Second, there is no question that Respondents informed Tony Erickson of the first failed IAPMO test, because Tony Erickson memorialized that fact in an email to Dr. Koslow upon which Peter Heilveil was copied.[76]

---

[75]  Peter Heilveil did not join OWFC until some time in late 2018 or early 2019, and when he joined, Peter Heilveil was the "VP Hardware Systems" – not a person at OWFC charged with addressing certification testing. *See* JB Resp. Ex. 7 RESP002154.

[76]  *See* JB Resp. Ex. 19, Email from C. Erickson to E. Koslow & P. Heilveil of 01/23/20 (RESP005315) (stating that "[a]s we discussed and to bring Peter up to speed: 1.0 Test results: Virus 99.96% versus minimum 99.99%").

c.     Third, Respondents informed OWFC of the second failed IAPMO test in an email sent to Tony Erickson on February 19, 2020, upon which Peter Heilveil was not copied.[77]

d.     Fourth, Dr. Koslow testified that he informed Tony Erickson of the third failed IAPMO test by phone, which Dr. Koslow said was Tony Erickson's preference for communicating test results at that point,[78] and given Tony Erickson's written instruction to both Dr. Koslow and Peter Heilveil that they "[not] reveal" failed IAPMO tests to investors "or anyone else,"[79] it is entirely plausible that Tony Erickson did instruct Dr. Koslow to only discuss test results by phone (even if Dr. Koslow might later have ignored that instruction).[80]

205.    Accordingly, at best, OWFC has failed to present sufficient evidence from which the Tribunal could conclude that Respondents concealed failed IAPMO tests from it, and at worst, OWFC's contention is simply wrong, but regardless, OWFC has failed to carry its evidentiary burden to show that Respondents intentionally concealed IAPMO test results from it.

206.    Consequently, OWFC's claim for an alleged breach of the covenant of good faith and fair dealing fails on the merits as a matter of fact and law.

### C.     OWFC's Unjust Enrichment Claim Fails on the Merits

207.    OWFC's claim for unjust enrichment is equally unsound and also fails on the merits, in no small part, because OWFC cannot claim equitable relief for conduct that falls within the ambit of a valid contract that OWFC has itself breached by failing to make required license fee payments.

---

[77]    *See* JB Resp. Ex. 20, Email from E. Koslow to C. Erickson of 02/20/20 (RESP007938) (stating that "I am sorry to report that the test results from IAPMO for virus once more showed a slight failure (99.97 vs target 99.99)," and to "[s]ee attached report").

[78]    *See* Tr. of 01/31/24, at 900:19-902:06, 913:08-17 (Dr. Koslow explaining his reporting practices).

[79]    *See* JB Resp. Ex. 19, Email from C. Erickson to E. Koslow & P. Heilveil of 01/23/20 (RESP005315).

[80]    *See* JB Resp. Ex. 20, Email from E. Koslow to C. Erickson of 02/20/20 (RESP007938) (communicating failed IAPMO test results).

208. OWFC's unjust enrichment claim is predicated on the notion that Respondents engaged in misconduct to cause OWFC to lose its exclusivity rights, and that "[a]s a result of Respondents' misconduct, Respondents were unjustly enriched with the return of the exclusive territories contracted to OWFC."[81]

209. Under New York law, unjust enrichment is an equitable, quasi-contractual remedy designed to permit an injured party to recover something of value that was improperly conferred upon another party.[82]

210. To prevail on an unjust enrichment claim, a party "must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered."[83]

211. As is the case with all quasi-contractual equitable claims, parties are generally precluded from succeeding upon them if a valid contract addresses the conduct complained of,[84] or if the party asserting the claim has unclean hands.[85]

212. In this case, the Parties' contract – the License Agreement – clearly addresses the conditions in which OWFC would lose exclusivity, and clearly states that loss of exclusivity is a remedy for unpaid license fees.

213. Accordingly, there is no question that a valid contract addresses the conduct complained of, or that OWFC is precluded as a matter of law from pursuing quasi-contractual relief.

---

[81]    OWFC's Post Hearing Written Submission, ¶ 266.

[82]    *See Paramount Film Distrib. Corp. v. State of New York*, 30 N.Y.2d 415, 421 (N.Y. Ct. App. 1972) (relating the general purpose of an unjust enrichment claim).

[83]    *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (N.Y. Ct. App. 2011) (internal citations and quotations omitted).

[84]    *See Clark-Fitzpatrick Inc.*, 521 N.Y.S.2d at 653 (explaining that parties cannot pursue quasi-contractual relief when there is a valid contract that covers the issue).

[85]    *See Cohen & Berk v. Rothman-Goodman Mgt. Corp.*, 125 A.D.2d 425, 436 (N.Y. App. Div. 1986) (denying unjust enrichment claim on grounds that "one may not obtain equitable relief where he himself has engaged in inequitable or unconscionable conduct connected with the matter in litigation, and where the party invoking the doctrine of unclean hands was injured by such conduct").

214. Moreover, as OWFC did not have a valid basis for refusing to pay license fees it owed to Respondents, it cannot seek equitable relief, because OWFC itself breached the contract by failing to pay those license fees without legal justification.[86]

215. Consequently, under any view, OWFC's unjust enrichment claim fails on the merits.

**D.    OWFC's Fraudulent Inducement Claim Fails on the Merits as a Matter of Fact and Law**

216. OWFC's claim that it was fraudulently induced to enter into Addendum No. 8 when Respondents allegedly concealed unsuccessful IAPMO tests and the flowrates those tests showed fails on the merits, because OWFC:

   a.    Did not carry its evidentiary burden to show that Respondents in fact concealed any IAPMO test results; and

   b.    Cannot prove materiality, justifiable reliance, or causation in any event.

217. To prove a claim for fraudulent inducement, OWFC must show:

   a.    A material misrepresentation;

   b.    That Respondents knew was false;

   c.    That Respondents made for the purpose of inducing OWFC's reliance;

   d.    Actual OWFC reliance; and

   e.    Damages to OWFC that resulted from that reliance.[87]

218. Notably, in certain circumstances, parties may maintain concurrent claims for fraudulent inducement and breach of the same contract.[88]

---

[86]    *See Cohen & Berk*, 125 A.D.2d at 436 (relating that parties cannot obtain equitable relief when they themselves have breached).

[87]    *See Wright v. Selle*, 811 N.Y.S.2d 525, 527-28 (N.Y. App. Div. 2006) (stating the elements of a fraudulent inducement claim) (OWFCLA746).

[88]    *See RKB Enter. Inc. v. Ernst & Young*, 582 N.Y.S.2d 814, 816 (N.Y. App. Div. 1992).

219. As noted in Paragraph 216 above, OWFC contends that Respondents fraudulently induced it to enter into Addendum No. 8 in two ways by:

    a. Purposely withholding "the second, third, fourth and fifth failed virus test results from OWFC even though OWFC inquired on several occasions regarding the status of IAPMO certification with respect to viral reduction," which led to Respondents "negotiat[ing] Addendum [No.] 8 with superior knowledge of the second and third failed test results;"[89] and

    b. Withholding from "OWFC evidence of low flow rate observed by IAPMO during NSF P231 testing," which resulted in Respondents "intentionally fail[ing] to disclose that there were known issues with the OWFC Filter Packs with respect to flowing, and intentionally conceal[ing] testing by IAPMO that showed that the OWF Filter Packs in fact did exhibit inadequate flow."[90]

220. With regard to OWFC's contention that Respondents withheld the results of IAPMO testing from it, as Paragraph 204 above explains, OWFC has not presented sufficient evidence to show that Respondents failed to fully inform it about the IAPMO test results, whereas Respondents presented evidence showing that they did in fact inform OWFC – and particularly Tony Erickson – about those results.[91]

221. Consequently, OWFC has not met its evidentiary burden of establishing its claim that Respondents intentionally withheld information from it.

222. Critically, that conclusion also disposes of OWFC's low flowrate claims based on the results seen in IAPMO testing, because if Respondents in fact shared those test results with

---

[89]    OWFC Post-Hearing Written Submission, ¶¶ 272-77.

[90]    *Id*., ¶¶ 281-82.

[91]    The Tribunal is constrained to point out that the mere fact that OWFC's primary witness – Peter Heilveil – may have been unaware of certain facts does not mean that OWFC was unaware of them, and the Tribunal will never know the full extent of OWFC's knowledge, because Tony Erickson was never available to present his evidence. There is, nevertheless, objective documentary evidence, as well as Dr. Koslow's evidence, from which the Tribunal can conclude that Respondents did make OWFC aware of the IAPMO test results. Lastly, the Tribunal cannot ignore that an individual director named Karl Leung signed Addendum No. 8 for OWFC, but that he provided no evidence whatsoever – not even a statement about what Tony Erickson might have told him before he signed the addendum or authorized his signature to be affixed to it. *See* JB Resp. Ex. 25 (RESP000087). Accordingly, while the Tribunal makes no firm factual finding regarding what OWFC may have definitively known by the time it agreed to Addendum No. 8, the evidence presented, as well as what was ***not*** presented, highlight that OWFC failed to carry its evidentiary factual burden.

- 46 -

OWFC, it would be illogical for the Tribunal to conclude that Respondents shared one potentially show-stopping aspect of them – namely, virus removal failures – but not one that Respondents believe directly and significantly impacts virus removal performance – namely, flowrates.

a.  Additionally, while those test results usually showed initial flowrates that substantially exceeded the ones set forth in Appendix B to the License Agreement and Appendix A to Addendum No. 5 as Paragraph 178 above discusses (which suggests no flowrate issue at all), those same tests also showed precipitous flowrate declines from initial levels that fell well below the flowrates set forth in Appendix A to Addendum No. 5.[92]

b.  Accordingly, there is not only evidence before the Tribunal that any low flowrates were in fact disclosed, but that the filters did not even show low flowrates initially in IAPMO testing (which is consistent with the conclusion that excessive flowrates were adversely affecting the filters' virus removal capabilities).

223.  Moreover, there is other evidence which suggests that Respondents shared the flowrates that the filter packs were demonstrating.

a.  On August 22, 2019, Respondents sent OWFC an email showing that the filter packs exhibited flowrates of 33 ml/minute.[93]

b.  On January 14, 2020, Respondents sent OWFC an email showing that the filter packs exhibited flowrates between 40 ml/minute and 120 ml/minute.[94]

224.  Lastly, Addendum No. 8 itself states in Section 5 that "it is possible for an 'air lock' to form between any of the OWF-GF1 filter elements which prevents the flow of water through the OWF-GF1 filters under certain operating conditions," that Respondents agreed

---

[92]  *See*, *e.g.*, JB Resp. Ex. 18 (RESP007919) (showing a flowrate drop from 250 ml/minute to 90 ml/minute); (RESP007924) (showing flowrates dropping from 350 ml/minute, to 170 ml/minute, to 85 ml/minute); (RESP007925) (demonstrating flowrate starting at 360 ml/minute, then dropping to 180 ml/minute, to 90 ml/minute); (RESP007929) (showing initial flowrate dropping from 230 ml/minute, to 115 ml/minute, to 55 ml/minute); (RESP007930) (showing initial flowrate dropping from 250 ml/minute, to 125 ml/minute, to 60 ml/minute).

[93]  *See* JB Ex. 381.

[94]  *See* JB Ex. 308.

to rectify that problem in part by "adding a droplet(s) of a mixture composed of food grade paraffin diluted in food grade hexane on each of the OWF Carbon Prefilters and OWF Sediment Prefilters in accordance with specifications and procedures confirmed by KTC via email."[95]

    a. While air locking is not the same problem as low flowrates, and while fashioning a solution to air locking might imply that the filters would flow at normal rates after that solution was implemented, it nevertheless was a flowrate problem that the Parties clearly discussed before they executed Addendum No. 8.

    b. Consequently, to presume that Respondents were somehow misleading OWFC about potential flowrate issues is unreasonable.

225. In short, OWFC has not presented sufficient evidence from which the Tribunal could conclude that Respondents intentionally concealed alleged flowrate issues.

226. While that conclusion alone is fatal to OWFC's fraudulent inducement claim, it is not the only reason that the claim fails on the merits.

227. OWFC's fraudulent inducement claim also fails because OWFC has not established several of the legal elements of a fraudulent inducement claim.

    a. OWFC has not established fraudulent intent – it has merely postulated a relatively attenuated theory that Respondents lured OWFC into Addendum No. 8 in the hope that OWFC would breach so that Respondents could terminate OWFC's exclusivity rights in various territories and thereby reclaim those rights for themselves. That theory – which leans heavily on OWFC's contention that Dr. Koslow is fundamentally dishonest – not only ignores OWFC's own allegations that the filters were inherently faulty (in which case, why would Respondents want to recover the right to sell them?), but also fails to recognize that if that were Respondents' objective, there would seem to be simpler ways to achieve it, such as claiming material breach for non-payment or failure to place orders.

---

[95]    JB Resp. Ex. 25, ¶ 5 (RESP000083).

b.      OWFC has not established that it reasonably relied upon any alleged misrepresentations, because the evidence before the Tribunal shows that OWFC was in fact aware of the alleged deficiencies about which it now complains, which renders OWFC's present contentions of ignorance unsustainable.

c.      Lastly, OWFC cannot show that the alleged misrepresentations caused OWFC to enter into Addendum No. 8, because OWFC was ostensibly aware of the IAPMO tests results and the flowrates they showed before OWFC executed Addendum No. 8 (through Karl Leung, who did not provide any evidence in this Arbitration), which vitiates causation.

228.    In short, while OWFC's fraudulent inducement claim fails on the merits for a lack of evidence, it also fails on the merits as a matter of law.

## E.      OWFC Is Not Entitled to Sanctions

229.    The Tribunal declines OWFC's invitation to sanction Respondents for Dr. Koslow's supposed misconduct by "strik[ing] Dr. Koslow's testimony"[96] and awarding it compensatory or punitive damages.[97]

230.    While OWFC devoted a substantial portion of its post-hearing closing submissions to its allegation that Dr. Koslow not only lied throughout these proceedings, but in others, OWFC has failed to establish a factual predicate for its position – at least in this action – and even if OWFC had done so, the Tribunal would not award OWFC the remedies it seeks, because the Tribunal repeatedly stated that it would accept all evidence and accord that evidence the weight to which the Tribunal deemed the evidence entitled – not strike it.

231.    Consequently, OWFC's sanctions request is denied on the merits.

## F.      OWFC Is Not Entitled to Any Damages

232.    As OWFC has failed to establish that Respondents are liable for any of OWFC's affirmative claims, the Tribunal need not explain why OWFC is precluded from recovering

---

[96]    OWFC's Post-Hearing Written Submission, ¶ 160.

[97]    While the Tribunal makes no finding in this regard, it also questions its ability under Section R-58 of the Commercial Rules to issue the type of sanctions that OWFC seeks for the alleged misconduct.

expectation damages, reliance damages, restitution damages, compensatory damages, or punitive damages of any kind.

233. Consequently, all of OWFC's affirmative damages claims are denied on the merits.

## IV.    RESPONDENTS' COUNTERCLAIMS

234. The following Sections address Respondents' counterclaims and explain why some of those counterclaims must necessarily be granted, and why some are nevertheless denied on the merits.

235. Section A describes why Respondents have prevailed on their claim that OWFC materially breached the License Agreement by failing to pay license fees.

236. Section B explains why Respondents' claim for tortious interference with prospective economic advantage fails.

237. Section C addresses why Respondents' good faith and fair dealing claims fail on the merits.

238. Section D explains why Respondents are entitled to a declaration that the License Agreement is terminated.

239. Section E describes why Respondents are entitled to their costs, including reasonable attorneys' fees.

### A.    Respondents Have Established the Right to Damages for Unpaid License Fees

240. As OWFC's claims against Respondents for breach of their certification and performance obligations have failed, as well as OWFC's claim for fraudulent inducement of Addendum No. 8, and as OWFC has not asserted any other defenses to Respondents' corollary counterclaim for unpaid license fees, Respondents' counterclaim must necessarily succeed, because OWFC's only excuse for not paying those fees was OWFC's failed contention that Respondents' alleged breaches excused OWFC's performance.

241. Consequently, Respondents are entitled to the unpaid license fees that OWFC contractually agreed to pay in Addendum No. 8 to the License Agreement, but failed to pay.

242.    Addendum No. 8 was the final addendum to the License Agreement that the Parties executed, and in relevant part, OWFC agreed to two critical things in it.

a.    First, under Article 6, OWFC ceded exclusive territorial rights in several western hemisphere countries back to Respondents.[98]

b.    Second, in Articles 7 and 8, OWFC agreed to a new licensing fee structure.

243.    It is the latter concession that is most relevant to Respondents' unpaid license fee counterclaim.

244.    In Article 7, OWFC agreed that:

a.    In relation to the Philippines, "[o]n or before July 1, 2021," OWFC would pay KTC "an amount equal to twenty-five percent (25%) of the Country Group Total License Fee specified in *Appendix A Exclusive Territory – License Fees* for CG01 Philippines less any amount of License Fee previously paid by OWFC to KTC as of July 1, 2021, that "on or before December 31, 2022," OWFC would "pay KTC the remaining balance of License Fee for CG01," and that any failure to do so would result in OWFC losing its exclusive rights for the Philippines;[99] and

b.    In relation to India, "[o]n or before July 1, 2021," OWFC would pay KTC "an amount equal to twenty-five percent (25%) of the Country Group Total License Fee specified in *Appendix A Exclusive Territory – License Fees* for CG09 India less any amount of License Fee previously paid by OWFC to KTC as of July 1, 2021," that "on or before December 31, 2022," OWFC would "pay KTC the remaining balance of License Fee for CG09," and that any failure to do so would result in OWFC losing exclusive rights for India.[100]

---

[98]    *See* JB Resp. Ex. 25, Art. 6 (RESP000084) (stating that the "Parties hereby agree that the Western Hemisphere Country Groups (includes Country Groups CG22, CG23, CG24, CG25, CG26 and CG27 listed on attached *Appendix A Exclusive Territory License Fees*) are no longer territories held by OWFC under the Agreement").

[99]    *Id*., § 7.3 (RESP000085).

[100]    *Id*., § 7.4 (RESP000085).

- 51 -

245. Appendix A to Addendum No. 8 set forth the license fees by Country Group, which the Parties "Calculated At [*sic*] $2,593 per Million Population," and set the total License Fees for CG01/the Philippines at $285,230, and for CG09/India at $4,119,240.[101]

246. In Article 8, OWFC agreed to pay updated license fees for a number of other country groups – namely, "CG02 through CG08 and CG10 through CG21," or the "Remaining CGs."[102]

    a. In Section 8.3, OWFC agreed to issue purchase orders for containers of filters for each of the Remaining CGs.[103]

    b. Under Section 8.4, if OWFC failed to place orders "on or before July 1, 2021," then OWFC had the "option to make a payment for an amount equal to twenty-five percent (25%) of the specific Remaining CG Country Group Total License Fee specified in *Appendix A Exclusive Territory – License Fees* on or before July 1, 2021 (herein the "License Fee Advance") in which case OWFC maintains the OWFC exclusive rights for the specific Remaining CG."[104]

    c. Under Section 8.5, OWFC agreed that "[f]or each of the Remaining CGs for which OWFC maintains the OWFC exclusive rights, OWFC agrees to pay KTC the remaining balance of License Fees for each specific Remaining CG for which OWFC maintains the OWFC exclusive rights on or before December 31, 2022," and that "[f]ailure of OWFC to make the payment specified in this Clause 8.5 for any Remaining CG for which OWFC maintains the OWFC exclusive rights by December 31, 2022 will result in the termination of OWFC exclusive rights for the applicable Remaining CG for which OWFC previously maintained the OWFC exclusive rights."[105]

---

[101]    *See* JB Resp. Ex. 25, Appendix A (RESP000088 – RESP000089).

[102]    *Id*., Art. 8 (RESP000085).

[103]    *See id*., § 8.3 (RESP000086).

[104]    *See id*., § 8.4 (RESP000086).

[105]    *See id*., § 8.5 (RESP000086).

247. Appendix A stated the total license fees that OWFC would pay to Respondents for all country groups is $17,346,392.00, which includes the amounts set forth above for CG01 and CG09.[106]

248. There is no dispute between the Parties that OWFC did not:

    a.    Pay all of the license fees required by Sections 7.3 or 7.4 of Addendum No. 8;

    b.    Place orders in accordance with Section 8.3 of Addendum No. 8; or

    c.    Pay license fees in the amounts required by Sections 8.4 and 8.5 of Addendum No. 8.

249. Indeed, OWFC's only excuses for not taking those actions were that Respondents had:

    a.    Relieved OWFC of that obligation by materially breaching the License Agreement when Respondents supposedly failed to deliver filters that met certification and performance standards; and

    b.    Fraudulently induced OWFC to enter into Addendum No. 8.

250. As Sections III.A and III.D above already concluded, however, OWFC failed to prove those claims.

251. Consequently, OWFC's defenses to the payment of license fees fail, and Respondents' counterclaim on those points must necessarily succeed.

252. Respondents' Breach of Contract counterclaim is therefore granted on the merits.

253. Respondents have claimed the full $17,346,392 in license fees stated in Appendix A to Addendum No. 8 for that breach, as well as "pre-judgment interest of at least $726,272, for a total of at least $18,072,664" as of the date of their post-hearing submission (June 21, 2024) was provided to the Tribunal.[107]

---

[106]    *See* JB Resp. Ex. 25, Appendix A (RESP000089).

[107]    Respondents' Post-Hearing Brief, ¶ 40.  The Tribunal notes that Respondents do not appear to have credited any amounts that OWFC might have paid against the sums owed, but OWFC has not raised that point in defense, so the Tribunal does not address it either.

254. To support that damages claim, Respondents have submitted an expert report from Lewis Stark, CPA, CFE, dated January 27, 2023 ("**Stark Report**"), which largely follows the express terms of Addendum No. 8 for Respondents' breach of contract counterclaim.[108]

255. The Stark Report calculates the prejudgment interest that KTC claims on those unpaid license fees by using New York's statutory rate of 9%, which is found in Section 5004 of the New York Civil Practice Law and Rules, as measured from July 1, 2021 for the payment due, and December 31, 2022 for the "remaining balance of $13,009,794," to the date of that report (January 27, 2023).[109]

256. While the Tribunal does not see any reason to apply New York's statutory rate for court proceedings in this Arbitration, in the absence of any contrary suggestion of a different interest rate from OWFC, the Tribunal will apply the rate that Respondents have requested, and accepts the calculation that Respondents have provided.

257. However, while Respondents contended in their post-hearing submission dated June 21, 2024, that they were entitled to interest "of at least $726,272," which was the amount the Stark Report calculated as of January 27, 2023, Respondents made no effort to update their interest calculation in their Post-Hearing Written Submission from the one the Stark Report provided a year and half earlier, even though:

a. The interest calculation was a merits issue that required evidence from Respondents; and

b. Respondents were given a clear opportunity to update that interest calculation, at least to the date of their Post-Hearing Written Submission.[110]

258. Consequently, the Tribunal is constrained to accept the only interest calculation that Respondents have provided, which is the $726,272 figure stated in the Stark Report that Respondents offered.

---

108    *See* JB Resp. Ex. 36, Stark Report, ¶ 18 (RESP008003) (calculating licensing fees due under Articles 7 and 8 of Addendum No. 8). OWFC did not submit a competing quantum expert report.

109    *Id*., ¶ 19 (RESP008003 – RESP008004).

110    Respondents' Post-Hearing Brief, ¶ 40.

259. The Tribunal therefore grants Respondents' Breach of Contract counterclaim, and awards Respondents $17,346,392 in license fees, as well as pre-judgment interest of $726,272 on that amount, for a total of $18,072,664, as Respondents expressly requested.

**B.    Respondents' Claim for Tortious Interference with Prospective Economic Advantage Fails**

260. Respondents' counterclaim for tortious interference with prospective economic advantage fails because they have not shown that OWFC filed legal proceedings against Respondents solely out of malice or for a patently improper purpose, as New York law requires.

261. Respondents have alleged that OWFC tortiously interfered with a prospective business relationship by misusing Respondents' confidential information to "identify Respondents' potential business partners and to name those business partners in a lawsuit (JB 464) that was filed" in court in violation of the License Agreement's arbitration clause for "the express purpose of interfering with Respondents' business prospects (JB 332)."[111]

262. Effectively, Respondents allege that OWFC intentionally filed the proceedings that began this dispute in court against Respondents and potential business partners, instead of in an arbitration, so that OWFC could thwart any deal between Respondents and their potential partners, which had the actual effect of preventing a transaction.[112]

263. Respondents contend that they are entitled to approximately $2.9 million in damages for several years of lost filter sales, and that those amounts must be trebled as punitive damages, for a total award in excess of $7.3 million.[113]

264. To prove their claim for tortious interference with prospective economic advantage, Respondents must show that:

a.    Respondents had a third-party business relationship;

b.    OWFC knew of that relationship;

---

[111]    *Id.*, ¶ 65.

[112]    Respondents' Post-Hearing Brief, ¶¶ 66-69.

[113]    *Id.*, ¶¶ 70-73.  The Tribunal notes that it is stating the monetary figures as Respondents stated them.

c.      OWFC "acted solely out of malice, or used dishonest, unfair, or improper means" to interfere; and

d.      The averred interference harmed Respondents' business relationship.[114]

265.    "This tort is a difficult one to sustain, with requirements 'more demanding than those for interference with [the] performance of an existing contract.'"[115]

266.    The prosecution of a civil lawsuit can constitute tortious interference "'if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes the litigation in bad faith, intending only to harass the third parties and not bring his claim to definitive adjudication.'"[116]

267.    However, "[i]n all but the most egregious circumstances, 'dishonest, unfair, or improper means' must amount to misconduct that constitutes either a crime or an independent tort" for the behavior to be actionable,[117] and acts "motivated by economic self-interest are not ones taken solely out of malice."[118]

268.    The Tribunal need not go through each element to deny Respondents' tortious interference claim on the merits, because it finds that Respondents have presented insufficient evidence to meet the high burden to show that OWFC filed this action in court against them "solely out of malice," or used "dishonest, unfair, or improper means."

269.    While the Tribunal has largely disagreed with OWFC's case by denying its claims against Respondents, OWFC had more than a good faith basis for asserting its claims, and there is no question in the Tribunal's mind that OWFC in fact believes its positions, including that Dr. Koslow is a dishonest individual who defrauded it.[119]

---

[114]    *PKG Group, LLC v. Gama Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006) (quoting *Fine v. Dudley D. Doernberg & Co.*, 203 A.D.2d 419, 419 (N.Y. App. Div. 1994)).

[115]    *PKG Group, LLC*, 446 F. Supp. 2d at 251.

[116]    *NBT Bancorp v. Fleet/Norstar Fin. Group*, 553 N.Y.S.2d 864, 912 (N.Y. App. Div. 1990) (internal citations omitted).

[117]    *PKG Group, LLC*, 446 F. Supp. 2d at 251.

[118]    *Id.* (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)).

[119]    Moreover, OWFC's belief is not outrageous, and is supported by a previous court decision from Delaware that expressed a dim view of Dr. Koslow's character in another matter.

270. Moreover, while the Tribunal will not speculate about OWFC's motivations, OWFC could well have initially filed its claims in court in the belief that Respondents would be willing to proceed there, or in the belief that it was necessary or more efficient to do so when OWFC wished to assert third-party claims.

271. Regardless, Respondents have not established the exacting malice element of their tortious interference claim, or demonstrated that OWFC acted dishonestly, unfairly, or improperly such that OWFC committed a crime or independent tort, which requires Respondents' tortious interference claim to be denied on the merits.

### C.    Respondents' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Equally Infirm

272. Respondents' claim that OWFC breached the implied covenant of good faith and fair dealing by denying them the right to sell products in the Western Hemisphere in violation of Addendum No. 8 by filing court claims against them and their potential business partners equally fails.[120]

273. The elements of a claim for breach of the implied covenant of good faith and fair dealing are set forth in Paragraphs 194 through 197 above.

274. To prevail, Respondents would have to show that OWFC not only destroyed their right to receive the benefits of Addendum No. 8, but that Addendum No. 8 does not address Respondents' right to sell products in the Western Hemisphere.

275. Respondents cannot prevail on their claim, because they have not made either showing.

276. First, even if the Tribunal were to find that OWFC's bona fide belief that it had valid claims against Respondents for seeking to deal with third parties was wrong and impeded those actions, OWFC did not destroy Respondents' rights under Addendum No. 8, as Respondents are still free to sell products in the Western Hemisphere.

277. Second, Respondents' complaints clearly fall within the scope of the express terms of Addendum No. 8, so Respondents' remedy is not a claim for breach of the implied

---

[120]    *See* Respondents' Post-Hearing Brief, ¶ 74. Respondents' claim that they are entitled to unpaid license fees and interest on those amounts for OWFC continuing to assert exclusivity rights in the Western Hemisphere during this period is also denied on grounds that OWFC had a good faith basis for believing it still had those rights.

covenant, but one for breaching Addendum No. 8, which is a claim that Respondents have asserted.

278. Consequently, Respondents' claim for Breach of the Implied Covenant of Good Faith and Fair Dealing must be denied on the merits.

**D.    Respondents Are Entitled to a Declaration that the License Agreement Is Terminated**

279. Respondents are entitled to a declaration that the License Agreement is terminated in accordance with the express terms of Sections 5.4 and 5.15 of the License Agreement, which is hereby awarded and made.

280. Respondents have asserted that they are entitled to a declaration that the License Agreement is terminated, because OWFC materially breached by, amongst other things, failing to pay license fees.

281. As the Tribunal noted above, OWFC failed to pay license fees it owes for all country groups listed in Appendix A to Addendum No. 8, which effectively amounts to the entire world.

282. The failure to pay license fees constitutes a material breach under Section 5.4 of the License Agreement, which states that a "material breach of this [License] Agreement for a specific country or Country Group has occurred in the event that the total License Fee for a specific country or Country Group has not been paid in full by . . . [OWFC] to KTC."[121]

283. In the event of "this specific material breach, the country or Country Group in default of License Fee payment shall be deemed no longer licensed for use by . . . [OWFC] and KTC shall have the option to either allow . . . [OWFC] to continue supplying that country or Country Group or license a third party to assume such license rights."[122]

284. Moreover, Section 5.15 of the License Agreement provides that it can be terminated "as a result of an uncured Material Beach of the Agreement."[123]

---

[121]    JB Resp. Ex. 3, § 5.4 (RESP000007).

[122]    *Id*. (RESP000007).

[123]    *Id*., § 5.15 (RESP000011 – RESP000012).

285. Accordingly, as OWFC has materially breached by failing to pay license fees, and as OWFC has not cured that breach, Respondents are hereby awarded the right to exercise the remedies contractually set forth in Sections 5.4 and 5.15 of the License Agreement, which is hereby declared to be terminated as Respondents have requested.

### E.    Respondents Are Entitled to their Costs

286. Respondents are entitled to their costs, including reasonable attorneys' fees, in an amount that will be determined in a subsequent costs award, which will be issued after receiving further sequential costs submissions from the Parties pursuant to a schedule that the Tribunal will set in consultation with the Parties.

287. Section R-47(c) of the Commercial Rules requires the Tribunal to assess costs, and in this case, the Tribunal elects to do so against OWFC in an amount that the Tribunal will determine after entertaining costs submissions from the Parties, taking into account factors the Tribunal has previously identified in Procedural Order No. 7, which is discussed in Section II.B.14 above.

288. Additionally, while both Parties have asserted a right to attorneys' fees under New York law,[124] the most compelling point to the Tribunal is that the arbitration clause found in Section 5.19 of the License Agreement, which states in relevant part that "[a]ny decision or award as a result of any such arbitration proceeding . . . ***shall*** include the assessment of costs, expenses, and ***reasonable attorneys' fees*,**" expressly requires the Tribunal to consider and make an attorneys' fees determination.[125]

289. Consequently, while New York law might permit the award of attorneys' fees in this instance for other reasons, because the arbitration clause pursuant to which this matter was

---

[124]    *See* OWFC's Post-Hearing Written Submission, ¶ 344 (arguing for an award of attorneys' fees); Respondents' Post-Hearing Brief, ¶¶ 34, 188 (setting forth the basis for Respondents' attorneys' fees claim). The fact that all Parties have requested attorneys' fees also permits such an award under Section R-47(d)(ii) of the Commercial Rules.

[125]    JB Resp. Ex. 3, § 5.19 (RESP000013). The fact that the arbitration clause clearly states that attorneys' fees "shall" be assessed is a clear factor New York courts consider in allowing such an award. *See Sage Sys., Inc. v. Liss*, 39 N.Y.3d 27, 30-31 (N.Y. Ct. App. 2022) (discussing when contractual language properly derogates the American Rule on attorneys' fees to allow an attorneys' fee award).

commenced and from which the Tribunal derives its authority expressly obligates the Tribunal to address that issue, such an award is hereby made.

290. Based on a variety of factors, the Tribunal determines that Respondents are entitled to reasonable attorneys' fees.

291. The Tribunal does not, however, currently decide in what amount, and invites the Parties to address that amount in the costs submissions they will sequentially submit, keeping in mind the factors the Tribunal previously identified for them in Procedural Order No. 7, which is discussed in Section II.B.14 above.

292. Accordingly, Respondents are awarded their costs, including reasonable attorneys' fees, in an amount that will be decided after further costs submissions are provided according to a schedule that will be set in consultation with the Parties.

## V.    PARTIAL FINAL AWARD

293. For the reasons set forth above, the Tribunal hereby awards as follows:

   a.    OWFC's affirmative claims are all denied on the merits;

   b.    Respondents' breach of contract counterclaim for unpaid license fees is granted;

   c.    Respondents are awarded damages of $17,346,392.00 in unpaid license fees for that counterclaim;

   d.    Respondents are awarded pre-judgment interest of $726,272.00 on that amount for that counterclaim;

   e.    The License Agreement is hereby declared to be terminated;

   f.    Respondents' request for costs and expenses, including reasonable attorneys' fees, is granted in an amount that will be determined after costs submissions are provided by the Parties;

   g.    Respondents' other remaining counterclaims are all denied on the merits; and

   h.    All sums set forth above are to be paid in immediately available United States Dollars within thirty calendar days of the subsequent costs award being issued.

294. Any other claims, counterclaims, or defenses on the merits that are not specifically referenced above are hereby denied on the merits.

295. The foregoing is a Partial Final Award that finally resolves the issues it addresses, with jurisdiction reserved to decide the remaining issues of fees and costs in the Tribunal's final award.

296. This Partial Final Award may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

297. The Parties are directed to attend a virtual conference with the Tribunal to be held at 10:00 EDT on October 31, 2024 for the purpose of establishing a schedule for the sequential exchange of costs submissions.

298. The Tribunal hereby certifies that, for the purposes of Article I of the 1958 United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, United States of America.

Dated: October 28, 2024
New York, New York

_____          _____          _____
Michele S. Riley                   James P. Duffy IV                   Stephen P. Gilbert
Arbitrator                         Tribunal Chair                     Arbitrator

State of New York ) 
                        ) SS:
County of New York )

I, Michele S. Riley, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

Date: October 28 2024                               _____
                                                    Arbitrator

State of New York )
                        ) SS:
County of New York )

I, James P Duffy IV, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

Date: October 28, 2024                               _____
                                                    Arbitrator

State of New York )
                        ) SS:
County of Westchester )

I, Stephen P. Gilbert, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

Date: October 28, 2024                               _____
                                                    Arbitrator